**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| DANIEL LEE SIEBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No.  2:07-cv-295-MEF |
| | ) |
| RICHARD ALLEN, Commissioner, | ) |
| Alabama Department of | ) |
| Corrections, et al., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Defendants Richard Allen, et al., respectfully move this Court to dismiss this action on grounds that the claims asserted by Siebert are time-barred and they state no claim upon which relief can be granted.  In support of this motion, defendants state the following:

### I.    LEGAL STANDARD

When considering a motion to dismiss, a trial court accepts the allegations in the complaint as true, construing them in a light most favorable to the plaintiff. Sibley v. Lando, 437 F.3d 1067, 1070 (11th Cir. 2005). "Motions to dismiss are granted 'when the movant demonstrates beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle
him to relief.'" Id. (citations omitted).

Siebert brings this claim pursuant to 42 U.S.C. § 1983
and alleges that the manner in which Alabama carries out
executions by lethal injection violates his rights under
the Eighth Amendment to the United States Constitution.
See Doc. 1. Defendants deny that Alabama's execution
procedures violate the United States Constitution; deny
that the procedures in place present an unreasonable risk
of unnecessary pain and suffering; deny that the procedures
call for the use of excessive force, sadistic acts, or
malicious intent; deny that the procedures violate basic
principles of human dignity or contemporary standards of
decency; deny that the procedures are repugnant to the
conscience of mankind; and deny that defendants show
intentional, reckless indifference to acts violating
Siebert's constitutional rights. Nonetheless, even
assuming the facts alleged in the Complaint to be true,
Siebert's claims are due to be dismissed because they were
asserted too late – after the end of habeas review and
years after Siebert knew or should have known of his claim.

In addition, the complaint should be dismissed because it fails to state a claim upon which relief can be granted.

## II. BACKGROUND OF SIEBERT'S CRIME, CONVICTION, AND LITIGATION

The facts of Siebert's crime are set forth in the in the Alabama Court of Criminal Appeals's opinion which affirmed his conviction and sentence of death as follows:

> [I]n late December 1985, Donald Hendron left Los Angeles, California, driving east.  Hendron was going first to North Carolina to visit his family, and then to Talladega, Alabama, where he was to operate a theater program at the Alabama Institute for the Deaf and Blind (hereinafter referred to as the Institute).  In Tucson, Arizona, Hendron picked up a man who identified himself as Danial Spence. Hendron identified the appellant as that man. Appellant, who was an artist, discussed his views on art with Hendron and showed him some of his work.  Hendron was impressed with appellant's talent and asked him to come to Talladega and work with the theater program as a set designer. Appellant readily agreed, but stated that he wished to visit his mother in Illinois before going to Talladega.  Hendron and appellant parted company just north of Jackson, Mississippi.  Appellant was hitchhiking north to Illinois.  Hendron continued driving east to North Carolina.  Hendron arrived in Talladega on January 9, 1986.  Appellant arrived there on January 20, 1986.
>
> Hendron and appellant first shared an apartment at the Institute, then moved into another apartment in the Porter Building approximately a week and a half later.  Appellant expressed to Hendron an interest in settling down in Talladega. Shortly after the two men moved into the Porter Building, appellant began dating Sherri Weathers, a 24-year-old deaf student at the Institute.  Because

such a relationship was specifically prohibited by the Institute's rules, Hendron wished to separate himself from this situation, and moved out of the Porter Building apartment on February 16, 1986. Hendron and appellant saw each other for the last time on February 19, 1986, when Hendron arranged to pick up appellant around 8:00 a.m. the next morning to attend a faculty meeting. When Hendron went by the Porter Building the next morning, however, appellant was not there.

In February 1986, Sherri Weathers was living in apartment 30 of the Sunrise Apartments with her sons, five-year-old Chad and four-year-old Joey. Around 8:00 p.m. on February 19, 1989 [sic], appellant was seen with Sherri Weathers and a neighbor of hers, Linda Jarman, buying beer at a convenience store in Talladega. The three left the convenience store together. Fettus Porter, a neighbor of Sherri's, returned home around 9:30 p.m. that night and found a note from Sherri asking him to come over and play cards with her, Linda Jarman, and appellant. Porter went over to Sherri's apartment around 10:30 p.m., where he found Sherri and Linda chatting. They told Porter that appellant had left in Linda's car, a cream-colored Buick, to get some beer, and said they all were going to play cards when appellant returned. Porter remained at the apartment until about 11:30 or midnight. When he left to go back to his apartment, appellant still had not returned.

Sometime during the night of February 19, 1986, Catherine Elaine Shellborne, who lived next door to Sherri Weathers in apartment 31 of the Sunrise apartments, heard through her wall adjoining Sherri's apartment a man saying "Come to me. You can join your mother." Later, she heard the man say, "Come on and you will be with your mother and your brother."

Billy Kyle, another resident of the Sunrise Apartments, saw Sherri Weathers fighting with appellant in her apartment on the night of February

19, 1986.  When asked what time he observed them fighting, Billy, a mildly retarded deaf man, could only say that it was sometime after 8:00 p.m., the time he arrived home.  By Sunday, February 23, 1986, Billy had not seen Sherri or her children around the apartments. Remembering the fight he had seen between Sherri and appellant in her apartment on Wednesday night, Billy tried to check on Sherri, but could summon no one to the door of apartment 30.  By this time Billy was extremely concerned about the welfare of Sherri and her children, so he entered Sherri's apartment through an unsecured window, but when he saw a part of Sherri's body protruding out from under a sheet, he became scared and left.  Billy Kyle was later cleared by the police of any involvement in the murders.

The next morning, however, Billy told Wanda Hunley, an Institute social worker, that he was concerned about Sherri and asked her to check on Sherri and her sons.  After making several phone calls, she learned that no one had seen Sherri or her children in several days.  She also learned that there was an odor emanating from apartment 30.  Ms. Hunley, accompanied by several other individuals, then went to the Sunrise Apartments and obtained a passkey for apartment 30.  Upon entering the apartment, Ms. Hunley and the others found the bodies of Sherri, Chad, and Joey Weathers.

Autopsies of the bodies of the three people disclosed that Sherri Weathers died as the result of strangulation, and that Chad and Joey Weathers died as the result of ligature strangulation.

An extensive investigation was launched. During this investigation, shoe prints were lifted from apartment 30 and from the appellant's apartment in the Porter Building.  The shoe print from the Porter Building apartment and some of those from Sherri's apartment were found to be consistent in tread design and approximate size.

Additionally, a child's pajama bottom was found in appellant's Porter Building apartment.

In March 1986, a 1973 Buick was found abandoned near Elizabethtown, Kentucky. A black purse in this car contained a receipt bearing the name of Sherri Weathers. Also found in the car was a brass key which opened the door to appellant's Porter Building apartment. At an abandoned campsite near the Buick were found business cards bearing the name Danial Spence and the address of his Porter Building apartment; various photographs of Sherri Weathers; a mailgram addressed to Don Hendron; a birth certificate bearing the name Danny Ray Spence; other items bearing the name Danial Spence; two sheets of white paper on which appeared the names Sherri Weathers, Chad Weathers, and Joseph Weathers; and an art pad bearing the name Sherri Weathers. Various items of clothing found at the Kentucky site were found to contain fibers of the same type as the red carpet in appellant's Porter Building apartment. Finally, two fingerprints and a palm print discovered on the Buick were identified as those of the appellant, Danial L. Siebert.

In March 10, 1986, appellant identified himself in New Jersey to Harold Hutchins of the Atlantic City Police Department, using a Social Security card bearing the name of Chad Weathers.

On June 14, 1986, appellant identified himself in Virginia to Joseph McLaughlin of the New Kent County Sheriff's Department, using a Social Security card bearing the name of Joseph Charles Weathers.

Appellant was finally apprehended in Hurricane Mills, Tennessee, on September 5, 1986. At the time of his arrest, appellant had in his possession a Social Security card bearing the name of Joseph C. Weathers, and a torn manila envelope on which appeared the following: "-eathers, Joseph."

After appellant was advised of his Miranda rights and waived those rights, he made a statement, the pertinent part of which follows:

> He went to Sherri Weathers's apartment on the evening of February 19, 1986, and let himself in with a key which he had been given. Sherri and Linda Jarman were there. Eventually, Linda left. As he and Sherri were walking toward her bedroom, he strangled her with a piece of cloth that he had on his person. Then he woke up each of the boys individually and strangled them. He left town in a car, which he abandoned in Kentucky after it had two flat tires. After spending a couple of days at a campsite he set up near the car, he headed north and then went east, in an attempt to get as far away from Alabama as he could.

> Thereafter, appellant waived his right to formal extradition proceedings and was returned to Alabama to stand trial for the murders of Sherri, Chad, and Joey Weathers. We note that appellant has also been convicted of the capital murder of Linda Jarman and received the death sentence. His conviction and sentence have been affirmed by this court. Siebert v. State [Ms. 7 Div. 851, April 14, 1989] (Ala. Crim. App. 1989).

Siebert v. State, 555 So. 2d 772, 773-75 (Ala. Crim.

App. 1989), aff'd, Ex parte Siebert, 555 So. 2d 780

(Ala. 1989).

Siebert then began a twenty-one-year odyssey through

the state and federal court system where his sentence and

conviction were affirmed at every turn. His last avenue

for post-conviction review, federal habeas corpus, ended on

March 19, 2007, when the United States Supreme Court denied

Siebert's petition for a writ of certiorari. Siebert v. Allen, 127 S. Ct. 1823 (2007). Only then – nineteen years after his conviction and five years after he knew that Alabama would use lethal injection as the method of his execution – did Siebert file this § 1983 action. Siebert's complaint does not contain any statement regarding why he waited to file his § 1983 lawsuit until his federal habeas challenge came to conclusion. In fact, the complaint appears to be a "cookie-cutter" pleading that could have been filed years before. Siebert's complaint appears be virtually identical to a complaint recently dismissed on laches grounds by another district judge in this district. See Grayson v. Allen, 2007 WL 1491009 (M.D. Ala. May 21, 2007)(Slip Copy).

The timing of relevant events is summarized as follows:

June 17, 1987       Siebert convicted of capital murder.

August 19, 1987     Siebert sentenced to death.

April 28, 1989      Alabama Court of Criminal Appeals affirmed Siebert's conviction and sentence of death. Siebert v. State, 555 So. 2d 772 (Ala. Crim. App. 1989).

December 15, 1989   Alabama Supreme Court affirmed Siebert's conviction and sentence of death. Ex parte Siebert, 555 So. 2d 780 (Ala. 1989).

| | |
|---|---|
| June 28, 1990 | United States Supreme Court denied petition for a writ of certiorari. Siebert v. Alabama, 497 U.S. 1032 (1990). |
| June 25, 1992 | Siebert filed Rule 32 post-conviction petition in state court. |
| December 29, 1998 | State trial court denied Rule 32 petition. |
| December 30, 1999 | Alabama Court of Criminal Appeals affirmed the denial of post-conviction relief.  Siebert v. State, 778 So. 2d 842 (Ala.Crim.App.1999). |
| September 15, 2000 | Supreme Court of Alabama denied petition for writ of certiorari.  Ex parte Siebert, 778 So. 2d 857 (Ala. 2000). |
| September 14, 2001 | Siebert filed petition for writ of habeas corpus with the United States District Court for the Middle District of Alabama.[1] |
| July 1, 2002 | Alabama adopted lethal injection as the method of execution (inmates then on death row given thirty days to affirmatively elect electrocution as method of execution). |
| July 31, 2002 | Siebert failed to affirmatively elect electrocution as method of execution. |
| October 4, 2005 | District Court denied relief of Siebert's § 2254 petition. |
| July 13, 2006 | United States Court of Appeals for the Eleventh Circuit affirmed district court's judgment.  Siebert v. Allen, 455 F.3d 1269 (11th Cir. 2006). |

---

[1] That same day, Siebert filed a habeas petition in the United States District Court for the Northern District of Alabama, challenging his conviction in Talladega County for the capital murder of Linda Jarman and his resulting death sentence for that murder.  Because those proceedings are limited to Siebert's Talladega County conviction and death sentence, they have no bearing on his Lee County conviction and death sentence, for which he has exhausted all three layers of appellate review.

March 19, 2007    United States Supreme Court denied
                  petition for writ of certiorari. <u>Siebert
                  v. Allen</u>, 127 S. Ct. 1823 (2007).

April 9, 2007     Siebert filed the above-styled § 1983
                  action.

April 17, 2007    The State of Alabama filed its motion to
                  set an execution date. <u>See</u> Motion to Set
                  an Execution Date, attached as Exhibit A.

On these facts, Siebert's complaint is time-barred, whether by operation of the statute of limitations or laches. In addition, Siebert fails to state a claim upon which relief can be granted. His complaint is therefore due to be dismissed.

## III. THE STATUTE OF LIMITATIONS RELATING TO SIEBERT'S § 1983 COMPLAINT EXPIRED IN 2004

Siebert's § 1983 action challenging Alabama's method of execution should be dismissed because it was filed after the applicable statute of limitations had expired. Actions filed pursuant to § 1983 are subject to a period of limitations concurrent with "the personal injury limitations period of the [forum] state." <u>Rozar v. Mullis</u>, 85 F.3d 556, 561 (11th Cir. 1996) (citing <u>Wilson v. Garcia</u>, 471 U.S. 261, 269, 105 S.Ct. 1938, 1943 (1985)). Personal injury actions in Alabama are subject to a two-year statute of limitation. <u>See</u> Ala. Code § 6-2-38(l) (2005). Thus, Siebert's § 1983 challenge to Alabama's method of execution

is barred if it was filed more than two years after the limitations period began to run.

Although the length of the limitations period is left to state law, "[t]he question of when the limitations period begins to run is one of federal law." Uboh v. Reno, 141 F.3d 1000, 1002 (11th Cir. 1998)(citing Wilson v. Garcia, 471 U.S. 261, 268-71, 105 S. Ct. 1938, 1942-44, 85 L. Ed.2d 254 (1985)). Federal law applies an accrual-based standard to the running of periods of limitation. For claims filed under § 1983, the Eleventh Circuit has held that "[the] statute of limitations begins to run when the cause of action accrues." Uboh, 141 F.3d at 1002; see also Kelly v. Serna, 87 F.3d 1235, 1239-40 (11th Cir. 1996) (same). That is "the statute of limitations begins to run from the date 'the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" Brown v. Georgia Bd. of Pardons & Paroles, 335 F.3d 1259, 1261 (11th Cir. 2003) (quoting Rozar v. Mullis, 85 F.3d 556, 561-62 (11th Cir. 1996)); see also Williams v. City of Tampa Police Dept., No. 06-12978, 2007 WL 412978, at *1 (11th Cir. 2007) (unreported opinion) ("The statute of

limitations accrues 'from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'"); Lovett v. Ray, 327 F.3d 1181, 1182-83 (11th Cir. 2003) (holding that the statute of limitation for a prisoner § 1983 challenge to the State's decision to alter the frequency with which it considers parole began to run when the prisoner "knew, or should have known, all of the facts necessary to pursue a cause of action"). As the Supreme Court reiterated in Wallace v. Kato, "the standard rule [is] that [accrual occurs] when the plaintiff has 'a complete and present cause of action.'" Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007) (quoting Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997) (quoting Rawlings v. Ray, 312 U.S. 96, 98 (1941))). "[T]hat is, [accrual occurs] when 'the plaintiff can file suit and obtain relief.'" Wallace, 127 S. Ct. at 1095 (quoting Bay Area Laundry, 522 U.S. at 201)).

The Eleventh Circuit recently applied the above detailed statute of limitations principles in Lesley v. David, 186 Fed. Appx. 926, 2006 WL 1760816, at *1 (11h Cir.

(June 28, 2006) (unpublished opinion).  Inmate Arlen Leslie was informed in June 1999 that he was eligible for parole in November 2005.  Id.  The next month (July 1999), however, the Florida Parole Commission "instituted new, harsher parole guidelines, resulting in a new parole date of November 2030."  Id.  Leslie was informed of the new guidelines and his new parole date in 1999.  Id.  Leslie was again informed of the guidelines change in 2004.  Id.

Shortly thereafter, the Supreme Court in Wilkinson v. Dotson, 544 U.S. 74 (2005), held that "habeas corpus petitions were not the exclusive remedy for prisoners seeking declaratory or injunctive relief for parole eligibility decisions."  Lesley, 2006 WL 1760816, at *1. Thus, in September 2005, Lesley filed a § 1983 action claiming that the new guidelines violated the Ex Post Facto, Due Process, and Equal Protection Clauses, and sought "a declaratory judgment and injunctive relief" to force Florida to reinstate his previous parole date.  See Lesley v. David, No. 405-CV-00343-MP/WCS, 2005 WL 3536276, at *1-2 (N.D. Fla. Dec. 23, 2005).

Applying the standard that a statute of limitations begins to run on § 1983 claims when "the facts which would

support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights," the district court dismissed Leslie's action as time-barred under Florida's four-year statute of limitation because he learned of the guidelines change in June 1999. Id. at *3. The Eleventh Circuit affirmed, holding that Leslie's cause of action accrued once the Florida's guidelines changed and Leslie discovered the change affected him. Id. at *2-3. Furthermore, the Leslie Court rejected the argument that the accrual date did not begin until the Supreme Court's decision in Wilkinson alerted Lesley that § 1983 might be a possible avenue to raise his claim. Id. at *3, n.1.

Recently, the Sixth Circuit, in Cooey v. Strickland, determined that a death row inmate's § 1983 method-of-execution challenge accrues for statute-of-limitation purposes at the conclusion of direct review – when the sentence becomes final - or when the State elects lethal injection as its method of execution.[2] Cooey v. Strickland,

---

[2] The Cooey case appears to be the only reported decision of a federal appeals court addressing the issue of when a death-row inmate's § 1983 method-of-execution challenge accrues for statute of limitation purposes. However, in a recent case ruling that Missouri's execution protocol is constitutional, the Eight Circuit emphasized that the State had not raised "timeliness" as an issue. See Taylor v. Crawford, --- F.3d ----, 2007 WL 1583874 (8th Cir. June 4, 2007).

479 F.3d 412, 422 (6th Cir. 2007), rehearing denied, Cooey v. Strickland, --- F.3d ----, 2007 WL 1574663 (6th Cir. June 1, 2007). In accord with Wallace, 127 S. Ct. at 1095, and Brown, 335 F.3d at 1261, the Cooey Court "look[ed] to the event that should have alerted the typical lay person to protect his or her rights." Id. at 416 (internal citation and punctuation omitted). The Cooey Court stated that "the most logical choice of a triggering event is the point when the death penalty is ordered, upon judgment of conviction and sentence." Id. at 418. To support its conclusion, the Cooey court cited a Fifth Circuit decision that holds that a method-of-execution claim may be raised any time after the inmate's conviction becomes final on direct appeal. Id. (citing Neville v. Johnson, 440 F.3d 221, 222 (5th Cir. 2006)). In addition, the Cooey Court emphasized that this triggering date mirrored the one found in 28 U.S.C. § 2244(d)(1)(A): "upon conclusion of direct review in the state court or the expiration of time for seeking such review." Id. at 422. Under that particular triggering event, the inmate's claim in Cooey would have accrued in 1991, after the United States Supreme Court denied direct review.

Because Ohio did not adopt lethal injection as a method of execution until 1993, or make it the exclusive method of execution until 2001, the Cooey Court held that "the accrual date must be adjusted because Cooey obviously could not have discovered the injury until one of those two dates." Id. at 422. Thus, Cooey held that the statute of limitations for § 1983 actions challenging a State's method of executions begins to run when the State adopts the method challenged or at the conclusion of the plaintiff's direct appeal, which ever is later. Id.

Applying the holdings of Wallace, Brown, and Cooey to this case, Siebert's lawsuit should be dismissed because it was filed after the statute of limitations had expired. Under precedent from the Eleventh Circuit, Siebert's two-year "statute of limitations [began] to run [when] 'the facts which would support [this cause of action became] apparent or should [have been] apparent to a person with a reasonably prudent regard for his rights." Brown, 335 F.3d at 1261. The facts which would support Siebert's § 1983 challenge to Alabama's method of execution became apparent or should have been apparent on July 1, 2002, when Alabama changed its primary method of execution to lethal

injection.    See Ala. Code § 15-18-82.1 (2006 Cumulative Supplement).    Siebert, therefore, had "a complete and present cause of action," and could have filed this action and obtained relief at that point.    Wallace, 127 S. Ct. at 1095; cf. Rutherford v. McDonough, 466 F.3d 970, 975 (11th Cir. 2006), cert. denied, 127 S.Ct. 465 (2006) (holding that Rutherford could have filed as early as 2000 when he knew or should have known of the claim); Jones v. Allen, 485 F.3d 635, 640 (11th Cir. 2007) ("We see no convincing reason why, after Alabama made lethal injection its primary method of execution, Jones could not have brought his method-of-execution challenge sooner than he did. Jones knew of the State's intention to execute him at least by July 2002."); Gomez v. United States Dist. Court for Northern Dist. of Cal., 503 U.S. 653, 654 (1992) (holding that a claimant's § 1983 action challenging the constitutionality of California's method of execution (gas) "could have been brought more than a decade ago").    Thus, the two-year statute of limitations for Siebert's § 1983 action challenging lethal injection as Alabama's method of execution began to run on July 1, 2002, when Alabama changed its primary method of execution to lethal

injection, or, alternatively, no later than July 31, 2002, when Siebert failed to affirmatively select electrocution as his method of execution.  See Ala. Code § 15-18-82.1 (2006 Cumulative Supplement).

Using these triggering dates, any claim filed after July 1, 2004, or July 31, 2004, is untimely.  Siebert knew on July 1, 2002, that Alabama changed its method of execution to lethal injection and knew on July 31, 2002, when he did not affirmatively select electrocution as a method of execution, that lethal injection was the method of execution that will be used during his execution; therefore, Siebert could have and should have filed his action, at a minimum, by July 31, 2004.  Under either triggering date, Siebert filed his complaint much too late.

Most of these same arguments were recently presented in Jones v. Allen, 483 F. Supp. 2d 1142, (M.D. Ala. 2007), and Grayson v. Allen, No. 2:06-cv-1032-WKW, 2007 WL 1491009 (M.D. Ala. May 21, 2007).  The inmate in Jones filed a § 1983 claim virtually identical to the one presented here and did so while his petition for certiorari was pending in the United States Supreme Court.  Defendants moved for summary judgment soon after the Cooey decision was released and

argued that Jones's claim was barred by the statute of limitations. Jones, 483 F.Supp.2d at 1145. The district court in Jones, although denying Jones's motion for a stay of execution, ruled that the statute of limitations was no bar to Jones's claim. Jones, 483 F. Supp. 2d at 1145-51. The essence of the district court's ruling in Jones was that a claim requesting injunctive relief to prevent an unconstitutionally tortious act from occurring in the future cannot be barred by a statute of limitations. Jones at 1147. The district court in Grayson adopted in full the holding of Jones regarding the statute-of-limitations defense. Grayson at *5. This Court should not follow those rulings for the reasons stated below.

The district court's ruling in Jones is incorrect primarily because it wrongfully focuses on the inmate's actual execution. However, Siebert is not challenging his execution but rather is challenging the execution protocol. See Doc. 1. Siebert's execution is not necessary to file a § 1983 method-of-execution claim and (potentially) obtain relief.

Consequently, a method-of-execution cause of action accrues well before the inmate is executed. And because

federal law holds that the limitation period begins to run when a § 1983 cause of action accrues, the district court in _Jones_ is wrong to say the limitations period fails to run until the inmate is executed (and, consequently, that it never runs at all).

With respect, the district court in _Jones_ missed the true nature of method-of-execution claims. According to the court in _Jones_, Siebert's cause of action is tort-based and, therefore, cannot accrue until the plaintiff suffers an injury during his execution. See _Jones_ at 1147 ("such a claim cannot be barred by the statute of limitations because the tortious act has not yet occurred and the tort is not yet complete").

But, this action is not based on a tort arising from an execution. It cannot be. If Siebert were seeking tort-based damages for suffering a cruel and unusual punishment, his claim would be immediately dismissed for failing to state a cause of action because he has yet to be executed and suffer an injury.

And, just as importantly, if Siebert was attacking his actual execution, instead of the protocol used to implement his execution (which is what he truly challenges), this

claim would be properly dismissed as a successive habeas petition. In allowing method-of-execution claims under § 1983, the Supreme Court has made clear that the relief sought in a § 1983 action cannot attack or foreclose the plaintiff's actual execution. See Hill, 126 S.Ct. at 2102; Nelson, 541 U.S. at 647-48 (ruling that because such challenges are brought under § 1983, which authorizes challenges to conditions of confinement, the inmate cannot challenge lethal injection as unconstitutional per se); see also Hutcherson, 468 F.3d at 754 ("Simply put, if the relief sought by the inmate would either invalidate his conviction or sentence or change the nature or duration of his sentence, the inmate's claim must be raised in a § 2254 habeas petition, not a § 1983 civil rights action.").

Consequently, Siebert's § 1983 suit is a challenge to Alabama's protocol – specifically, the drugs it uses and how it implements those drugs. To raise this challenge, Siebert does not have to be executed first. Thus, Siebert could have (and did) file his cause of action before he was executed.

Because the focus of the plaintiff's lawsuit is the State's method of execution, not the execution itself, the

"the facts which would support [his] cause of action [became] apparent or should [have been] apparent to a person with a reasonably prudent regard for his rights," Brown, 335 F.3d at 1261, when Alabama changed its method of execution to lethal injection. Thus, the statute of limitation begins to run when the plaintiff's sentence is final – at the conclusion of direct review – and the State has adopted the method of execution under attack. Consequently, the Jones Court erred in holding that there is no statute of limitations for § 1983 challenges to lethal injection and that opinion should not be followed.

Furthermore, the Jones Court erroneously held that choosing a date on which the statute of limitations begins to run is arbitrary. Jones, 483 F. Supp. 2d at 1149. Contrary to that Court's holding, there is nothing arbitrary in applying binding case law and holding that the statute of limitation for a plaintiff's action begins to run when he has "a complete and present cause of action." Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007). Applying this simple principle, a plaintiff has two years from the date on which he could have "file[d] suit and obtain[ed] relief.'" Wallace, 127 S. Ct. at 1095.

In short, the defendants respectfully request that this Court adopt the well-reasoned holding in Cooey and dismiss Siebert's action because it is barred by the applicable statute of limitations.

## IV.  SIEBERT'S CLAIMS ARE ALSO BARRED BY LACHES

Siebert's claims are also due to be dismissed based on the doctrine of laches.[3]  A claim is barred by laches if the following three elements are present: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted."  Kason Indus., Inc. v. Component hardware Group, Inc., 120 F.3d 1199, 1203 (11th Cir. 1997).  The first two elements are met because Siebert knew or should have known of his claim in 2002 when his sentence changed to lethal injection by operation of law.  At that time, he had a petition for a writ of habeas corpus pending in district court.  He could have asserted his claims much earlier and there is no excuse for his having failed to do so.

The unreasonable delay has likewise caused defendants

---

[3] Siebert may argue that defendants' two theories, laches and statute of limitations, are inconsistent.  To that extent, defendants' grounds should be considered as alternative theories.

undue prejudice.  The district court in <u>Grayson</u> dismissed a lethal-injection suit on laches grounds ruling that the delay in filing caused the State undue prejudice "on two fronts."  <u>Grayson</u> at *9.  First, at the conclusion of federal post-conviction review the State has an "added moral dimension" "in meting out a sentence of death in a timely manner."  <u>Id.</u> (quoting <u>Calderon v. Thompson</u>, 523 U.S. 538, 556 (1998)).  "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike."  <u>Grayson</u> at *9 (quoting <u>Calderon</u>, 523 U.S. at 556).  Second, defendants are prejudiced because the case would have to be placed on a "fast-track" in order to litigate it so that a stay of execution would not have to be granted.  <u>Grayson</u> at *10.[4] Siebert, and Siebert alone, controlled when he filed his lawsuit and he chose to file it a point when the courts and the parties would have to expedite their schedules in order to litigate the late-filed claim.  "Expedited litigation taxes the resources and schedules of the defendants."

---

[4] The State moved for an execution date on April 17, 2007.  Presumably, the Alabama Supreme Court will soon set Siebert's execution.  Thus, it is not possible to see this litigation through conclusion, including all appeals, unless Siebert is granted a stay of execution.

*Grayson* at \*10.  "Moreover, expedited cases create future inefficiencies, including the specter of each inmate demanding late in the day the same consideration given to Grayson."  *Id.*  This Court should follow *Grayson* and dismiss this case on laches grounds.

### A.  Siebert's Late-Filed Claim Causes Prejudice Because the State Cannot Enforce Its Judgment If Siebert Is Allowed To Fully Adjudicate his Claim

The State is prejudiced because Siebert's sentence cannot be carried out in a timely manner if this lawsuit is fully adjudicated including appeals.  The State has a legitimate expectation that it will be able to carry out a death sentence at the conclusion of federal habeas review. The Eleventh Circuit has recently reiterated the State's expectation in expeditiously carrying out its duly-adjudicated judgments:

> It is common practice in Alabama for the State to seek an execution date soon after the Supreme Court denied certiorari review of an inmate's federal habeas petition.  As a matter of common sense, completion of collateral review eliminates the last possible obstacle to execution, and Jones should have foreseen that the execution date would likely be set promptly upon completion of collateral review.

Jones at 639 n.2.  See also Grayson at *9 (quoting Jones,
485 F.3d at 641)("We will not interfere with the State's
strong interest in enforcing its judgment in this case.");
id. (quoting Grayson, 460 F.3d at 1342 ("The government has
a strong interest in the finality of duly adjudicated
criminal judgments."); id. (quoting Thompson v. Wainwright,
714 F.2d 1495, 1506 (11th Cir. 1983)("Each delay, for its
span, is a commutation of a death sentence to one of
imprisonment.").

The State suffers undue prejudice based on the "change
of circumstances" between the time Siebert should have filed
his lethal-injection challenge and the time he actually did.
Grayson at *9.  The "change of circumstances" is brought
about because the State here has a legitimate and legally
recognized expectation that justice will finally be served.
Siebert's late-filed claim, if litigated to conclusion, will
impede the State's interest in carrying out its judgment.
"He who would invoke laches must show a delay which has
subjected him to a disadvantage in asserting and
establishing his claimed right or defense."  Esso
International, Inc. v. SS Captain John, 443 F.2d 1144, 1150
(5th Cir. 1971).  The State here has a "claimed right" (in

fact, a right recognized by the Eleventh Circuit and the Supreme Court) to carry out its duly-adjudicated judgment.

Siebert filed his lethal-injection challenge over four years after Alabama changed its method of execution to lethal injection and after his federal habeas appeals concluded. As recognized by the Supreme Court, the State has a "moral" interest "in meting out a sentence of death in a timely manner" when post-trial proceedings have run their course. Grayson at *9 (quoting Calderon, 523 U.S. at 556). The delay in filing thus causes prejudice because the State cannot carry out Siebert's sentence if his late-filed claim is fully adjudicated.

The timing of Siebert's filing leads ineluctably to the conclusion that his primary purpose for filing his lawsuit is to forestall his execution. The Eleventh Circuit, in the similar circumstances presented in Jones ruled that: "[b]y waiting until November 2006 to file his challenge to the State's lethal injection protocol, Jones 'leaves little doubt that the real purpose behind his claim is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out.'" Jones, 485 F.3d at 640. If Siebert were truly interested in challenging

Alabama's method of execution, he would have filed his lawsuit so that it could be litigated without the entry of a stay or without the time pressures created by his delay. By filing his § 1983 action when he did, Siebert implicitly asserts that he is entitled to what amounts to a fourth layer of appeal.

Siebert is following in the footsteps of other § 1983 death-row inmates who filed at the conclusion of habeas review and successfully delayed (or prevented, as the case may be) their executions. One of those individuals, Danny Bradley, filed a § 1983 action on June 26, 2001, at the conclusion of his federal post-conviction appeals seeking DNA testing. See Bradley v. Nagle, 2:01-cv-01601-SLB (N.D. Ala.) After that complaint was dismissed, the Eleventh Circuit reversed – ruling that claims seeking post-conviction access to biological evidence for DNA testing purposes may be brought in § 1983 actions. Bradly v. Pryor, 305 F.3d 1287, 1290 (11th Cir. 2002). The federal district court recently entered a memorandum opinion denying relief and dismissing Bradley's lawsuit. Bradley v. Nagle, 2:01-cv-01601-SLB (N. D. Ala. March 29, 2007). Bradley has appealed.

There are two other Alabama death-row inmates who have successfully prevented their executions by filing § 1983 actions at the conclusion of federal habeas review.  Darrell Grayson filed a § 1983 action on November 15, 2002, requesting DNA testing.  Grayson v. Pryor, CV-02-BE-2800-S.  Grayson's lawsuit was dismissed by the federal district court and rejected on appeal by the Eleventh Circuit and the Supreme Court.  See Grayson v. King, 460 F.3d 1328 (11th Cir. 2006), cert. denied, Grayson v. King, 127 S.Ct. 1005 (Jan. 8, 2007).[5]  Similarly, David Larry Nelson filed a complaint on October 6, 2003, alleging that any use of a so-called "cut-down" procedure would be unconstitutional.  Nelson v. Campbell, 2:03-cv-1008-MHT (M.D. Ala.).  The Supreme Court ultimately reversed the lower courts, ruling that Nelson could challenge the "cut-down" procedure in a § 1983 action.  See Nelson v. Campbell, 541 U.S. 637, 124 S.Ct. 2117 (2004).  The case was subsequently remanded to the federal district court where it languishes to this day.  Each of these § 1983 cases delayed an execution.

---

[5] Grayson, however, was successful in preventing his execution.  The Alabama Supreme Court (over three dissents) denied the State's motion to set an execution "pending a ruling on the motion for DNA testing."  Ex parte Grayson, 1830756 (Ala. May 22, 2003).  Grayson then filed a lethal-injection challenge that was dismissed on laches grounds.  Grayson, 2007 WL 1491009.

Thus, these examples demonstrate that the State suffers prejudice from Siebert's unjustifiable delay in filing. Siebert is presumably aware that other death-row inmates have filed § 1983 actions at the conclusion of federal habeas review and successfully forestalled their executions. As previously stated, the Eleventh Circuit has ruled that this type of challenge has been available since 2002 and denied a stay of execution because, _inter alia_, the inmate could have filed his lethal-injection challenge sooner. _Jones_, 485 F.3d at 639 n.2. That Siebert chose to do so reveals his primary motive, which is to prevent his execution.

**B.    Prejudice Results When Courts Are Forced To Expedite Litigation Schedules Due To Late-Filed Claims, Especially Considering That Seven Other Lethal-Injection Challenges Remain Pending**

Given when this case was filed, the only possible way to reach a hearing on the merits is to expedite the schedule. Expedited litigation of a complex case, even a single complex case, causes prejudice. When a matter is litigated at that pace, no matter how diligently the parties, counsel, and court do their jobs, the result is a different sort of – and less complete - record than would

result if a case is given the time that its complexity requires.

The problem, and the prejudice, is magnified many fold because we are not talking about just our case. There are numerous similar cases and no end in sight to the cases that will follow as other inmates follow Siebert's strategy. As the district court in <u>Grayson</u> found, "expedited cases create future inefficiencies, including the specter of each inmate demanding late in the day the same consideration given to Grayson." <u>Grayson</u> at *10. It is important to recognize that Siebert's case does not exist in a vacuum. This case is one of six lethal-injection challenges filed in the Middle District of Alabama, all but two of which are currently pending: <u>See</u> <u>Jones v. Allen</u>, No. 2:06-cv-986-MHT-TFM;[6] <u>Grayson v. Allen</u>, 2:06-cv-1032-WKW, 2007 WL 1491009;[7] <u>McNair v</u>. Allen, 2:06-cv-695-WKW; <u>Callahan v. Allen</u>, 2:06-cv-919-WKW; <u>Williams v. Allen</u>, 2:07-cv-307-MEF. In addition, two inmates have filed in the Southern District of Alabama: <u>Arthur v. Allen</u>, CV-07-342; <u>Hallford v. Allen</u>, CV-

---

[6] The district court denied Jones' motion to stay, the Eleventh Circuit affirmed, <u>Jones</u>, 485 F.3d 635, and the Supreme Court denied certiorari, <u>Jones v. Allen</u>, 127 S.Ct. 2160 (May 3, 2007). Jones was executed on May 3, 2007.

[7] The <u>Grayson</u> case is currently on appeal to the Eleventh Circuit.

07-410.   Since the United States Supreme Court clarified
that method-of-execution claims are properly brought under §
1983, eight Alabama death row inmates have reached the end
of habeas review, and every one has filed a virtually
identical lawsuit.  As the parties approach execution dates
in those cases, those plaintiffs will demand discovery and
the parties will have to retain expert witnesses.  And, as
with Jones and Grayson, these schedules will be set on an
expedited basis, many times overlapping with other expedited
cases.  Considering the lack of success of lethal-injection
challenges nationwide and that the inmate in Grayson was
found to have not demonstrated a likelihood of success on
the merits, see Grayson at *12, the State is prejudiced in
having to litigate these claims over and over again.  The
possibility of subjecting execution team members to
repetitive litigation could cause these individuals, who are
qualified to carry out their functions, refuse to
participate in future executions.

     The State is also prejudiced because if an inmate does
prevail, any resulting alteration of the execution
procedures could not be fully adjudicated without having to
enter a stay.  "[I]f the court were to find in favor of

Jones on the merits, fashioning relief, (that is, reviewing the State's adoption of a new protocol for lethal injections) would take much more than three months." <u>Jones</u>, 2007 WL 1140416, *10.  However, Siebert's unjustifiable delay ensures that a stay will be required if any such alteration (no matter how slight) is ordered.

The strategy of the day for death-row inmates is to seek a delay of execution by challenging lethal-injection procedures, and it apparently is a strategy that all death-row inmates will use.  Currently, the cases are decided on the basis of a motion for stay of execution, and the result is a rushed case that prejudices the State as it tries to handle litigation of the merits, litigation of a stay, and expedited appeals, often occurring simultaneously in multiple cases.  It will continue to be this way unless there is a rule, either based on laches or the statute of limitations, which requires inmates to file by a date certain.  If this Court establishes such a rule, then to reach the merits, an inmate would have to file much earlier; and when an inmate files as late as Siebert, the case may be disposed of quickly and efficiently.  Until then, and for purposes of this case, the late filing and rushed appeals of

multiple cases interfere with the State's right to timely enforcement of judgments, places an unfair burden on the State, and results in an incomplete and less reliable record.

Siebert filed this action twenty years after his conviction for capital murder; sixteen years after his direct appeal ended; six years after the end of his state Rule 32 review; six years after he initiated habeas proceedings; five years after the State of Alabama made lethal injections its method of execution. He filed <u>after</u> the conclusion of habeas review. Binding Eleventh Circuit precedent provides that Siebert could have filed his claim earlier and that he should have known that the State would move for execution. Now, the case cannot be litigated to conclusion without prejudicing the State, without requiring a stay and interfering with the State's interest in enforcement of its judgment. Laches, then, is an absolute bar and requires dismissal.

## V. SIEBERT HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Siebert's claims should also be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure because he has failed to state a claim upon which relief can be

granted.  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007).  In ruling on the Defendants' motion to dismiss for failure to state a claim, this court should look to the plausibility of success on the allegations in the complaint. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968-73 (2007).  "To survive a motion to dismiss, the factual allegations in the complaint 'must be enough to raise a right to relief above the speculative level.'" Rattigan v. Gonzales, No. 04-2009-ESH, 2007 WL 1577855, at *6 (D.D.C. May 31, 2007) (mem. op.) (quoting Bell Atlantic Corp.,127 S.Ct. at 1965).  That is the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Bell Atlantic Corp.,127 S. Ct. at *1959.  If there is no plausible hope for success on the merits then summary dismissal is proper. See id. at 1968-73.

Siebert's claims boil down to nothing more than mere speculation that there is a risk that the drugs used during executions in Alabama will not properly render him

unconscious and speculation that the alleged lack of medical expertise of the execution team might result in an accident during the execution. Mere speculation regarding possibilities that could occur during an execution is insufficient to state a claim upon which relief can be granted. See Bell Atlantic Corp., 127 S. Ct. at *1959. In a recent decision ruling that Missouri's execution protocol is constitutional, the Eight Circuit emphasized that "we are not concerned with a risk of accident." Taylor v. Crawford, No. 06-3651, 2007 WL 1583874, at *7 (8th Cir. June 4, 2007). Specifically, the Court held: "If Missouri's protocol as written involves no inherent substantial risk of the wanton infliction of pain, any risk that the procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis." Taylor, 2007 WL 1583874, at *7 (citing Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464 (1947)). Because Siebert's entire action is based on speculation that accidents may occur, he has failed to state a claim, and this lawsuit should be dismissed. Fed. R. Civ. P. 12(b)(6).

In addition to the fact that Siebert's claims are based on speculations and mere possibilities, there is no

plausibility of success on the merits, as recently recognized in Grayson v. Allen, No. 2:06-cv-1032-WKW, 2007 WL 1491009, at *12-13 (M.D. Ala. May 21, 2007). Grayson filed a § 1983 action that was virtually identical to the complaint before this Court. In reviewing whether to grant a stay of execution, Judge Watkins found that "Grayson cannot show a likelihood of success on the merits, much less a significant likelihood." Grayson, 2007 WL 1491009, at *12 (emphasis added). The Grayson Court reasoned that Grayson's claims were merely speculative, that he had not identified any mishaps in an Alabama execution, and that there is no legal support for his allegations. Id. at *12-13. The Court went on to find that "[t]he absence of evidence of a mishap, or even the risk of something more than negligence, not only controverts Grayson's claim, but it also significantly diminishes the probative value of training and procedural deficiencies that he alleges exist in Alabama's system." Id. at *13. Based on those factors, the Grayson Court found that there was no likelihood of success on the merits. Id. at *12.

Like Grayson, Siebert's claims are merely speculative, do not identify any mishaps during an Alabama execution,

and completely lack any legal support. As the Sixth Circuit recently noted:

> No court to our knowledge has issued a final decision declaring a State's lethal-injection protocol unconstitutional. And several lower courts have upheld this specific three-drug, lethal-injection protocol. <u>One cannot credibly establish a likelihood of success in attacking a death-penalty procedure when the theory of success has yet to succeed in a considerable number of cases over a considerable number of years</u>.

<u>Workman v. Bredesen</u>, No. 07-5562, 2007 WL 1311330, at *8 (6th Cir. May 7, 2007) (emphasis added); <u>See also</u> <u>Grayson</u>, 2007 WL 1491009, at *13. Furthermore, in <u>Taylor v. Crawford</u>, the Eighth Circuit recently upheld Missouri's lethal injection protocol, which is strikingly similar to Alabama's, against the same allegations Siebert submits to this Court. 2007 WL 1583874, at *7-12 (holding that "Missouri's written lethal injection protocol does not violate the Eighth Amendment."). The fact that execution protocols similar to Alabama's have been upheld as constitutional under identical attacks establishes that Siebert's speculative claims lacks any plausibility of success. It, therefore, should be dismissed.

Because Seibert's boiler-plate § 1983 complaint challenging Alabama's method of execution merely speculates that problems may occur during an execution and relief

thereon is implausible, he has failed to state a claim upon which relief can be granted.  Therefore, this Court should dismiss this lawsuit.

**VI.  CONCLUSION.**

For the forgoing reasons, the defendants respectfully request the Siebert's § 1983 action be dismissed.

Respectfully submitted,

TROY KING
ALABAMA ATTORNEY GENERAL


/s/ J. Clayton Crenshaw
J. Clayton Crenshaw (CRE007)
James W. Davis (DAV103)
Jasper Roberts (ROB157)
Corey L. Maze (MAZ003)
Assistant Attorneys General

OF COUNSEL:

Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
(334) 242-7300
(334) 353-8440 Fax
Email:ccrenshaw@ago.state.al.us
     jimdavis@ago.state.al.us
     jroberts@ago.state.al.us
     cmaze@ago.state.al.us

## CERTIFICATE OF SERVICE

This is to certify that on the 18th day of June, 2007, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will electronically send a copy of the same to the following:

    Anne E. Borelli
    Federal Defender's office
    201 Monroe Street, Suite 407
    Montgomery, AL 36104
    Anne_borelli@fd.org

    Thomas M. Goggans
    Ala. S.J.I.S.
    2030 East Second Street
    Montgomery, AL 36105
    tgoggans@tgoggans.com


                              /s/  J. Clayton Crenshaw
                              J. Clayton Crenshaw
                              ASSISTANT ATTORNEY GENERAL

OF COUNSEL:
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
(334) 242-7300 Office
(334) 353-8440 Fax
Email: ccrenshaw@ago.state.al.us

# EXHIBIT A

## IN THE SUPREME COURT OF ALABAMA

FILED

APR 17 2007

CLERK
SUPREME COURT OF ALABAMA

EX PARTE DANIEL LEE SIEBERT   )

)

In re: State of Alabama,   )

)

       Petitioner,   )

)   No. _____

v.   )

)

Daniel Lee Siebert,   )

)

       Respondent.   )


## MOTION TO SET AN EXECUTION DATE

Pursuant to Rule 8(d)(1) of the Alabama Rules of Appellate Procedure, the State of Alabama respectfully moves this Honorable Court to set an execution date for carrying out Daniel Lee Siebert's lawful sentence of death. In support of this motion, the State offers the following:

1. Daniel Lee Siebert currently resides on Alabama's Death Row, where he has spent the past twenty (20) years. As described below, Siebert committed the brutal murders of Sherri Weathers and her two sons, Chad Charles Weathers and Joseph Charlton Weathers. As a result of his commission of that horrible crime, Siebert was convicted of the capital offense of the murder of two or more persons by one act or pursuant to one scheme or course of conduct, pursuant to Ala. Code § 13A-5-40(a)(10). Following the presentation

of evidence, closing arguments, and instructions from the trial court, the jury unanimously recommended that Siebert should be sentenced to death. The trial court followed the jury's recommendation and sentenced him to death. Because Siebert has exhausted all three layers of appellate review (direct appeal, Rule 32, and federal habeas), the State now seeks execution of that sentence.

### *Facts of the Crime*

2. The Alabama Court of Criminal Appeals summarized the facts of Siebert's crime, as follows:

> The evidence as presented by the State tended to establish that in late December 1985, Donald Hendron left Los Angeles, California, driving east. Hendron was going first to North Carolina to visit his family, and then to Talladega, Alabama, where he was to operate a theater program at the Alabama Institute for the Deaf and Blind (hereinafter referred to as the Institute). In Tucson, Arizona, Hendron picked up a man who identified himself as Danial Spence. Hendron identified the appellant as that man. Appellant, who was an artist, discussed his views on art with Hendron and showed him some of his work. Hendron was impressed with appellant's talent and asked him to come to Talladega and work with the theater program as a set designer. Appellant readily agreed, but stated that he wished to visit his mother in Illinois before going to Talladega. Hendron and appellant parted company just north of Jackson, Mississippi. Appellant was hitchhiking north to Illinois. Hendron continued driving east to North Carolina. Hendron arrived in Talladega on January 9, 1986. Appellant arrived there on January 20, 1986.

2

Hendron and appellant first shared an apartment at the Institute, then moved into another apartment in the Porter Building approximately a week and a half later. Appellant expressed to Hendron an interest in settling down in Talladega. Shortly after the two men moved into the Porter Building, appellant began dating Sherri Weathers, a 24-year-old deaf student at the Institute. Because such a relationship was specifically prohibited by the Institute's rules, Hendron wished to separate himself from this situation, and moved out of the Porter Building apartment on February 16, 1986. Hendron and appellant saw each other for the last time on February 19, 1986, when Hendron arranged to pick up appellant around 8:00 a.m. the next morning to attend a faculty meeting. When Hendron went by the Porter Building the next morning, however, appellant was not there.

In February 1986, Sherri Weathers was living in apartment 30 of the Sunrise Apartments with her sons, five-year-old Chad and four-year-old Joey. Around 8:00 p.m. on February 19, 1989 [sic], appellant was seen with Sherri Weathers and a neighbor of hers, Linda Jarman, buying beer at a convenience store in Talladega. The three left the convenience store together. Fettus Porter, a neighbor of Sherri's, returned home around 9:30 p.m. that night and found a note from Sherri asking him to come over and play cards with her, Linda Jarman, and appellant. Porter went over to Sherri's apartment around 10:30 p.m., where he found Sherri and Linda chatting. They told Porter that appellant had left in Linda's car, a cream-colored Buick, to get some beer, and said they all were going to play cards when appellant returned. Porter remained at the apartment until about 11:30 or midnight. When he left to go back to his apartment, appellant still had not returned.

Sometime during the night of February 19, 1986, Catherine Elaine Shellborne, who lived next door to Sherri Weathers in apartment 31 of the

3

Sunrise apartments, heard through her wall adjoining Sherri's apartment a man saying "Come to me. You can join your mother." Later, she heard the man say, "Come on and you will be with your mother and your brother."

Billy Kyle, another resident of the Sunrise Apartments, saw Sherri Weathers fighting with appellant in her apartment on the night of February 19, 1986. When asked what time he observed them fighting, Billy, a mildly retarded deaf man, could only say that it was sometime after 8:00 p.m., the time he arrived home. By Sunday, February 23, 1986, Billy had not seen Sherri or her children around the apartments. Remembering the fight he had seen between Sherri and appellant in her apartment on Wednesday night, Billy tried to check on Sherri, but could summon no one to the door of apartment 30. By this time Billy was extremely concerned about the welfare of Sherri and her children, so he entered Sherri's apartment through an unsecured window, but when he saw a part of Sherri's body protruding out from under a sheet, he became scared and left. Billy Kyle was later cleared by the police of any involvement in the murders.

The next morning, however, Billy told Wanda Hunley, an Institute social worker, that he was concerned about Sherri and asked her to check on Sherri and her sons. After making several phone calls, she learned that no one had seen Sherri or her children in several days. She also learned that there was an odor emanating from apartment 30. Ms. Hunley, accompanied by several other individuals, then went to the Sunrise Apartments and obtained a passkey for apartment 30. Upon entering the apartment, Ms. Hunley and the others found the bodies of Sherri, Chad, and Joey Weathers.

Autopsies of the bodies of the three people disclosed that Sherri Weathers died as the result

of strangulation, and that Chad and Joey Weathers died as the result of ligature strangulation.

An extensive investigation was launched. During this investigation, shoe prints were lifted from apartment 30 and from the appellant's apartment in the Porter Building. The shoe print from the Porter Building apartment and some of those from Sherri's apartment were found to be consistent in tread design and approximate size. Additionally, a child's pajama bottom was found in appellant's Porter Building apartment.

In March 1986, a 1973 Buick was found abandoned near Elizabethtown, Kentucky. A black purse in this car contained a receipt bearing the name of Sherri Weathers. Also found in the car was a brass key which opened the door to appellant's Porter Building apartment. At an abandoned campsite near the Buick were found business cards bearing the name Danial Spence and the address of his Porter Building apartment; various photographs of Sherri Weathers; a mailgram addressed to Don Hendron; a birth certificate bearing the name Danny Ray Spence; other items bearing the name Danial Spence; two sheets of white paper on which appeared the names Sherri Weathers, Chad Weathers, and Joseph Weathers; and an art pad bearing the name Sherri Weathers. Various items of clothing found at the Kentucky site were found to contain fibers of the same type as the red carpet in appellant's Porter Building apartment. Finally, two fingerprints and a palm print discovered on the Buick were identified as those of the appellant, Danial L. Siebert.

In March 10, 1986, appellant identified himself in New Jersey to Harold Hutchins of the Atlantic City Police Department, using a Social Security card bearing the name of Chad Weathers.

On June 14, 1986, appellant identified himself in Virginia to Joseph McLaughlin of the New Kent County Sheriff's Department, using a Social

Security card bearing the name of Joseph Charles Weathers.

Appellant was finally apprehended in Hurricane Mills, Tennessee, on September 5, 1986. At the time of his arrest, appellant had in his possession a Social Security card bearing the name of Joseph C. Weathers, and a torn manila envelope on which appeared the following: "-eathers, Joseph."

After appellant was advised of his *Miranda* rights and waived those rights, he made a statement, the pertinent part of which follows:

> He went to Sherri Weathers's apartment on the evening of February 19, 1986, and let himself in with a key which he had been given. Sherri and Linda Jarman were there. Eventually, Linda left. As he and Sherri were walking toward her bedroom, he strangled her with a piece of cloth that he had on his person. Then he woke up each of the boys individually and strangled them. He left town in a car, which he abandoned in Kentucky after it had two flat tires. After spending a couple of days at a campsite he set up near the car, he headed north and then went east, in an attempt to get as far away from Alabama as he could.

Thereafter, appellant waived his right to formal extradition proceedings and was returned to Alabama to stand trial for the murders of Sherri, Chad, and Joey Weathers. We note that appellant has also been convicted of the capital murder of Linda Jarman and received the death sentence. His conviction and sentence have been affirmed by this court. *Siebert v. State* [Ms. 7 Div. 851, April 14, 1989] (Ala. Crim. App. 1989).

*Siebert v. State*, 555 So. 2d 772, 773-775 (Ala. Crim. App. 1989), *aff'd, Ex parte Siebert*, 555 So. 2d 780 (Ala. 1989).

### Sentencing Facts

3.    After finding Siebert guilty of the capital murder of Sherri, Chad, and Joseph Weathers, the jury unanimously recommended a sentence of death. *Siebert*, 555 So. 2d at 773. The Honorable William C. Sullivan followed the jury's recommendation and sentenced Siebert to death. *Id.*

4.    In sentencing him to death, the trial court found the existence of one statutory aggravating circumstance: that Siebert was previously convicted of two felonies involving the use or threat of violence, pursuant to Ala. Code § 13A-5-49(2). *Id.* at 779. In particular, Siebert had been convicted of voluntary manslaughter, for which he was sentenced to ten years in prison, and capital murder, for which he was sentenced to death. *Id.* The trial court did not find the existence of any mitigating circumstances. *Id.* Moreover, the trial court, in its sentencing order, observed that Siebert "does not possess a single redeeming feature nor attribute." *Id.*

### Procedural History

5.    **Direct Appeal:** On April 28, 1989, the Alabama Court of Criminal Appeals affirmed Siebert's capital murder conviction and death sentence. *Siebert*, 555 So. 2d at 779.

On December 15, 1989, this Court affirmed Siebert's capital murder conviction and death sentence. *Siebert*, 555 So. 2d at 784. On January 3, 1990, the Alabama Court of Criminal Appeals issued the certificate of judgment. The United States Supreme Court denied Siebert's petition for writ of certiorari on June 28, 1990. *Siebert v. Alabama*, 497 U.S. 1032 (1990).

6. **Rule 32 Petition:** On June 25, 1992, more than two years after the issuance of the certificate of judgment, Siebert filed a Rule 32 petition for post-conviction relief in the Lee County Circuit Court.[1] *Siebert v. State*, 778 So. 2d 842, 846 (Ala. Crim. App. 1999). On August 25, 1992, he filed a Rule 32 petition in Talladega County, challenging his capital murder conviction and death sentence for the robbery-murder of Linda Jarman. *Id.* Siebert's petitions were consolidated for an evidentiary hearing. *Id.*

7. The evidentiary hearing was held on Siebert's Rule 32 petitions on April 3-5, 1995. *Id.* On March 29, 1995, just days before the evidentiary hearing was scheduled to begin, Siebert filed amendments to both of his petitions.

---

[1] The statute of limitations in effect at that time provided that a Rule 32 petition must be filed within two years of the issuance of the certificate of judgment by the Alabama Court of Criminal Appeals.

*Id.* In response to Siebert's amendments, the State filed a motion for leave to amend its answers, an amended answer, and a motion to dismiss both of his amended petitions on April 4, 1995, the second day of the hearing. *Id.* In those pleadings, the State argued for the first time that Siebert's petitions should be dismissed because they were untimely filed, under Rule 32.2(c) of the Alabama Rules of Criminal Procedure. *Id.* Out of an abundance of caution, the Rule 32 circuit court allowed the hearing to proceed but also ruled that, by doing so, it was not suggesting that the State had waived its argument that his petitions were untimely filed. *Id.* The evidentiary hearing ended on April 5, 1995, but additional evidence was received by the court on September 26, 1995 and January 21, 1997. *Id.*

8.   On December 29, 1998, the circuit court entered a final order dismissing Siebert's Rule 32 petitions because they were untimely filed. *Id.* In the alternative and as a secondary holding, the court addressed the claims, finding that many of them were procedurally barred from review and that all of them were meritless. *Id.*

9.   Siebert subsequently filed a consolidated appeal in the Alabama Court of Criminal Appeals. In affirming the

9

ruling of the Rule 32 circuit court, the Alabama Court of Criminal Appeals held that Siebert's Rule 32 petitions were barred by the statute of limitations set forth in Rule 32.2(c) of the Alabama Rules of Criminal Procedure. *Siebert*, 778 So. 2d at 846-847. In reaching that result, the court concluded that the statute of limitations begins to run on the date that the certificate of judgment is entered, thereby rejecting Siebert's argument that the state post-conviction limitations period does not begin to run until the United States Supreme Court issues its ruling on direct appeal. *Id.* On September 15, 2000, this Court denied Siebert's petition for writ of certiorari. *Ex parte Siebert*, 778 So. 2d 857 (Ala. 2000).

10. **Federal Habeas:** On September 14, 2001, Siebert filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Alabama.[2]

---

[2] That same day, Siebert filed a habeas petition in the United States District Court for the Northern District of Alabama, challenging his conviction, in Talladega County, for the capital murder of Linda Jarman and his resulting death sentence for that murder. The parties are litigating that separate and distinct matter in the Eleventh Circuit Court of Appeals. Because those proceedings are limited to Siebert's Talladega County conviction and death sentence, they have no bearing on his Lee County conviction and death sentence, for which he has exhausted all three layers of appellate review.

On March 14, 2002, the Honorable W. Harold Albritton held that Siebert's habeas petition was time-barred under the one year statute of limitations established by 28 U.S.C. § 2244(d) and accordingly dismissed his petition. *Siebert v. Haley*, 193 F.Supp.2d 1260, 1272 (M.D. Ala. 2002). In reaching that result, the district court interpreted the Eleventh Circuit's decision in *Webster v. Moore*, 199 F.3d 1256 (11th Cir. 2000), as holding that an untimely state post-conviction petition is not "properly filed" and does not, therefore, toll the AEDPA limitation period while the untimely state petition is pending. *Id.* at 1264

11. On June 23, 2003, the Eleventh Circuit reversed the judgment of the district court. *Siebert v. Campbell*, 334 F.3d 1018 (11th Cir. 2003). In *Siebert*, 334 F.3d at 1024, the Eleventh Circuit interpreted the United States Supreme Court's decision in *Artuz v. Bennett*, 531 U.S. 4 (2000), as holding that "[c]ompliance with a statute of limitations is not generally treated as a precondition to a suit's commencement, but rather as a condition that must be satisfied to win relief...." In *Artuz*, 531 U.S. at 11, the Court contrasted a "condition to filing" with a "condition to obtaining relief," holding that non-compliance with a

11

condition to obtaining relief does not prevent a habeas petitioner's state collateral petition from being "properly filed." The court, in *Siebert*, 334 F.3d at 1030, held that the application of Alabama's time limitation is a matter of discretion and, therefore, under *Artuz*, compliance with the time limitation was a "condition to obtaining relief." Thus, the court concluded that it is not necessary for the state collateral petition to have been filed within the state's statute of limitations in order for that petition to have been "properly filed" for § 2244(d)(1) tolling purposes, provided that the statute of limitations is not jurisdictional in nature. *Id.* at 1032.

12. On remand, the State filed an amended answer and a brief arguing that all of the claims in Siebert's habeas petition, with the exception of one claim, are procedurally defaulted because his Rule 32 petition was not timely filed in state court. In addition, the State filed a motion to dismiss Siebert's petition based upon the United States Supreme Court's decision in *Pace v. Diguglielmo*, 544 U.S. 408 (2005), in which the Court held that the one year statute of limitations mandated by the AEDPA is not tolled during the pendency of a state petition for post-conviction

relief if the state courts conclude that the petition is untimely. In its motion to dismiss Siebert's petition, the State argued that *Pace* implicitly overruled the Eleventh Circuit's *Siebert* decision.

13. The Magistrate Judge recommended that Siebert's habeas petition should be dismissed on the ground that all of the claims in his petition (with one exception) were defaulted because Siebert did not timely file his Rule 32 petition. In reaching that result, the Magistrate Judge applied *Hurth v. Mitchem*, 400 F.3d 857 (11th Cir. 2005), which held, among other things, that a state procedural rule need not be jurisdictional to be "firmly established and regularly followed" for the purpose of determining whether a claim is defaulted. The court, in *Hurth*, 400 F.3d at 862-64, further concluded that Alabama courts have consistently applied the time limitation procedural bar – Ala. R. Crim. P. 32.2(c) – in holding that claims are procedurally barred, even where the bar was not applied on a jurisdictional basis. The Magistrate Judge did not specifically address the State's motion to dismiss Siebert's petition based on *Pace*.

14. United States District Judge Albritton adopted the recommendation of the Magistrate Judge and overruled the State's objections to the Magistrate Judge's failure to address the State's motion to dismiss Siebert's petition based on *Pace v. DiGuglielmo*. *Siebert v. Campbell*, 2005 WL 2456032 (M.D. Ala. 2005).

15. The Eleventh Circuit affirmed the district court's judgment, holding that Siebert defaulted his claims in state court by failing to timely file his state post-conviction petition and that Alabama's post-conviction time bar was "firmly established and regularly followed for purposes of applying the doctrine of procedural default." *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006). The court concluded that the district court correctly held that *Hurth* is binding precedent and correctly found that Siebert's claims are defaulted. *Id.* at 1272.

16. On January 2, 2007, Siebert filed a petition for writ of certiorari in the United States Supreme Court. The Court denied his petition on March 19, 2007. *Siebert v. Allen*, --- S. Ct. ----, 2007 WL 98145 (2007).

17. There currently are no pending challenges to the validity of Siebert's lawful conviction and death sentence.

14

Siebert has exhausted his direct appeal, his state post-conviction remedies, and his federal habeas remedies.   As such, it is time for his death sentence to be carried out.

### 42 U.S.C. § 1983 Lawsuit

18. Although there are no pending challenges to the validity of his lawful conviction and death sentence *per se*, Siebert recently filed suit against Richard Allen, the Commissioner of the Alabama Department of Corrections, challenging Alabama's method of execution.   That lawsuit is not, however, a valid ground for leaving in place the Rule 8(d)(1) stay of sentence.

19. The question of whether any further delay is warranted in this case is not a State law question under Rule 8(d)(1) but, instead, is best decided by the federal court in which Siebert currently is litigating his civil lawsuit.   As observed by the United States Supreme Court in *Hill*, the equitable remedy of a stay of execution must be balanced in these cases against the State's "strong interest in enforcing its criminal judgments without undue interference from the federal courts."   *Hill v. McDonough*, 126 S. Ct. 2096, 2104 (2006) (citing *Nelson v. Campbell*, 541 U.S. 637, 649-650 (2004)).   The only voice that the

residents of the State of Alabama have to represent their strong interest in enforcing the State's lawful criminal judgments without undue interference from the federal courts is through this Court's issuance of the requested Order setting an execution date.

20. The federal courts are in the best position to balance the equities in determining whether this civil lawsuit warrants any further delay of Siebert's execution. The United States Supreme Court has held that a federal court that is petitioned for a stay of execution so as to allow litigation of a § 1983 civil lawsuit must balance the equities with "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 126 S. Ct. at 2104. The determination of whether a stay is warranted turns on whether the lawsuit is viewed as speculative, dilatory, or abusive. *Id.* As the Court held in *Hill*, it is the responsibility of the federal courts to protect the States from such abuses. *Id.*

21. Moreover, the pending civil lawsuit is in no way related to the State's lawful criminal judgment. Indeed,

16

the entire theory of permitting such suits under § 1983 is that they do not bear on the underlying criminal proceeding. *Hill*, 126 S. Ct. at 2096. By the United States Supreme Court's own decree, the federal courts are the appropriate venues for balancing the equities, and it is their duty to respect any decision of this Court setting an execution date and to protect such an Order against abusive, dilatory suits, such as the one filed by Siebert.

22. Other states have sought the execution of death row inmates with pending § 1983 lawsuits, such as the one filed by Siebert, without offending the respective federal courts. In fact, the inmate in *Hill* was executed last year – after the United States Supreme Court held that he had the right to file a § 1983 suit similar to the one filed by Siebert – because the Eleventh Circuit determined that Hill "was the architect of the very trap from which he now seeks relief." *Hill v. McDonough*, 464 F.3d 1256, 1259 (11th Cir. 2006). Hill's delay in waiting to bring his lawsuit until the eve of his execution, after his collateral proceedings were concluded, was critical to the decision to allow his execution to proceed. *Id.* ("In light of Hill's actions in this case, which can only be described as dilatory, we

17

join our sister circuits in declining to allow further litigation of a § 1983 case filed essentially on the eve of execution."). Likewise, Siebert's lawsuit, which was filed after the conclusion of his collateral appeals - when his Rule 8(d)(1) stay was no longer valid - should not serve as a legitimate ground for further delaying his execution. *See*, *e.g.*, *Harris v. Johnson*, 376 F.3d 414, 417-418 (5th Cir. 2004) (condemned inmate who filed § 1983 action ten weeks before his scheduled execution "leaves little doubt that the real purpose behind his claim is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out").

23. In addition, the following States have executed inmates even though a § 1983 lawsuit challenging lethal injection was pending at the time: Florida[3], Oklahoma[4], Texas[5], Tennessee[6], and Virginia[7]. Just like those States, Alabama has the right to pursue its interest in obtaining finality of its criminal judgments. If a federal court

---

[3] *Hill*, 464 F.3d at 1259; *Rutherford v. McDonough*, 466 F.3d 970 (11th Cir. 2006).

[4] *Patton v. Jones*, 2006 WL 2468312 (10th Cir. Aug. 25, 2006).

[5] *Brown v. Livingston*, 457 F.3d 390 (5th Cir. 2006).

[6] *Alley v. Little*, 186 Fed.Appx. 604 (6th Cir. 2006).

[7] *Lenz v. Johnson*, 443 F.Supp.2d 785 (E.D.Va. 2006).

concludes that a stay is warranted in this matter, despite Siebert's delay in pursuing such relief, it may grant one.

### *Conclusion*

24. Pursuant to Rule 8(d)(1) of the Alabama Rules of Appellate Procedure, the State of Alabama respectfully moves this Honorable Court to "enter an order fixing a date of execution, not less than 30 days from the date of the order," for Daniel Lee Siebert.

Respectfully submitted,

Troy King
*Attorney General*

Henry M. Johnson
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130-0152
Tele: (334) 353-9095

April 17, 2007

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of April, 2007, a copy of the foregoing was served on the attorneys for Daniel Lee Siebert by placing the same in the United States Mail, first class postage prepaid and addressed as follows:

Ms. Leslie Smith, Esq.
Federal Defenders
201 Monroe Street, Suite 407
Montgomery, Alabama 36104

Ms. LaJuana Davis, Esq.
Equal Justice Initiative of Alabama
122 Commerce Street
Montgomery, Alabama 36104


Henry M. Johnson
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130-0152
April 17, 2007    Tele: (334) 353-9095