IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DANIEL LEE SIEBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD ALLEN, Commissioner, | ) |
| Alabama Department of Corrections, | ) |
| | ) |
| GRANTT CULLIVER, Warden, | ) |
| Holman Correctional Facility, and | ) Case No.: 2:07-cv-295-MEF-WC |
| | ) |
| OTHER UNKNOWN EMPLOYEES | ) |
| AND AGENTS, | ) |
| Alabama Department of Corrections, | ) |
| | ) |
| Individually, and in their | ) |
| official capacities, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff, Daniel Lee Siebert, by and through undersigned counsel, hereby opposes

Defendants' Motion to Dismiss.  The Defendants seek to prevent Mr. Siebert from litigating

his claim on three grounds: 1) statute of limitations, 2) laches, and 3) failure to state a claim

upon which relief can be granted.  This Court should deny the Defendants' Motion on all

three grounds.  The statute of limitations defense has already been rejected in this district in

Jones v. Allen,  483 F.Supp. 2d 1142  (M.D. Ala. 2007) (Jones I).  In a "thorough and well-

reasoned opinion," <u>Jones v. Allen</u>, 485 F.3d 635, 639 (11th Cir. 2007) (<u>Jones II</u>),[1] Judge Myron Thompson rejected the same Defendants' arguments as "anomalous," given that the injury complained of in a § 1983 suit challenging a lethal injection protocol is a future one, <u>Jones I</u>, 483 F.Supp. at 1145. The laches defense, though successful in cases where an execution date had been set and a stay would be necessary to complete the litigation, <u>see</u>, <u>e.g.</u>, <u>id.</u> at 1151-53, is inapplicable where no date has been set and no stay has yet been requested, as here. Given the insufficiency of the two preceding arguments, the Defendants assert a third: that Mr. Siebert has failed to meet his burden of pleading. The Defendants' argument on this point is based on a misconstruction of the case they rely on, resulting in a heightened standard of pleading, which this Court cannot approve. Defendants' Motion is, therefore, due to be dismissed on the following grounds:

### Legal Standard

The threshold for a complaint to survive a motion to dismiss is "exceedingly low." <u>Ancata v. Prison Health Servs., Inc.</u>, 769 F.2d 700, 703 (11th Cir. 1985). <u>See also</u> <u>Quality Foods de Centro America, S.A., v. Latin American Agribusiness Dev.</u>, 711 F.2d 989, 995 (11th Cir. 1983). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007) (internal citation omitted). <u>See also</u> <u>Ellis v. General Motors Acceptance Corp.</u>, 160 F.3d 703, 706 (11th Cir. 1998) ( court must take "all of the material

---

[1]The Eleventh Circuit did not review the statute of limitations ruling. <u>Jones II</u>, 485 F.3d at 638 n. 1.

allegations of the complaint as true while liberally construing the complaint in favor of the plaintiff"); <u>Roberts v. Florida Power & Light Co.</u>, 146 F.3d 1305, 1307 (11th Cir. 1998). A motion to dismiss "should not be granted unless it appears to a certainty 'that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Ancata</u>, 769 F.2d at 702-03 (internal citation omitted). "When considering a motion to dismiss . . . all inferences are viewed in the light most favorable to the plaintiff." <u>Levine v. World Financial Network Nat'l Bank</u>, 437 F.3d 1118,1120 (11th Cir. 2006).

I.    **The Defendant's Motion to Dismiss for Failure to State a Claim Should Be Denied Because the Argument Is Based on an Incorrect, Heightened Standard of Pleading.**

The Defendants move that Mr. Siebert's suit should be dismissed because they assert that his complaint fails to state a claim upon which relief can be granted. Defendants' Motion at 34-39. The Defendants' arguments impose a heightened standard of pleading impermissible under Rule 8(a)(2), Federal Rules of Civil Procedure, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The Defendants correctly state that the legal standard for motions to dismiss is that "a judge must accept as true all of the factual allegations contained in the complaint." Defendants' Motion at 35, <u>quoting</u> <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (June 4, 2007). The Defendants misconstrue, however, the holding of <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955 (May 21, 2007), to impose some additional showing of likelihood of success on the merits by blurring the line between pleading requirements and the standard for obtaining a stay. <u>See</u>,

3

e.g., Defendants' Motion at 36-37 ("there is no plausibility of success on the merits . . . 'Grayson cannot show a likelihood of success on the merits'" (emphasis added in Defendants' Motion)).  The only "plausibility of success" required at the pleading stage is that the plaintiff show some facts which, if proved true, support each element of his claim.

The Defendants' arguments attempt to impose a standard of proof on Mr. Siebert at a point where he need meet only a standard of pleading.  There is no requirement at the pleading stage that Mr. Siebert demonstrate a "likelihood of success on the merits." Defendants' Motion at 37.  The Defendants import this requirement from stay litigation by citing to Grayson v. Allen, 2007 WL 1491009 (M.D. Ala. 2007), Defendants' Motion at 37[2] but it is not applicable in the court's analysis of a motion to dismiss, especially where no stay has yet been requested.[3]  The United States Supreme Court has explicitly stated that "probability of success" is not a factor in assessing whether a complaint can withstand a motion to dismiss.  Bell Atlantic, 127 S. Ct. at 1965 (even in a Sherman Antitrust action, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage").  Rather, the plaintiff must plead some facts which, if

---

[2]Defendants' citation to the Sixth Circuit's opinion in Workman v. Bredesen, 486 F.3d 896 (6th 2007), Defendants' Motion at 37 and 38, is of no more avail than the citation to Grayson, since that case likewise involves the issuance of a temporary restraining order.

[3]It is questionable whether dismissal of the suit was the proper ruling in Grayson.  Whether to grant a stay request is a different and distinct inquiry from whether a suit should be dismissed. In Grayson, the court's dismissal of the plaintiff's suit was based on a laches defense premised on the necessity of a stay to allow time to litigate the claim.  2007 WL 1491009 at *4.  This is not the issue in this case.

4

proved true, will support the necessary elements of his cause of action. Id. at 1964-65. The court is forbidden from basing its ruling on this matter on its own assessment of the likely truth of the facts or the apparent unlikelihood of recovery. Id. at 1965, citing Neitzke v. Williams, 490 U.S. 319, 327 (1989), and Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

An action brought under § 1983 is composed of two elements, allegation of a violation of civil rights and action by a "person" "under color of any statute . . . of any State." 42 U.S.C. § 1983. See also West v. Atkins, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law"). Mr. Siebert has pled a civil rights violation, i.e., execution by means inconsistent with the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishment, and action by the Defendants under state law, i.e., Alabama's lethal injection statute, ALA. CODE 1975 § 15-18-82.1.

The Defendants go awry because they fail to understand the specific point at issue in the case upon which they rely. In Bell Atlantic, the Supreme Court addressed the pleading requirements for a complaint brought under Section 1 of the Sherman Antitrust Act. 127 S. Ct. at 1961, 1964. The particular question before the Court was what degree of factual specificity is required to support an allegation of "agreement" under the statute. Id. at 1961, 1963 ("We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct"). The Court held that, even at the

5

pleading stage, mere allegation of "parallel conduct" is insufficient to demonstrate agreement. Id. at 1966 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). The Court's reasoning was that, even if the facts demonstrating parallel conduct were assumed to be true, as they must be when considering a motion to dismiss, proof of parallel conduct alone would not support a finding of agreement.[4] Id. at 1965-66. Because the element of agreement would be lacking even if all of their allegations were assumed to be true, the plaintiffs in Bell Atlantic failed to meet their burden of pleading. Id. at 1970-73. In contrast, the Supreme Court reiterated in Erickson, a § 1983 action involving medical treatment of a prisoner in state custody and decided subsequent to Bell Atlantic, that the pleading standard under Rule 8(a)(2), Fed. R. Civ. P., is a "liberal" one and that"[s]pecific facts are not necessary." 127 S. Ct. at 2200.

The Defendants in this case have made no argument that Mr. Siebert has failed to plead facts in support of any necessary element of a § 1983 action in general or a challenge-to-execution-protocol claim in particular. Instead the Defendants forge ahead to the likeliness of Mr. Siebert's success on the merits. This is not the question before the Court on a motion to dismiss. Mr. Siebert's complaint, to survive a motion to dismiss, "need '"only

---

[4]The Court's concern with requiring "heft" in a Section 1 complaint, Bell Atlantic, 127 S. Ct. at 1966, rested at least in part on the "enormous expense of discovery" in antitrust cases and the coercion posed by such expense to "push cost-conscious defendants to settle even anemic cases before reaching those proceedings," id. at 1967. Such considerations are not in play in this case, which seeks only injunctive relief.

6

give the defendant fair notice of what the claim is and the grounds upon which it rests."'"

Erickson, 127 S.Ct. at 2200.  He has done this by alleging that the particular drugs prescribed in the Defendants' execution protocol are likely to subject the condemned inmate to "unnecessary and wanton" pain.  For example, he has alleged that the Defendants employ an unnecessary neuromuscular blocking agent (impermissible under state statute for use in animal euthanasia, see ALA. CODE 1975 § 34-29-131(a)), which serves no useful purpose in an execution, but rather serves to mask errors.   He has also alleged that the likelihood of improper administration of the drugs is increased by the Defendants' failure to employ appropriate safeguards, such as sufficient training of the execution team, their location during the execution and the layout of the execution chamber to facilitate observation of the prisoner throughout the execution, appropriate use of monitoring devices, and record-keeping sufficient to document that procedures are being followed and that the anesthetic does take effect before administration of the other two drugs.  Such deficiencies violate the Eighth Amendment which prohibits cruel and unusual punishment by creating an unacceptable risk of unnecessary pain.

The kind of "speculation" the Defendants argue is not an absence of an element of Mr. Siebert's cause of action or of facts to support each element, but goes rather to the rate of accident or degree of risk.  Whether Mr. Siebert can demonstrate at trial that Alabama's protocol reaches the threshold of unconstitutionality is a matter of proof, requiring evidentiary submissions, but it is not a requirement of pleading.  Any "speculative" quality

to Mr. Siebert's pleading is fully permissible under Rule 8(a)(2), Fed. R. Civ. P.[5] Defendants do intend to execute Mr. Siebert, as alleged in the Complaint. Defendants have not offered evidence that they will not use the three drugs described in the Complaint. Defendants assume that Mr. Siebert will not be able to demonstrate anything more than the possibility of accident; however, that is a matter to be proved. At the pleading stage, inferences are to be made in favor of the plaintiff. Levine, 437 F.3d at 1120. Mr. Siebert cannot prove a "substantial risk of the wanton infliction of pain," Taylor v. Crawford, 2007 WL 1583874, at *7 (8th Cir. June 4, 2007), until he obtains discovery and is permitted to submit evidence. The Defendants attempt to foreclose Mr. Siebert's day in court on the basis of incomplete and expedited discovery in another case to which Mr. Siebert was not a party and on the basis of information to which Mr. Siebert has not had access. See Agreed Confidentiality Orders in McNair v. Allen, Case No. 2:06-cv-695-WKW-CSC, Doc. #28; Jones v. Allen, Case No. 2:06-cv-00986-MHT-TFM, Doc. #12; Grayson v. Allen, Case No. 2:06-cv-1032-WKW-CSC, Doc.#13. Even the Eighth Circuit, before ultimately finding against Mr. Taylor, acknowledged that he was entitled to a full and fair evidentiary hearing preceded by complete discovery. See Taylor, 2007 WL 1583874, at *1.

The Defendants further argue that the Eighth Circuit's conclusion that Missouri's protocol does not violate the Eighth Amendment prohibition against cruel and unusual

---

[5]It is inconsistent for the Defendants to argue both that Mr. Siebert's claim is too speculative to withstand a motion to dismiss and that he has known enough facts to support a cause of action since 2002 when the State adopted lethal injection.

punishment is somehow transferable to Alabama's protocol. <u>See</u> Defendants' Motion at 38. The Defendants assert similarity without specifying <u>how</u> the two protocols are similar. The Eighth Circuit's holding applied to a new, untested protocol adopted after the State of Missouri attempted to comply with the federal district court's orders to revise the old, unwritten protocol <u>See</u> <u>Taylor</u>, 2007 WL 1583874, at *5 ("we therefore remanded the entire dispute to provide the district court the first opportunity to consider the constitutionality of the <u>newly propounded protocol</u>") (emphasis added); <u>see also</u> <u>id.</u> at *10 ("Our independent review of the State's written protocol and the record in this case leads us to the conclusion that the <u>written protocol</u> does not violate Eighth Amendment") (emphasis added).

In the protocol under review in <u>Taylor</u>, Missouri had already adopted numerous safeguards to reduce the likelihood of accident. <u>Id.</u> at *9 (description of the new protocol).[6] The Eighth Circuit found that Missouri's as yet untested protocol appeared, on paper, to guard adequately against accident. The only point established by the <u>Taylor</u> opinion is that one court has found that the three-drug sequence can be administered in a manner that

---

[6]The new protocol included the following changes: (1) written (4 pages with 6 parts); (2) 5 grams of thiopental mandated (versus 2.5 grams sometimes used); (3) execution team includes contracted medical personnel; (4) physician, nurse or pharmacist prepares chemicals; (5) physician, nurse or EMT starts the IV line; (6) primary and secondary lines established; (7) IV site determined by medical personnel; (8) medical personnel must have appropriate training, education and experience to perform IV placement; (9) medical personnel must confirm that IV line is working both before and during the procedure; (10) electrocardiograph monitors execution procedure; (11) medical personnel supervise DOC employees who actually inject drugs; (12) medical personnel must confirm prisoner is unconscious, using standard clinical techniques, before drugs two and three administered; (13) medical personnel must inspect the catheter site again before drugs two and three administered; (14) three minute wait between injection of anesthetic and other two drugs; and (15) accurate documentation to be maintained of drugs, drug amounts used, and order in which given.

sufficiently protects against a "foreseeable risk of . . . gratuitous and unnecessary pain."[7]

2007 WL 1583874 at *6 (quoting from the Hill v. McDonough, 126 S. Ct. 2096 (2006), plaintiff's statement of claim with approval),  That decision rested on the specific, extensive provisions adopted by Missouri, including the use of trained medical personnel to monitor the prisoner's unconsciousness before delivery of the second and third drugs and the correct placement and functioning of the IV line.  Id. at *11.  The Eighth Circuit's admonition that "[b]ecause of the pain that undoubtedly would be inflicted by the third chemical if administered without adequate anesthetization, it is imperative for the State to employ personnel who are properly trained to competently carry out each medical step of the procedure," id. (emphasis added), in fact indicates that that court would have found that, without adequate training of the team, the risk of pain would rise to the constitutional level. Whether Alabama can meet that standard is a matter for proof after discovery and trial of the matter, not at the pleading stage.

Because Mr. Siebert has met his burden of pleading under Rule 8(a)(2), the Defendants' Motion to Dismiss for failure to state a claim must be denied.

## II.    The Defendants' Motion to Dismiss Should Be Denied Because the Statute of Limitations Applicable to This Claim Cannot Have Begun to Run Where the Injury Has Yet to Occur.

The Defendants argue that Mr. Siebert's claim should be dismissed because a two-year statute of limitations applies to § 1983 claims and that that limitations period began to

---

[7]Mr. Siebert does not, however, concede that the specific three-drug sequence employed by Alabama meets the constitutional standard.

run from the State's adoption of lethal injection as its method of execution in July 2002.

Defendants' Motion to Dismiss at 10-23.  Mr. Siebert responds that the relief he requests

from this Court is prospective, injunctive relief–barring the implementation of his death

sentence under the current protocol employed by the Defendants; thus, no limitations period

can yet have begun to run.

**A.    The statute of limitations cannot have begun to run on a
claim challenging a future tortious act.**

The statute of limitations applicable to a § 1983 action is to be taken from the forum

state's personal injury statute.  Wilson v. Garcia, 471 U.S. 261, 280 (1985).  Where a state

has more than one statute of limitations governing personal injury actions, the general or

residual limitations period applies.    Owens v. Okure, 488 U.S. 235, 250 (1989).

Consequently, § 1983 actions in Alabama are subject to a two-year statute of limitations.

ALA. CODE 1975 § 6-2-38(1).  See also Owens, 488 U.S. at 246 n. 9; Jones v. Preuit &

Mauldin, 876 F.2d 1480, 1483 (11th Cir. 1989).  Although state law governs the applicable

statute of limitations, "the accrual date of a § 1983 action is a question of federal law."

Wallace v. Kato, 127 S.Ct. 1091, 1094 (2007).  A "tort cause of action accrues, and the

statute of limitations begins to run, when the wrongful act or omission results in damages,"

id. at 1097, i.e., "at the time of the plaintiff's injury," United States v. Kubrick, 444 U.S. 111,

120 (1979).  While a statute of limitations generally applies to § 1983 claims for past injury,

"a statute of limitations does not necessarily apply to a claim for prospective, injunctive

relief," Anderson v. Cornejo, 199 F.R.D. 228, 245 (N.D. Ill. 2000) (citing McCarthy v.

11

Madigan, 503 U.S. 140, 153 n. 5 (1992) (emphasis added). Courts should keep in mind, also, that the purposes of 42 U.S.C. § 1983 call them "to accord the statute 'a sweep as broad as its language.'"[8]  Wilson, 471 U.S. at 272.

The action from which Mr. Siebert seeks protection is not the State of Alabama's adoption of lethal injection as its method of execution or adoption of its current execution protocol, but the Defendants' application of that protocol in executing him. This is an action which has not yet occurred. A statute of limitations cannot be triggered by an injury not yet accomplished. Jones v. Allen, 483 F.Supp. 2d 1142, 1148 (M.D. Ala. 2007) (Jones I) ("in a case where the plaintiff seeks an injunction pursuant to 42 U.S.C. § 1983 to prevent an unconstitutionally tortious act from occurring in the future, such a claim cannot be barred by the statute of limitations because the tortious act has not yet occurred and the tort is not yet complete"). The act of which Mr. Siebert complains is his execution by unconstitutional means. The statute of limitations could not begin to run from the point when the State of

---

[8]Oddly, the Owens decision had the reverse effect in Alabama from what it had in the forum state of New York. In Owens, the Supreme Court's supposed simplification of the process for determining which statute of limitations applied to a § 1983 action expanded the time for filing from one year to three. 488 U.S. at 237-38, 251. In Alabama, however, the limitations period applied before Owens was six years, from ALA. CODE 1975 § 6-2-34(1). See, e.g., Jones v. Preuit & Mauldin, 763 F.2d 1250, 1256 (11th Cir. 1985). This result contradicts the motivating factors behind the Second Circuit's ruling, which the Supreme Court affirmed in Owens, that the § 1983 statute of limitations should be "expansive enough to accommodate the diverse personal injury torts that section 1983 has come to embrace," Okure v. Owens [sic], 816 F.2d 45, 48 (2d Cir. 1987), and that § 1983 claims are not "necessarily apparent to the victim at the time they are inflicted," id. Should this Court adopt the Defendants' argument that a two-year statute of limitations began to run from July 2002, Mr. Siebert would respond that such an application "would improperly restrict the scope of § 1983 and controvert federal policy," Okure v. Owens, 625 F.Supp. 1568, 1571 (N.D.N.Y. 1986), because this short timeframe would fail to "afford a reasonable time to the federal claimant," Burnett v. Grattan, 468 U.S. 42, 61 (1984) (Rehnquist, J., dissenting).

Alabama adopted lethal injection, as the Defendants argue, Defendants' Motion at 16-18, because adoption of a method of execution, standing alone, is not the injury complained of. "Knowledge of a needless risk of a painful death at the hands of the State does not itself violate the Constitution; only the execution itself would," Jones I, 483 F.Supp. 2d at 1149.

The Defendants' discussion of accrual, Defendants' Motion at 11-14, is misleading. The cases on which the Defendants rely to assert that knowledge of the grounds for a cause of action constitutes the trigger for the statute of limitations all involved situations where the plaintiffs suffered an injury in the past. In Lovett v. Ray, 327 F.3d 1181, 1183 (11th Cir. 2003), for example, the court explicitly states that the injury to the plaintiff was the resetting of the date for reconsideration of his parole in line with a newly adopted policy: "the defendants' act (deciding not to consider Lovett for parole again until 2006) was a one time act with continued consequences, and the limitations period is not extended." Because Lovett received notice of the change at the time it occurred, his cause of action was complete: "Lott [sic] was notified by the defendants in September 1998 that he would not be reconsidered for parole until 2006. As of that time he knew, or should have known, all of the facts necessary to pursue a cause of action." Id. at 1182. In Brown v. Georgia Bd. of Pardons and Paroles, 335 F.3d 1259 (11th Cir. 2003), also relied upon by the Defendants, the issue was precisely the same. Again, Lesley v. David, 186 Fed. Appx. 926 (11th Cir. 2006) (unpublished opinion), is simply a Florida version of a similar situation. These cases are distinguishable from Mr. Siebert's. In all of these cases, the injury complained of was the

13

change in date of the plaintiff's next parole reconsideration. This resetting occurred by operation of each state Board's adoption of a new policy. The plaintiffs in all three cases suffered the injury on the date their next parole reconsideration was postponed, and their causes of action accrued as soon as they <u>received</u> <u>notice</u> of the new date. Thus, all of these plaintiffs brought suit concerning <u>past</u> injuries, and all received contemporaneous notice of those injuries.

In Mr. Siebert's case, however, the adoption of lethal injection as Alabama's method of execution was not the injury that gave rise to the present cause of action. The injury complained of is his execution by unconstitutional means, a <u>future</u> event. <u>See</u> <u>Jones</u> I, 483 F.Supp. 2d at 1147. Mr. Siebert is not challenging the constitutionality of lethal injection as a method of execution <u>per</u> <u>se</u>, a complaint which might be tied to the effective date of Alabama's statute. What Mr. Siebert <u>is</u> challenging is his execution under the particular protocol in place at the time his execution appears, at least potentially, imminent. The distinction between Mr. Siebert's case and the foregoing is that in <u>Lovett</u>, <u>Brown</u>, and <u>Lesley</u>, the adoption of a new policy led to immediate application, which immediately injured the plaintiffs. Injury to Mr. Siebert did not follow immediately upon enactment of Alabama's lethal injection statute or the adoption of the current protocol. Injury to Mr. Siebert will occur only when the then-currently effective protocol is employed to execute him. Thus, the Defendants' attempt to pin triggering of the statute of limitations to a date before Mr. Siebert has suffered injury cannot succeed.

14

The Defendants complain that such a view of the matter yields the result that the statute of limitations never begins to run. Defendants' Motion at 20. A similar result arises, however, in those cases where a defendant is charged with ongoing harmful conduct. There, the defendant's repeated acts repeatedly retrigger the statute of limitations, such that the limitations period can never be said to have run out. See, for example, the court's conclusion in <u>Lovett</u> that the resetting of his parole date was "a one time act" that did <u>not</u> retrigger the statute of limitations. 327 F.3d at 1183. This effect arises from the conduct of the defendant or the nature of the claim, not from any manipulation attributable to the plaintiff. Thus, there is no reason to penalize the plaintiff for matters beyond his control by reconfiguring the rules governing statutes of limitations.

Nor does <u>Cooey v. Strickland</u>, 479 F.3d 412 (6th Cir. 2007), relied upon by the Defendants, provide a reasonable rationale for determining accrual of a lethal-injection-protocol claim. In <u>Cooey</u>, the Sixth Circuit decided that "the most logical choice of a triggering event is the point when the death penalty is ordered, upon judgment of conviction and sentence," <u>id.</u> at 418, i.e., at the conclusion of direct appeal. The <u>Cooey</u> court's logic does not comport with the United States Supreme Court's recent decision in <u>Panetti v. Quarterman</u>, 2007 WL 1836653 (2007). In <u>Panetti</u>, the State of Texas argued that incompetency-to-be-executed claims under <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986), to be preserved for later adjudication, must be raised in a first habeas petition, while, at the same time, "acknowledg[ing] that <u>Ford</u>-based incompetency claims, as a general matter, are not

15

ripe until after the time has run to file a first federal habeas petition." <u>Panetti</u>, 2007 WL 1836653 at *9. As the <u>Panetti</u> Court reasoned, such a requirement "would add to the burden imposed on courts, applicants, and the States, with no clear advantage to any," by forcing all habeas petitioners to bring unripe <u>Ford</u> claims that for some would never ripen. <u>Id.</u>

> An empty formality requiring prisoners to file unripe <u>Ford</u> claims neither respects the limited legal resources available to the States nor encourages the exhaustion of state remedies. . . . Instructing prisoners to file premature claims, particularly when many of these claims will not be colorable even at a later date, does not conserve judicial resources, 'reduc[e] piecemeal litigation,' or 'streamlin[e] federal habeas proceedings.' . . . AEDPA's concern for finality, moreover, is not implicated, for under none of the possible approaches would federal courts be able to resolve a prisoner's <u>Ford</u> claim before execution is imminent.

<u>Id.</u> at *11 (citations omitted). Similarly, requiring early adjudication of lethal-injection-protocol claims, for example at the conclusion of direct appeal as the <u>Cooey</u> court suggests, or even at any point prior to the conclusion of federal habeas, would result in repetitive and wasteful litigation, and relitigation, of such claims. Each death-sentenced prisoner would have to relitigate his claim throughout his state postconviction and federal habeas proceedings every time the State revised its protocol in any substantial way (even assuming the petitioner/plaintiffs could discover that such revision had been made), because he could never count on a newer method or protocol being adopted and restarting his statutory limitations period before he completed his appeals. Even if such a policy saved time at the endpoint (which is debatable), it would do so at the expense of wasted effort on such a vast scale as to rightly merit the epithet "perverse," <u>Panetti</u>, 2007 WL 1836653, at *9.

16

As the history of Alabama's method of execution shows, as far as it can be ascertained, under the Cooey rationale, a plaintiff such as Mr. Siebert should have brought a challenge to Alabama's electrocution protocol at the end of his direct appeals, which concluded in 1990. See Siebert v. State, 778 So. 2d 842, 845-46 (whether counting from the Court of Criminal Appeals' mandate, issued on January 3, or the denial of certiorari by the United States Supreme Court on June 28). When the state adopted lethal injection as its method in 2002, ALA. CODE 1975 § 15-18-82.1, he should then have filed another suit, as soon as he had any indication of what the new protocol entailed. Since the protocol has also been changed an unspecified number of times, see Jones I, 483 F.Supp. at 1146 n. 2, Mr. Siebert would have had to file an unknowable number of interim challenges in order to preserve his right to challenge the protocol actually in place at the time his execution date is set. Such a policy, multiplied two-hundredfold (for all currently death-sentenced prisoners in this state), would indubitably "crash" this district's judicial system.

Although Mr. Siebert has as yet suffered no injury, he can, nonetheless, bring suit to enjoin an injurious future act.[9] Here Mr. Siebert seeks injunctive relief "to prevent great, immediate, and irreparable loss of [his] constitutional rights." Mitchum v. Foster, 407 U.S. 225, 242 (1972). Federal courts are authorized to intervene in state judicial or executive

---

[9]The Jones court distinguishes between accrual and ripeness. 483 F.Supp. 2d at 1149. A claim may be ripe for adjudication where no injury has yet occurred if the relief sought is injunctive–i.e., prevention of injury. Id. A cause of action accrues when injury occurs. Id. In a case such as this, where the injury cannot be remedied after the fact, the claim must be ripe at some point prior to injury, even though the cause of action has not accrued for statute of limitations purposes. Id.

proceedings in such circumstances.  Id.  There can be no question that execution by

unconstitutionally cruel means would qualify as "great, immediate, and irreparable" harm.

See Grayson, 2007 WL 1491009 at *12, ("it would be disingenuous not to conclude that

Grayson, should his claim prove meritorious, clearly would suffer irreparable injury").

Because a statute of limitations cannot begin to run on an injury which has not yet

occurred, the Defendants' Motion to Dismiss on statute of limitations grounds must be

denied.

> **B.     Even if the statute of limitations in a lethal-injection-protocol challenge begins to run before the execution occurs, it could not begin to run until the protocol being challenged was adopted and the plaintiff had knowledge of that adoption.**

Even if the two-year statute of limitations to Mr. Siebert's claim begins to run before

the event being challenged, i.e., his execution, the Defendants have not demonstrated that

Mr. Siebert has failed to meet it.  As the Defendants note, Mr. Siebert's challenge is to the

protocol, Defendants' Motion at 19, (or, rather, execution under a particular protocol), not

to lethal injection per se.  Because Mr. Siebert's challenge implicates the protocol, rather than

lethal injection generally, if any statute of limitations is running on his claim, it could not

begin to run until the State's adoption of the currently effective protocol, as Judge Myron

Thompson indicated in Jones I.  483 F.Supp. at p. 1146 n. 2 ("if a material componenet of

Jones's claim arises from a part of the execution procedurethat was not part of the protocol

from its inception but was initiated within two years of Jones filing his complaint, then even

under the <u>Cooey</u> framework Jones's claim would not be barred on statute-of-limitations grounds"). The Defendants have made no factual showing of the date on which the current protocol was adopted or that that event occurred more than two years before the filing of the present suit. <u>Id.</u> Yet, the Defendants bear the burden of proof on any defense. <u>Tello v. Dean Witter Reynolds, Inc.</u>, 410 F.3d 1275, 1293 (11th Cir. 2005) ("'It is beyond dispute that the defendants have the burden of proof in establishing the elements of the affirmative defense of the statute of limitations'") (<u>quoting</u> <u>Smith v. Duff & Phelps, Inc.</u>, 5 F.3d 488, 492 n. 9 (11th Cir.1993). Mere assertion that no substantive changes to the protocol have been made does not suffice.[10]

Even if the Defendants could show that Mr. Siebert failed to file within two years of the adoption of the present protocol, a statute of limitations could not bar his claim, because he could not reasonably be said to have known that his cause of action had accrued. In <u>Lovett v. Ray</u>, 327 F.3d 1181, 1182 (11th Cir. 2003), for example, the Eleventh Circuit stated that "the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." (Citation omitted.) In <u>Lovett</u>, the court held that the statute of limitations began to run on the day the plaintiff <u>received</u> <u>notice</u> of a change to the method by which his parole eligibility was to be calculated. <u>Id.</u> In a state such as Alabama, where the

---

[10]In <u>Jones I</u>, the Defendants admitted that changes had been made to the protocol, but asserted that the changes were not substantive; however, they were unable to produce documentation of the changes. 483 F.Supp. at p. 1146 n. 2.

19

execution protocol is not made public and is subject to change at any time without public notice, a plaintiff cannot be said to have the requisite knowledge to file his suit within two years of the adoption of a protocol, since he cannot know when such adoptions occur. The challenge in Mr. Siebert's suit is not simply to the specific drugs used,[11] although that is one part of his claim; he also challenges the quantity of drugs used, the manner in which the drugs are administered, the arrangement of the execution chamber and locations of the execution team members, the qualifications of the personnel carrying out the execution, and any other element of the protocol which increases the risk of suffering pain. Mr. Siebert could not have known the details of these elements in July 2002. Even if he had brought suit at that time, the Defendants have changed the protocol more than once, at times unknown to Mr. Siebert. See Jones I, 483 F.Supp. at p. 1146 n. 2.

Because Mr. Siebert's challenge, to be valid, must be to the protocol effective at the time his execution is imminent, bringing suit before his execution is reasonably close at hand

_____

[11]That the drugs used are not the only crucial element in Mr. Siebert's challenge to the Defendants' lethal injection protocol is obvious from the following scenario. State A and State B employ the same three-drug sequence to effect execution by lethal injection. State A has a written protocol which cannot be altered except through prearranged procedures, has fixed amounts of each drug specified in the protocol, employs trained personnel, has the execution chamber constructed and equipped in such a way that the execution team can readily observe the prisoner and monitor the delivery of the drugs throughout the procedure, etc. State B has no written protocol, employs untrained prison personnel who alter the amounts of the drugs at will, arranges the execution chamber so that the prisoner faces away from the execution team, positions all members of the execution team in a separate room with a severely limited view of the prisoner, etc. State A's protocol might reasonably be held constitutional at the same time that State B's is not, even though the two states employ the same three-drug sequence. Thus, Mr. Siebert respectfully submits that the Eleventh Circuit's statement in Jones II, that the real issue was the drugs, which Jones could have known about since at least 2003, 485 F.3d at 640 n. 3, is not a valid conclusion.

would be futile.  See, e.g., Boyd v. Beck, 404 F.Supp.2d 879, 884 (E.D.N.C. 2005) (challenge to anesthesia protocol moot where state no longer proposed to use it).  Assuming for purposes of this suit that an execution date is imminent,[12] the pertinent date for statute of limitations purposes would be the date on which the currently effective protocol was adopted. Since the Defendants have made no showing that the current protocol was adopted more than two years before Mr. Siebert filed the present suit, they have presented no grounds for dismissal.  Furthermore, since such a showing would be an evidentiary submission outside of Mr. Siebert's complaint, it cannot be considered in a ruling on a motion to dismiss.  Ellis, 160 F.3d at 706; Patton v. Jones, 2006 WL 2246441 (W.D. Okla. 2006) (matters requiring evidentiary submissions are outside the purview of the court on a motion to dismiss).

III.    **With Respect to the Doctrine of Laches, the Defendants' Motion to Dismiss Should Be Denied  Because Laches Does Not Apply in an Action for Injunctive Relief against a Wholly Future Injury or Because Mr. Siebert Has Not Unduly Delayed nor Would Adjudication of His Claim Cause Undue Prejudice to the Defendants.**

The Defendants argue that, even if no statute of limitations applies to bar Mr. Siebert's claim, his suit must be dismissed on grounds of laches.  Defendants' Motion at 23-34.  Mr. Siebert asserts, first, that a defense of laches is inappropriate in a § 1983 action where the relief sought is prospective, injunctive relief against a wholly future injury and, second, that

---

[12]Mr. Siebert would argue that an execution date cannot yet be set for the conviction and sentence underlying this suit, because litigation of his Talladega conviction, on which the State relied to obtain a death sentence in this case, is not yet complete.  See Exhibit 1, objections filed with the Alabama Supreme Court.  However, Mr. Siebert has brought his lethal injection challenge at this time as a result of the unsettled question as to when it is appropriate to litigate such a claim.

even if laches is applicable, he has not unduly delayed in filing his claim and no prejudice

accrues to the Defendants where the outcome of the litigation will still result in the execution

of the State of Alabama's judgment against Mr. Siebert.

### A. The defense of laches does not apply to § 1983 actions in general or where the relief sought is prospective, injunctive relief against a wholly future injury.

Statutes of limitations and laches generally are mutually exclusive defenses. Lyons

Partnership, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 798 (4th Cir. 2001) ("when

considering the timeliness of a cause of action brought pursuant to a statute for which

Congress has provided a limitations period, a court should not apply laches to overrule the

legislature's judgment as to the appropriate time limit to apply for actions brought under the

statute"); Shouse v. Pierce County, 559 F.2d 1142, 1147 (9th Cir. 1977) (noting that

application of laches to bar a § 1983 claim before the statute of limitations has run is rare);

Equal Employment Opportunity Comm'n v. Dresser Indus., Inc., 668 F.2d 1199, 1201 (11th

Cir. 1982) (in federal case, laches applies "in the absence of an appropriate statute of

limitations"). The district court in Grayson erred in holding that laches may apply to a §

1983 claim, despite the availability of a statute of limitations. Grayson v. Allen, at *5.[13] In

---

[13]The Grayson court cited to an Alabama state court case, Gayle v. Pennington, 64 So. 572, 577 (Ala. 1914), for the proposition that laches may apply even if the applicable statute of limitations has not yet run. The court stated that substantive state law applies in a nondiversity case, absent any "compelling federal interest." Grayson, 2007 WL 1491009 at *5 n. 10. The court did not explain why a § 1983 action challenging the constitutionality of an execution protocol under the Eighth and Fourteenth Amendments does not show a "compelling federal interest." In any event, Gayle does not stand for the proposition that laches may apply before the statute of limitations begins to run. 64 So. 2d at 577.

Kason Indus., Inc., v. Component Hardware Group, Inc., 120 F.3d 1199 (11th Cir. 1997), for example, the Eleventh Circuit applied laches only because the suit was brought under the Lanham Act, which has no statute of limitations, id. at 1203, and the analogous state law also had no statute of limitations, id. at 1203, 1204. On the other hand, the Supreme Court has explicitly held that a statute of limitations applies to § 1983 actions and that that limitations period is to be derived from the forum state's personal injury statute. Wilson, 471 U.S. at 280. Additionally, "[o]nly the length of the [statutory] limitations period, and closely related questions of tolling and application, are to be governed by state law." Id. at 269. Even if both may be applied, the principles that should guide a court's decision on laches must be comparable to the principles governing statutes of limitations:[14] that a reasonable period must be "expansive enough to accommodate the diverse personal injury torts that section 1983 has come to embrace," Okure v. Owens,[15] 816 F.2d 45, 48 (2d Cir. 1987) (Okure II), and that § 1983 claims are not "necessarily apparent to the victim at the time they are inflicted," id. The Court must also apply the doctrine in a fashion that "would [not] improperly restrict the scope of § 1983 and controvert federal policy," Okure v. Owens, 625 F.Supp. 1568, 1571

---

[14]The reasons for applying laches and statutes of limitations to bar suit are likewise comparable, i.e., protecting against claims which can no longer be adequately defended against due to unavailability of witnesses or loss of evidence. On statutes of limitations, see Judge Thompson's discussion in Jones I, 483 F.Supp. 2d at 1149 and citations therein. On laches, see, e.g., Kason, 120 F.3d at 1206; Dresser, 668 F.2d 1199, 1203 (11th Cir. 1982). State law governing laches is the same. See, e.g., Ex parte Lightwave Tech., L.L.C., 2007 WL 1229206 at *8 (Ala. 2007); Ex parte Grubbs, 542 So. 2d 927, 929 (Ala. 1989); Gayle, 64 So. at 577.

[15]Thus, the reporter title, despite the fact that Owens was the appellant.

(N.D.N.Y. 1986) (<u>Okure I</u>), and "afford a reasonable time to the federal claimant," <u>Burnett</u>

<u>v. Grattan</u>, 468 U.S. 42, 61 (1984) (Rehnquist, J., dissenting).

Laches as a defense is meant to protect potential defendants from "stale" claims. <u>See</u>,

<u>e.g.</u>, <u>Davis v. Dugger</u>, 829 F.2d 1513, 1518-19 (11th Cir. 1987).   Particular concerns

addressed by laches are that undue delay may result in the loss of evidence, the absence of

witnesses, and actions undertaken in reliance on the status quo.  <u>Dresser</u>, 668 F.2d at 1203.

For these reasons, "the general rule [is] that laches does not bar future injunctive relief."[16]

<u>Danjaq, LLC v. Sony Corp.</u>, 263 F.3d 942, 959-60 (9th Cir.2001).  This rule "stems from a

practical recognition of the interaction between the temporal components of those two

doctrines.  Laches stems from prejudice to the defendant occasioned by the plaintiff's past

delay, but almost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's

ongoing behavior that threatens future harm."  <u>Id.</u>  Similarly, "[a] prospective injunction is

entered only on the basis of current, ongoing conduct that threatens future harm.  Inherently,

such conduct cannot be so remote in time as to justify the application of the doctrine of

laches." <u>Lyons</u>, 243 F.3d at 799.  <u>See</u> <u>also</u> <u>University of Pittsburgh v. Champion Products,</u>

<u>Inc.</u>, 686 F.2d 1040, 1044 (3d Cir. 1982) (plaintiff's delay "will bar its claim for an

accounting for past infringement but not for prospective injunctive relief").

Federal courts' power to grant injunctive relief against state action respecting

---

[16]An exception to the general rule might apply where the defendants have already undertaken construction at considerable expense, which the plaintiffs seek to stop by injunction. <u>See</u>, <u>e.g.</u>, <u>Sierra Club v. U.S. Army Corps of Engineers</u>, 295 F.3d 1209, 1218-19 (11th Cir. 2002). But <u>Sierra Club</u> was not a § 1983 case, and no question of such reliance or incurrence of expense is at issue here.

enforcement of criminal judgments is limited.  "[R]ecognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws in the absence of a showing of <u>irreparable</u> <u>injury</u> which is 'both <u>great</u> <u>and</u> <u>immediate</u>.'"  <u>O'Shea v. Littleton</u>, 414 U.S. 488, 499 (1974) (<u>citing</u> <u>Younger v. Harris</u>, 401 U.S. 37, 46 (1971)) (emphasis added).  Thus, a § 1983 plaintiff seeking relief from the execution of a death sentence in an unconstitutional manner, an undeniably "great" and "irreparable" injury, must also face "immediate" injury.  Furthermore, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).  Thus, a lethal injection protocol claim cannot be ripe until the conclusion of habeas review.

Mr. Siebert could not reasonably bring suit respecting the Defendants' employment of the State of Alabama's lethal injection protocol against him until all other avenues of review were shut off and the likelihood of his execution became "immediate."  See also the discussions above at the conclusion of Section I(A), here incorporated by reference.

Even if it were appropriate to consider laches in this case, "[t]he laches defense raises fact questions regarding the existence of any delays, the reasons for any such delays, the prejudice created by any delays, and the balance of equities.  These issues cannot be determined on a motion to dismiss."  <u>Patton v. Jones</u>, 2006 WL 2246441 (W.D. Okla. 2006).

In this suit, Mr. Siebert seeks to bar the Defendants from carrying out a future act in a way that fails to comport with constitutional requirements. Because the Defendants' present practice is the point at issue, the concerns underpinning laches are not in play.

> **B.**    **Even if laches may be applied in a § 1983 action where the relief sought is prospective, the Defendants have failed to demonstrate that Mr. Siebert has unreasonably delayed or that they have suffered undue prejudice.**

The defense of laches requires a showing from the defendant that the plaintiff unreasonably delayed filing his claim, that the delay is inexcusable, and that the delay resulted in undue prejudice to the defendant. Venus Lines Agency, Inc., v. CVG Int'l Am., Inc., 234 F.3d 1225, 1230 (11th Cir. 2000). These elements raise evidentiary questions which cannot be addressed on a motion to dismiss. See, e.g., Bratton v. Bethlehem Steel Corp., 649 F.2d 658, 666-67 (9th Cir. 1980) ("Laches questions are seldom susceptible of resolution by summary judgment, because where laches is raised as a defense, the factual issues involved . . . can rarely be resolved without some preliminary evidentiary inquiry") (internal quotation marks omitted); Patton v. Jones, 2006 WL 2246441, at *4 (W.D. Okla. 2006) ("The laches defense raises fact questions . . . These issues cannot be determined on a motion to dismiss."). The Defendants, who bear the burden of proof on a laches defense, id., cannot demonstrate that Mr. Siebert has unreasonably delayed filing suit or that they have suffered undue prejudice.

> **i.**    ***The Defendants fail to demonstrate unreasonable delay.***

The Defendants argue that Mr. Siebert unreasonably delayed this suit because he knew

of his cause of action as early as July 2002, yet failed to file suit until April 2007. Defendants' Motion at 23. They enumerate the elements of a laches defense, citing to <u>Kason Indus., Inc., v. Component Hardware Group, Inc.</u>, 120 F.3d 1199, 1203 (11th Cir. 1997), but ignore the facts and holding of that case. The plaintiff in <u>Kason</u> did not bring a § 1983 action, but an action under the Lanham Act and state law alleging trademark infringement and unfair business practices. <u>Id.</u> at 1201. Because no specific statute of limitations applied to certain of the claims, the court considered the applicability of the doctrine of laches. <u>Id.</u> at 1205-07. With respect to the claims for damages, the Eleventh Circuit agreed with the plaintiff that the date upon which the plaintiff first became aware of its competitor's product was not the date from which to measure delay. <u>Id.</u> at 1206. Because of the nature of the claim, which involved elements not easily provable at the point of first awareness (such as "likelihood of confusion"), the court held that the principle of "progressive encroachment" applied. Therefore, any delay on the plaintiff's part in bringing suit should "be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement." <u>Id.</u> Thus, the holding of <u>Kason</u> was that a more expansive period applied than under a strict application of the state's statute of limitations.

Analogizing the principles of <u>Kason</u> to Mr. Siebert's situation lead to a conclusion opposite that argued by the Defendants. At the time Alabama adopted lethal injection as its method of execution in 2002, Mr. Siebert had, and could be expected to have, no awareness of what its protocol for effecting lethal injection might be, because the statute does not

specify anything more than "lethal injection" as the method, ALA. CODE 1975 § 15-18-82.1, and the Warden of Holman Correctional Facility as the executioner, ALA. CODE 1975 § 15-18-82(c).  That other states' protocols were public cannot be said to have been proof positive to Mr. Siebert that Alabama's protocol was the same or similar.  Alabama cloaked its protocol in secrecy, refusing, for example, to provide it, upon request, to counsel for David Nelson.  Nelson v. Campbell, 541 U.S. 637, 641 (2004).  In Florida (which adopted lethal injection in 2000, Sims v. State, 754 So. 2d 657, 663 n. 11 (Fla. 2000)), on the other hand, state court litigation brought to the public's view full details of that state's protocol.  See id. at 666 n. 17.  Thus, the plaintiffs in Hill v. McDonough, 126 S. Ct. 2096 (2006), Rutherford v. Crosby, 438 F.3d 1087, 1092 (11th 2006) (reversed on other grounds) (Rutherford I), and Diaz v. McDonough, 472 F.3d 849 (11th Cir. 2006) (all Florida cases) had notice of the procedures Florida would employ years before they brought their claims.[17]  However, as with plaintiffs arguing "progressive encroachment," Alabama plaintiffs awareness of this claim took years to mature to a point where enough was known to raise a challenge.  Thus, although the Eleventh Circuit affirmed denial of Aaron Jones' application for a stay, in part, on grounds that he could have brought his suit at any time after the State of Alabama adopted lethal injection as its method of execution, Jones II, 485 F.3d at 640, such a supposition does

---

[17]Similarly with Ohio's protocol, which calls into question the applicability of the Sixth Circuit's analysis in Cooey v. Strickland, 479 F.3d 412, 422 (6th Cir. 2007).

not accurately reflect the nature of Mr. Jones' or Mr. Siebert's claims.[18]

Also, unlike the plaintiff in Rutherford, for example, where "[t]here ha[d] been no suggestion that the lethal injection chemicals or procedures used by Florida ha[d] changed in the last six years, and Rutherford's complaint assume[d] that they ha[d] not," Mr. Siebert challenges a protocol adopted at an unknown time.  See also White v. Johnson, 429 F.3d 572, 574 (5th Cir. 2005) (denying relief on the grounds that "White has been on death row for more than six years, and only now, with his execution imminent, has decided to challenge a procedure for lethal injection that the State has been using for his entire stay on death row").  Thus, the Grayson court's citation to Rutherford I, 438 F.3d at 1092 n. 3, and support from White, 429 F.3d at 573-74, for the applicability in Alabama of "equitable principles . . . to all types of equitable relief sought by inmates facing execution." 2007 WL 1491009 at *7, is flawed for precisely this reason: that no allegations were made, either in Rutherford I or White, that there had been any change to the protocol during the years since each state's adoption of lethal injection.  Cf. Boyd v. Beck, 404 F.Supp.2d 879, 884 (E.D.N.C. 2005) (challenge to anesthesia protocol moot where state no longer proposed to use it).  A defense alleging unreasonable delay in challenging a particular protocol cannot succeed where the Defendants have failed to show the date on which the challenged protocol was adopted or to allege that Mr. Siebert could and should have known of its adoption.

---

[18]The Eleventh Circuit did not address the issues of statute of limitations or applicability of a laches defense in Jones II.  485 F.3d at 638 n. 1.  The issue before the court was the propriety of denying a stay of execution.  Id. at 636-37.

The Defendants also suggest that Mr. Siebert delayed unreasonably because he could have raised a lethal injection challenge in his § 2254 petition, which was still pending at the time Alabama adopted lethal injection. Defendants' Motion at 23. Although the Eleventh Circuit suggested in Jones II, that Mr. Jones could have followed this path to relief, 485 F.3d at 639; see also Jones I, 483 F.Supp. at 1152 ("[Jones] could have then [in 2002] amended his habeas petition to challenge lethal injection as well"), litigating a protocol challenge in this manner is barred by the distinctive nature of § 1983 and § 2254 actions, at least where the challenged protocol is not established by statute. The Eleventh Circuit itself opined in Hutcherson v. King, 468 F.3d 750, 754 (11th Cir. 2006), that the two forms of suit are "mutually exclusive." A § 2254 petition challenges the constitutionality of a prisoner's conviction and/or sentence. Hill, 126 S.Ct. at 2101 ("Challenges to the lawfulness of confinement or to particulars affecting the duration are the province of habeas corpus") (citations omitted). A § 1983 action, on the other hand, challenges the conditions of confinement or the manner in which a punishment is to be meted out. Id. As the Supreme Court indicated in Hill, where the challenged protocol is not established by statute, such that invalidation of the protocol would bar the State from proceeding with the execution, the claim is cognizable in § 1983. Id. at 2101-02. Essentially, what the Supreme Court indicated in Hill is that a challenge to a protocol established by statute is a challenge to the constitutionality of the statute and, hence, to the constitutionality of the prisoner's sentence under the statute. This would constitute a § 2254 claim. However, where, as here, the

protocol is not established by statute, invalidation of the protocol does not bar the State from employing some other procedure to effect the death sentence.[19]  In such circumstances, a challenge to the protocol is properly cognizable in a § 1983 action.  Where either § 2254 or § 1983 might both apply, the Supreme Court has held that the plaintiff/petitioner must proceed under the stricter requirements of § 2254.  Nelson, 541 U.S. at 643.  ("§ 1983 must yield to the more specific federal habeas statute, with its attendant procedural and exhaustion requirements, where an inmate seeks injunctive relief challenging the fact of his conviction or the duration of his sentence").  If Mr. Siebert's claim had been cognizable in a § 2254 action, he would not now be able to bring this suit under § 1983, as Hill permits him to do.

The district court's conclusions in Grayson that the plaintiff had unreasonably delayed are not applicable here.  There the court was faced with the necessity of a stay of execution, even though the stay was to be requested only if the plaintiff succeeded on the merits.  2007 WL 1491009 at *4.  Mr. Siebert's case is distinguishable because no execution date has yet been set and no stay has yet been requested.  Mr. Siebert has litigation ongoing in a related

---

[19]The Supreme Court, in Nelson, implies that, where a specific procedure is not mandated by statute, but is determined to be an indispensable requirement to effect the death sentence, i.e., no effective alternatives are available, the claim might have to be recharacterized as a § 2254 claim. 541 U.S. at 644-45.  (The plaintiff, however, bears no burden of providing an alternative.  Hill, 126 S.Ct. at 2103.)  The foregoing analysis does not pretend to fully explain the interrelationship between § 1983 and § 2254 actions, which it is not necessary to settle here.  Complications would arise under this scheme, for instance, where a state enacted a new statute, laying out the full protocol, after a plaintiff's statute of limitations for habeas had run and his case was on appeal (thus, no opportunity for amendment).  Because his challenge to the protocol would then become a challenge to the constitutionality of the statute itself, his claim would be a § 2254 claim, but he would have no means to challenge it.

case, which the State relied on as an aggravating factor to obtain the underlying death sentence in this case. <u>See</u> Exhibit 1 at 2-5. Should the Alabama Supreme Court order an execution date, Mr. Siebert would move for a stay on those grounds, <u>inter</u> <u>alia</u>.

This § 1983 case is also in a different procedural posture, as <u>Grayson</u> was dismissed at the motion for summary judgment stage, after discovery and "evidentiary submissions." 2007 WL 1491009 at *1, *6. As the Grayson court acknowledged, no federal court has applied laches at the motion to dismiss stage because of concerns about evidentiary questions. <u>Id.</u> at *5.

Furthermore, the <u>Grayson</u> court emphasized the "unique circumstances" of the case, <u>id.</u> at *5, *11, which included the litigation of a prior § 1983 claim, <u>id.</u> at *6. The <u>Grayson</u> court found that, because Mr. Grayson had had an execution date requested at the end of his federal habeas in 2002 and litigated his DNA testing request for four years thereafter, he had ample opportunity to present his lethal injection claim at a time when it would not have required hurried litigation to resolve. <u>Id.</u> Such is not the situation here, where Mr. Siebert is still engaged in the litigation of his federal habeas claims in an intertwined case and has never before filed for relief under § 1983.

The Defendants' arguments that Mr. Siebert unduly delayed are all premised on their assertion that he had full knowledge of a cause of action that was ripe in 2002.[20] These

---

[20]Mr. Siebert would also note that the Defendants' long list of supposedly relevant dates in the procedural history of this case, Defendants' Motion at 8-10, are of no consequence to his present claim. Bringing suit at any time before 2002 against a lethal injection protocol that was not in existence before that year would have been a factual impossibility.

32

arguments, however, do not comport either with the facts concerning the ripeness of Mr. Siebert's claim or Mr. Siebert's ability to know facts necessary to show he has a provable claim.

### ii.    The Defendants fail to demonstrate undue prejudice.

The Defendants argue undue prejudice on the grounds that litigation of Mr. Siebert's claim will delay his execution.  Defendants' Motion at 25-30.  Such grounds are not a legitimate bar to allowing Mr. Siebert to proceed, when no date for execution has been set in his case and the constitutionality of the very means by which the Defendants propose to execute Mr. Siebert is the subject of the litigation.  The State of Alabama can have no "expectation," Defendants' Motion at 25, to carry out an execution in an unconstitutional manner, see Gomez v. United States Dist. Court for the Northern Dist. of Cal., 503 U.S. 653, 659 (1992) (Stevens, J., dissenting) ("if execution by cyanide gas is in fact unconstitutional, then the State lacks the power to impose such punishment").  The Defendants, even more than Mr. Siebert, could have avoided the present delay, by revising the execution protocol to comply with constitutional standards respecting the infliction of unnecessary pain.  See id. at 658-59.  Yet they have not.

Prejudice in a laches defense usually contemplates either economic loss or some limitation on the defendant's ability to defend against the suit:

> To establish prejudice, the defending party must show that allowing the plaintiff's claim after an unreasonable delay will cause the defending party either economic prejudice or prejudice in mounting a defense.  Cornetta v. United States, 851 F.2d 1372, 1378 (Fed.Cir.1988) (en banc).  Economic

prejudice exists "where a defendant and possibly others . . . suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." <u>Wanlass v. Gen. Elec. Co.</u>, 148 F.3d 1334, 1337 (Fed.Cir.1998) (<u>quoting</u> <u>A.C. Aukerman Co. v. R.L. Chaides Constr. Co.</u>, 960 F.2d 1020, 1033 (Fed.Cir.1992) (en banc)). Defense prejudice exists when the defendant's ability to mount a defense is impaired due to the plaintiff's delay. <u>A.C. Aukerman</u>, 960 F.2d at 1033.

<u>United Enterprise & Associates v. United States</u>, 70 Fed. Cl. 1, 21 (Fed. Cl. 2006). Stated

somewhat more broadly, the "economic prejudice" option requires at least some action taken

in reliance on the plaintiff's delay:

> Prejudicial harm does not occur merely because one loses what he otherwise would have kept. <u>Esso International, Inc. v. SS Captain John</u>, 443 F.2d 1144 (5th Cir. 1971). He who would invoke laches must show a delay which has subjected him to a disadvantage in asserting and establishing his claimed right or defense, or other <u>damage caused by his detrimental reliance on his adversary's conduct</u>. <u>See id.</u>; <u>Save Our Wetlands v. U. S. Army Corps of Engineers</u>, 549 F.2d 1021 (5th Cir. 1977).

<u>Law v. Royal Palm Beach Colony, Inc.</u>, 578 F.2d 98, 101 (5th Cir. 1978) (emphasis added).

"Defense prejudice" refers to such obstacles to mounting a defense as absence of witnesses

and loss of evidence as a result of the delay.[21] <u>Kason</u>, 120 F.3d 1206; <u>Dresser</u>, 668 F.2d

1199, 1203 (11th Cir. 1982). Even if prejudice is to be read to cover noneconomic damage,

a court considering a laches defense is "required to balance the equities, considering both the

expenditures which have been made by the defendants and the . . . benefits which might

---

[21]This is what is meant by the Alabama Supreme Court's comment that a court may dismiss on laches grounds if it "believes that, under the circumstances, it is too late to ascertain the merits of the controversy." <u>Ex parte Grubbs</u>, 542 So. 2d 927, 929 (Ala. 1989). The <u>Grayson</u> court misapprehends the state court's meaning when it interprets this comment to permit dismissal on the basis of the shortness of time available to try the case. <u>See</u> 2007 WL 1491009 at *9.

result if the plaintiffs are allowed to proceed with th[e] litigation." Save Our Wetlands, 549 F.2d at 1028.

The Defendants in this case argue that prejudice arises because of their inability to assert a claimed right, i.e., to carry out a sentence of death on Mr. Siebert. Defendants' Motion at 26-27. In the first place, Mr. Siebert would argue that the "disadvantage in asserting and establishing [a] claimed right or defense" refers to an inability to present witnesses or evidence at trial because of the passage of time, not delay in executing a death sentence or carrying out whatever action is the subject of the litigation.[22] The Defendants cite to no case (other than Grayson) in which the delay occasioned to the defendants by the pendency of the lawsuit, rather than the passage of time before suit was brought, was considered by the court in deciding whether the defense of laches was applicable. Even if such court-time delay is encompassed within the scope of prejudice for laches purposes, any injury occasioned to the Defendants' ability to carry out the State of Alabama's judgment against Mr. Siebert while this lawsuit is pending must be measured against the injury to Mr. Siebert if that judgment were to be carried out in a manner incompatible with the United States Constitution. This Court must balance the equities between permitting the State to proceed to execution without an examination of its protocol, which, at the least, employs

_____

[22]The Defendants' argument respecting "change of circumstances" is incomprehensible. Defendants' Motion at 26. "Change of circumstances" in a laches defense refers to such matters as defendants undertaking actions they would not have undertaken if suit had been commenced earlier or an alteration in operations between the time of alleged injury and of bringing suit. See, e.g., Pegues v. Morehouse Parish School Bd., 632 F.2d 1279, 1282-83 (5th Cir. 1980).

drugs that cause excruciating pain (given that the Defendants have not denied the use of

pancuronium bromide and potassium chloride), and assuring that Mr. Siebert is not subjected

to unnecessary agony.  Mr. Siebert's death cannot be made un-cruel after the fact.  The

Defendants complain that litigation of multiple claims drains their resources.  Defendants'

Motion at 31-32.  The only way to stop this drain is to litigate through to the merits of some

plaintiff's claims.

Furthermore, in this case, unlike Jones I and Grayson, the issue of when the State will

be able to proceed on its judgment is far from settled.  Balancing of the equities, then, must

consider the damage to Mr. Siebert that would ensue from dismissing his claim when no

execution date has been (or can be) set and a year or more may remain before that event

occurs.  The Defendants ask this Court to dismiss Mr. Siebert's suit on the supposition that

when the State asks to set a date, the Alabama Supreme Court will set one, no matter the

circumstances.  Defendants' Motion at 24 n. 4 ("The State moved for an execution date on

April 17, 2007.  Presumably, the Alabama Supreme Court will soon set Siebert's execution.

Thus, it is not possible to see this litigation through [to] conclusion").  But in Ex parte

Grayson, Ala. Sup. Ct. Case No. 1830756, docket sheet entry for 5/22/2003 (attached as

Exhibit A to Respondent's Objections appearing as Exhibit 1 to this pleading), the state

supreme court denied the State's request to set an execution date pending the resolution of

his § 1983 DNA action.  As Mr. Siebert has argued to the state court, his execution on the

death sentence underlying this suit cannot proceed until his companion case is litigated

through to a conclusion.  See Exhibit 1 at 2-5.  That is not likely to occur, even in the shortest

possible timeframe, in less than a year.[23]  Even if a date is set, this Court would have to

consider Mr. Siebert's arguments for a stay on the same grounds.  Thus, dismissal at this

point would be improper.

Additionally, whether Mr. Siebert's suit should be permitted to proceed to trial and

whether Mr. Siebert should be granted a stay, should that become necessary, are two different

inquiries.  The Defendants repeatedly confuse the issues of stay litigation and litigation of

the underlying claim.  See, e.g., Defendants' Motion at 30 (concluding discussion of the

above cases by reference to the Eleventh Circuit's precedent on denying a stay to § 1983

execution-protocol litigants).  In Grayson, even though the court concluded that dismissal

was proper before a stay had been formally requested, that decision was premised on the

foregone conclusion that a stay would be required, as an execution date had already been set.

2007 WL 1491009 at *4.  That is not the case here.  The prejudice which the court found

sufficient in Grayson to justify dismissal stemmed primarily from two factors: the necessity

of "fast-track" litigation, because of the impending execution date, id. at *11, and Mr.

Grayson's previous litigation of a § 1983 action, id. at *6.  The Defendants urge that this suit

_____

[23]Mr. Siebert's Talladega/Northern District case is currently before the United States
Supreme Court on a petition for certiorari by the State.  Sup. Ct. No. 06-1680.  Should the Supreme
Court grant certiorari (the likelihood of which is held to be minimal when inmates' timing is at issue,
see Jones II, 485 F.3d at 639 n. 2), schedules for briefing and oral argument would then be
forthcoming, setting the case sometime during the next term, beginning in October 2007.  Should
the Supreme Court deny certiorari, the case will be remanded to the district court, where Mr. Siebert
has not yet had the opportunity even to submit a merits brief.

be dismissed on the grounds that an execution date has been requested, even though no date has yet been set.  Defendants' Motion at 24 n. 4.  Mr. Siebert has no execution date set and has not applied for a stay.  Should an execution date be set, Mr. Siebert would apply for a stay in this Court, but on grounds, inter alia, both that he needs time to litigate his § 1983 claim and that litigation of the sentence underlying this claim, is not final until completion of Mr. Siebert's conviction and sentence in the Talladega County case.  See Exhibit 1 at 2-5. Additionally, unlike Mr. Grayson, Mr. Siebert has never before filed a § 1983 action.

The Defendants' argument that having to defend multiple suits at the same time causes prejudice, Defendants' Motion at 31-32, is without merit and can have no bearing on whether Mr. Siebert can proceed to trial on the merits of his claims.  The Eleventh Circuit rejected a similar argument, brought by a government agency as plaintiff, in Dresser, 668 F.2d at 1203.  In that case, the Equal Employment Opportunity Commission argued that its tardiness in bringing suit should be excused because of the heaviness of its caseload.  Id.  The Eleventh Circuit stated, "we cannot allow defendants [in this case, plaintiffs] to be sacrificed in an administrative quagmire."  Id.  Injury to many plaintiffs does not and cannot excuse a defendant from answering each of them.  Even if Mr. Siebert were tardy, though he argues that he is not, this is not the kind of inability to defend a tardily-brought claim contemplated under the doctrine of laches.  The Defendants argue that they are prejudiced by the number of prisoners bringing such suits at one time, yet, under the Defendants' theories of timeliness, a far greater  number of plaintiffs would have to file in the near future in order to preserve

their right to bring such an action. The Defendants' argument concerning prejudice because of the number of lethal injection lawsuits currently in litigation must be rejected.

If there is to be any time limitation on when § 1983 challenges to execution <u>protocols</u> can be brought, it would make far more sense to prohibit their initiation until an execution date has been set. Requiring, or even merely promoting, litigation before that point wastes the resources of the courts and of the parties. <u>See</u> <u>Panetti</u>, 2007 WL 1836653 at *11. If a plaintiff is required to litigate his claim at the conclusion of direct appeal or during the course of his postconviction proceedings, as the Defendants urge, any ruling on the merits of the claim may well become moot by the time the plaintiff actually faces execution. <u>See</u>, <u>e.g.</u>, <u>Boyd</u>, 404 F.Supp. 2d at 884 (challenge to anesthesia protocol moot where state no longer proposed to use it). Mr. Siebert, as well as most, if not all, plaintiffs in his position, is indigent. Neither he nor others in his position have the resources to litigate challenges to execution protocols repeatedly. Nor would such repetitive litigation serve the interests of judicial economy or even the interests of the affected state, which would be compelled to litigate such claims multiple times for the same plaintiffs.

Furthermore, the challenge in a § 1983 suit is to the <u>particular</u> <u>protocol</u> that will be used to execute the <u>particular</u> <u>plaintiff</u>, not to a method of execution. Especially in a state such as Alabama, where the protocol is subject to change without notice or publication at the discretion of unspecified persons, timing requirements that force plaintiffs to undertake such litigation years before a date can be set compromise plaintiffs' ability to vindicate their

constitutional right not to be executed in a cruel or unusual fashion. The fact that a stay of execution by the federal court would be necessary to conduct the litigation at this point in the proceedings is not the result of delaying tactics by the plaintiffs; it is simply a reflection of the nature of the claim.

For these reasons, Mr. Siebert respectfully requests that the Court deny the Defendants' Motion to Dismiss and proceed with the trial of this matter.

Dated: July 10, 2007.

Respectfully submitted,

/s/Anne E. Borelli
ANNE E. BORELLI
Federal Defenders
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail:anne_borelli @fd.org
AL Bar Code: BOR -016

Thomas M. Goggans
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery, AL 361056
Phone: 334-834-2511
Fax: (334) 834-2512
E-mail: tgoggans@tgoggans.com

Counsel for Daniel Lee Siebert, Plaintiff

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **DANIEL LEE SIEBERT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **RICHARD ALLEN, Commissioner,** ) | |
| **Alabama Department of Corrections,** ) | |
| ) | |
| **GRANTT CULLIVER, Warden,** ) | |
| **Holman Correctional Facility, and** ) | **Case No.: 2:07-cv-295-MEF-WC** |
| ) | |
| **OTHER UNKNOWN EMPLOYEES** ) | |
| **AND AGENTS,** ) | |
| **Alabama Department of Corrections,** ) | |
| ) | |
| **Individually, and in their** ) | |
| **official capacities,** ) | |
| ) | |
| **Defendants.** ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2007, a copy of the foregoing has been electronically

filed with the Clerk of the Court using the CM/ECF system, which will electronically send

a copy of the same to each of the following:

> James Clayton Crenshaw, Esq.
> Office of the Attorney General
> 11 South Union Street
> Montgomery, AL 36130
> Tel.: (334) 242-7300
> Fax: (334) 353-8440
> Email: ccrenshaw@ago.state.al.us

James William Davis, Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 242-7300
Fax: (334) 353-8440
Email: jimdavis@ago.state.al.us

Jasper Beroufon Roberts, Jr., Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4848
Fax: (334) 353-3637
Email: jroberts@ago.state.al.us

Corey Landon Maze
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4336
Fax: (334) 353-3637
Email: cmaze@ago.state.al.us

Respectfully submitted,

/s/ Anne E. Borelli
ANNE E. BORELLI

42

# EXHIBIT 1

FILED
APR 2 7 2007
CLERK
SUPREME COURT OF ALABAMA

IN THE SUPREME COURT OF ALABAMA

Ex parte DANIEL LEE SIEBERT )
                            )
In re: State of Alabama,    )
                            )
    Petitioner,             )
                            )
v.                          )    Case No.
                            )
Daniel Lee Siebert,         )
                            )
    Respondent              )

## RESPONDENT'S OBJECTIONS AND OPPOSITION TO THE STATE OF ALABAMA'S MOTION TO SET AN EXECUTION DATE

Comes now the Respondent, Daniel Lee Siebert, and moves this Honorable Court to deny the State's Motion to Set an Execution Date (State's Motion) in Lee County Case No. CC 87-371 both because the **SENTENCE IN THIS CASE IS DEPENDENT ON HIS CONVICTION IN TALLADEGA COUNTY CASE** No. CC 86-300, habeas review of which is **STILL PENDING** in the Eleventh Circuit, Siebert v. Allen, 480 F.3d 1089 (11th Cir. 2007) (reversed and remanded; petition for rehearing en banc filed by the State on March 19, 2007), and the United States District Court for the Northern District of Alabama, Siebert v. Allen, No. 1:01-cv-02323-IPJ-TMP (N.D. Ala. 2006), and because Mr. Siebert is litigating a 42 U.S.C. § 1983 challenge to Alabama's lethal injection protocol in the United States District Court for the Middle District of Alabama, Siebert v. Allen et al., No. 2:07-

1

cv-295-MEF-WC.    In support of this request, Mr. Siebert submits the following objections:

1. Initially, Mr. Siebert would note that the Rule 8(d)(1), Alabama Rules of Appellate Procedure, stay does not automatically dissolve at the conclusion of federal habeas review.    See State's Motion at 18 ("Siebert's [lethal injection] lawsuit . . . was filed . . . when his Rule 8(d)(1) stay was no longer valid").    The rule states that this Court shall "at the appropriate time" set a date for execution, but also authorizes this Court to "make other appropriate orders upon disposition of the appeal or other review."    Ala. R. App. P. 8(d)(1).    This Court has the authority to postpone setting a date for execution and should where there is good cause.    See, e.g., Ex parte Darrell Grayson, docket sheet entry for 05/22/2003, attached as Exhibit A (motion to set execution date DENIED pending resolution of motion for DNA testing in federal district court).

**I.    This Court Should Deny the State's Request to Set an Execution Date in the Lee County Case Because the Death Sentence in This Case Is Dependent on the Talladega Conviction.**

2. There is good cause for this Court to delay setting an execution date in this case.    Rule 8(d)(1), Ala. R App. P., provides that an execution date may be set upon the conclusion

of "appeal or other review." Mr. Siebert's sentence in this case is not beyond "other review." The State asserts that Mr. Siebert's conviction and sentence in Talladega County Case No. CC 86-300, which are still being litigated in federal court, "have no bearing on his Lee County conviction and death sentence." State's Motion at 10, n. 2. This is an inaccurate statement of the facts.[1]

3. At the penalty phase of Mr. Siebert's trial in this case (Lee County), the State argued that his conviction in the Talladega County case constituted an aggravating circumstance under Alabama Code 1975 § 13A-5-49(2).[2]  (R. 659-60, 662.) The trial court instructed the jury that it had this aggravating circumstance to consider in arriving at a verdict regarding Mr. Siebert's punishment.  (R. 680.)  In its sentencing order, the trial court made a finding that an

_____

[1]The State's account of the procedural history of this case also omits certain key facts, such as, that the reason for amendment of the Rule 32 petition was the discovery of several Brady v. Maryland, 373 U.S. 83 (1963), claims arising from the grant of discovery a few months prior to the amendment. See State's Motion at 8-9. Mr. Siebert does not address those omissions which are not material to his present arguments, but does not waive his right to address them at some later date, should that become necessary.

[2]The District Attorney argued to the jury not only Mr. Siebert's Talladega conviction but his sentence and the jury vote on that sentence.  (R. 662.)

aggravating circumstance under Alabama Code 1975 § 13A-5-49(2) existed, in part, on the basis of the Talladega County conviction. (C.R. 38.) Thus, Mr. Siebert's Talladega conviction was weighed by the sentencing court in making its determination that death was the appropriate sentence in this case.

4. Mr. Siebert is currently litigating the constitutionality of his conviction and sentence in the Talladega County case. See Siebert v. Allen, 480 F.3d 1089 (11th Cir. 2007) (reversed and remanded; petition for rehearing en banc filed by the State on March 19, 2007); Siebert v. Allen, No. 1:01-cv-02323-IPJ-TMP (N.D. Ala. 2006). There has been no ruling on the merits in either of Mr. Siebert's federal habeas cases. Should Mr. Siebert obtain relief, the validity of the Talladega conviction as an aggravating circumstance in the Lee County case would be undermined. Brown v. Sanders, 546 U.S. 212, 891, 892 (2006) (death sentence must be set aside "if the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it"); Stringer v. Black, 503 U.S. 222, 232 (1992) ("when the sentencing body is told to weigh an invalid factor in its

decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale").

5.    The events underlying Mr. Siebert's two convictions occurred on the same evening in the same apartment complex. The State chose to prosecute Mr. Siebert under two separate indictments. However, the State also elected to create a dependency between the two cases by asking that the jury consider the Talladega conviction as an aggravating circumstance in the Lee case; therefore, it cannot legitimately argue unnecessary delay by Mr. Siebert based on his request that all matters respecting his Talladega conviction and sentence be resolved before an execution date can be set in either case.

6.    Setting an execution date in Mr. Siebert's Lee County case before complete adjudication of his Talladega County conviction would violate his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and all applicable provisions of Alabama law. Therefore, this Court should deny the State's Motion to Set an Execution Date.

II.  **This Court Should Deny the State's Request to Set an Execution Date Because Mr. Siebert Should Be Permitted to Complete Litigation of His 42 U.S.C. § 1983 Lethal Injection Challenge.**

5

7.   Mr. Siebert filed a 42 U.S.C. § 1983 challenge to the constitutionality of Alabama's lethal injection protocol in the United States District Court for the Middle District of Alabama on April 9, 2007. See Siebert v. Allen et al., 2:07-cv-295-MEF-WC (Doc. #1).  The State then filed its Motion to Set an Execution Date with this Court on April 17, 2007.  This pattern has been followed in several of the recently filed lethal injection challenges. See, e.g., Ex parte Aaron Jones, No. 1860415 (Ala. Feb. 27, 2007), Petitioner's Motion to Vacate Execution Date Order at 1-2, and Ex parte Darrell Grayson, No. 1830756 (Ala. March 19, 2007), Petitioner's Opposition to State of Alabama's Motion to Set an Execution Date at 4.

8.   Courts throughout the country are evaluating states' lethal injection protocols and finding them deficient with respect to the specific drugs used, the quantity of the drugs used, the manner in which the drugs are administered, the personnel administering the drugs, the monitoring equipment used to gauge the condemned inmate's level of consciousness, the layout of the execution chamber with respect to personnel's ability to observe the inmate throughout the course of the execution, the inadequate recordkeeping

6

respecting all of the above, the manner in which protocols are created and revised, etc. See, e.g., Taylor v. Crawford, 2006 WL 1779035 (W.D. Mo. 2006); Morales v. Tilton, No. C 06 219/926 JF RS, 2006 U.S. Dist. LEXIS 92243 (N.D. Cal. 2006) (Memorandum of Intended Decision); Nooner v. Norris, No. 5:06-cv-00110-SWW-JFF (E.D. Ark. 2006) (granting preliminary injunction); Jackson v. Taylor, No. 06-300-SLR (D. Del. May 9, 2006) (same). State executives, likewise, are halting lethal injections after discovering the same problems. See Tenn. Exec. Order No. 43 (Feb. 1, 2007), available at http://www.tennesseeanytime.org/governor/AdminCMSServlet?action=viewFile&id=970, attached as Exhibit B, and Fla. Exec. Order No. 06-260, § 9 (Dec. 15, 2006), available at http://www.flgov.com/pdfs/orders/06-260-lethalinjection.pdf, attached as Exhibit C. Florida's Commission on Administration of Lethal Injection has issued a report recommending that executions by lethal injection not resume until that state's policies can be revised and manner of implementation can be "optimal[ly] supervis[ed] and manage[d]." See GOVERNOR'S COMM'N ON ADMIN. OF LETHAL INJECTION, FINAL REPORT WITH FINDINGS AND RECOMMENDATIONS (March 1, 2007) at 9, available at http://www.law.berkeley.edu/clinics/dpclinic/Lethal%20Inject

ion%20Documents/Florida/lethalinjectionfinalreport.pdf.

9. Mr. Siebert's § 1983 action, therefore, is not an "abusive, dilatory suit[]," as the State suggests, State's Motion at 17, but a serious and valid request for appropriate inquiry into a procedure fraught with the potential for error and unnecessary pain. Mr. Siebert also brings his challenge to Alabama's lethal injection protocol at the appropriate time. The State has argued to the federal court that the protocol has changed without providing information as to when the changes occurred or what the changes were.[3] See Jones v. Allen et al., No. 2:06-cv-00986-MHT (M.D. Ala. April 17, 2007) (Doc. #89, Opinion at 15-16, n. 2, attached as Exhibit D). Had Mr. Siebert brought his § 1983 action at a time when his federal habeas petition was still pending, the State might well now argue that any ruling in such a suit is invalid under the new protocol. See, e.g., Ohio Forestry Ass'n, Inc., v. Sierra Club, 523 U.S. 726 (1998) (environmental organization's cause of action not ripe where revision or modification of

---

[3]Mr. Siebert cannot ascertain precisely what information has been supplied to the federal district court, because the State has moved to seal any documents relating to the protocol, and the court granted that motion. McNair v. Allen et al., No. 2:06-cv-00695-WKW (M.D. Ala. 2006), Docs. 16 (Motion for Protective Order) and 29 (Agreed Confidentiality Order).

logging plan possible before cutting would be imminent). Elements of the protocol such as the identity, education, training, and experience of the persons designated to carry out the death sentence on Mr. Siebert were unknown and unknowable at any time before the courts completed review of Mr. Siebert's habeas petition and the possibility of an execution date being set became imminent. See, e.g., Ala. State Fed'n of Labor, Local Union No. 103, United Bhd. of Carpenters and Joiners of America v. McAdory, 325 U.S. 450, 459-61 (1945) (injunction claim is premature when "contingencies of attempted enforcement cannot be envisioned in advance"). To avoid such duplicative litigation and waste of court resources, it was appropriate for Mr. Siebert to wait for the conclusion of federal habeas litigation to file his § 1983 suit.

10. As of the date of this filing, the constitutionality of Alabama's protocol for execution by lethal injection has not been decided on the merits in any federal court in this state. Trial of the issue is currently scheduled in the McNair case for October 2, 2007. McNair (M.D. Ala. March 8, 2007) (Doc. #41, Order Granting Motion to Continue Pre-Trial and Trial Dates). On information and belief, Alabama's lethal

injection protocol is the same as or very similar to protocols being successfully challenged in other jurisdictions.[4]   See Deborah W. Denno, When Legislatures Delegate Death:  The Troubling Paradox behind State Uses of Electrocution and Lethal Injection and What It Says about Us, 63 OHIO STATE L.J. 63, 95-100 (2002) (source of lethal injection protocol).   In at least 12 states-Arkansas, California, Delaware, Florida, Kentucky, Maryland, Missouri, North Carolina, Ohio, Oklahoma, South Dakota, and Tennessee-there is either extensive federal litigation,  including  stays  of  execution,  surrounding  the constitutionality  of  lethal  injection  or  legislative  and executive branch studies concerning its application.

11.  Federal  district  courts  in a  number  of  states  have found  sufficient  merit  in plaintiffs'  challenges  to  lethal injection  to hold that  the process  violates  the Eighth  and Fourteenth  Amendment  guarantees  against  cruel  and  unusual punishment  or  to  issue  preliminary  injunctions  to  suspend executions  while  the  process  is  examined.    In  Missouri,

_____

[4]Dr. Jay Chapman, Chief Medical Examiner for the State of Oklahoma and one of the two devisers of the lethal injection protocol, admits that he did no research before recommending the drugs and procedure now used in virtually every death penalty state.   See HUMAN RIGHTS WATCH, SO LONG AS THEY DIE: LETHAL INJECTIONS IN THE UNITED STATES 18.1(G) at 13-15.

Federal District Judge Fernando Gaitan found that the State's method of execution by lethal injection violated the Eighth and Fourteenth Amendments to the United States Constitution. Taylor v. Crawford, No. 05-4173-cv-c-FJG, 2006 WL 1779035 (W.D. Mo. 2006). That court found "numerous problems," including the lack of a written protocol that describes which drugs will be administered, in what amounts, and how they will be administered, the ability of the prison to change the "formula" without oversight or any checks and balances, the proof of past mistakes in the mixing of the drugs, the inability of a medical professional to closely monitor the condemned inmate during the execution, and the lack of any experience in anesthetics by the medical professional. Id. at *4-8. The court also learned that the process of mixing the different drugs and knowing the correct amount of drugs to dissolve in the correct amount of solution involved very precise measurements and an ability to use, decipher, and not confuse numbers. Id.

12. In Arkansas, Federal District Judge Susan Wright, after hearing expert medical testimony and eyewitness accounts of executions by lethal injection, granted a preliminary injunction finding that the petitioner had satisfied his

11

burden of demonstrating that he was under threat of irreparable harm. <u>Nooner v. Norris</u>, No. 5:06-cv-00110-SWW-JFF (E.D. Ark. 2006). In California, after four days of hearings and a judicial visit to the execution chamber, Federal District Judge Jeremy Fogel issued a Memorandum of Intended Decision on petitioner's 1983 claim, concluding that California's lethal injection procedure creates an "undue and unnecessary risk" of cruel and unusual punishment in violation of the Eight and Fourteenth Amendments. <u>Morales v. Tilton</u>, No. C 06 219 JF RS, 2006 U.S. Dist. LEXIS 92243, at *28 (N.D. Cal. 2006). Delaware Federal District Judge Sue Robinson stayed the execution of Robert Jackson on May 9, 2006, after Jackson challenged the constitutionality of the state's lethal injection protocol. <u>Jackson v. Taylor</u>, No. 06-300-SLR (D. Del. May 9, 2006) (order granting preliminary injunction). On February 23, 2007, Judge Robinson granted class action status to the lethal injection challenges, effectively applying Jackson's stay to all inmates on death row in Delaware. <u>Id.</u> (order granting class action status).

13. Not only the federal courts, but the states themselves have found the process of execution by lethal injection violative of constitutional guarantees. Florida

Governor Jeb Bush issued an Executive Order on December 15, 2006, after the botched execution of Angel Diaz, thereby stopping all future executions in that state and ordering the establishment of a commission to review its administration of lethal injection. Fl. Exec. Order No. 02-260 (Dec. 15, 2006). Governor Bush was prompted to this action by the serious problems with the Diaz execution, including the prolongation of the process to thirty-four minutes, GOVERNOR'S COMM'N ON ADMIN. OF LETHAL INJECTION, FINAL REPORT at 8, and the 11 to 12" chemical burns on Diaz' arms, resulting from improper placement of the needles, Nathan Crabbe, Botched Diaz Execution Prompts Further Study by Commission, Gainesville Sun, January 28, 2007, available at http://www.gainesville.com/apps/pbcs.dll/ article?AID=/20070128/LOCAL/701280301/-1/news, attached as Exhibit E. See also Affidavit of Neal Dupree, Counsel for Angel Diaz, filed in the Florida Supreme Court, available at http://www.floridasupremecourt.org/pub_info/summaries/briefs /06/06-2391/Filed_12-14-2006_AttachmentE.pdf, and attached here as Exhibit F. Tennessee Governor Phil Bredesen suspended executions in his state in the midst of a federal suit there. Tenn. Exec. Order No. 43 (Feb. 1, 2007); Harbison v. Little et al., No. 3:06-cv-01206 (M.D. Tenn. Jan. 29, 2007) (Doc. #18-1,

13

order denying in part and granting in part Defendant's motion
to dismiss).

14. The State of Alabama's secrecy[5] and poor record-
keeping with respect to the protocol and changes effected in
it, for example, the inability to locate previous versions of
the lethal injection protocol,[6] certainly suggest that
problems similar to those noted in the <u>Taylor</u> case in Missouri
are likely to be exposed during the course of the federal
litigation here.

15. All of the foregoing demonstrate that Mr. Siebert's
claim, that execution by lethal injection constitutes cruel
and unusual punishment, is a substantial constitutional issue.
Regardless of whether Mr. Siebert and the other petitioners
litigating the claim in the federal court for the Middle
District of Alabama ultimately prevail, there should be, at a
minimum, a postponement of execution dates until the issue is
resolved.

16. The State asserts that "[t]he only voice that the
residents of the State of Alabama have to represent their

---

[5]<u>McNair v. Allen et al.</u>, No. 2:06-cv-00695-WKW (M.D. Ala.
2006), Docs. 16 (Motion for Protective Order) and 29 (Agreed
Confidentiality Order).

[6]<u>See</u> Exhibit D at 15-16, n. 2.

strong interest in enforcing the State's lawful criminal judgments without undue interference from the federal courts is through this Court's issuance of the requested Order setting an execution date." State's Motion at 15-16. However, Alabama's constitution, like the federal constitution, prohibits the imposition of cruel and unusual punishments. Ala. Const. of 1901, art. I, § 15. The residents of the State of Alabama have an equal or greater interest in ensuring that criminal judgments, when executed in their name, comply with the proscriptions of their constitutions, state and federal. The courts of this state, too, have a constitutional duty to prevent "the unnecessary and wanton infliction of pain," Gregg v. Georgia, 428 U.S. 153, 173 (1976) (quoting Furman v. Georgia, 408 U.S. 238, 392-393 (1972) (Burger, C. J., dissenting), in executing criminal judgments. Barring other relief, each of the petitioners in the pending lethal injection challenges will be put to death at some point; the question presently under consideration is whether the method used by the State of Alabama complies with constitutional requirements. This Court should suspend setting execution dates until that question is answered.

17. The State suggests that the federal court is the appropriate forum to balance the assorted interests at stake in seeking a stay of execution. State Motion at 16. The State argues, in essence, that this Court should simply approve its requests to set dates of execution and let any matters of equity be settled in federal court. The State's suggestion demeans this Court's critical rôle in the process of capital punishment in Alabama. It is the duty of this Court, and not the federal court, to determine whether to set dates for executions while legitimate and valid constitutional claims are at stake. For all residents of this state, it is this Court, and not the federal court, that serves as the primary guarantor of all constitutional rights; that is the basis for the principles of comity and federalism. If this Court has any doubt as to the constitutionality of execution by lethal injection—which the proliferation of injunctions, stays and moratoria nationwide compels—it should act in accordance with the dictates of fairness and justice and permit § 1983 plaintiffs to litigate their legitimate challenges to that procedure.

18. As a comparison, this Court should consider the action taken by the Supreme Court of Indiana in a similar

16

situation. That court had set a date for the execution of a mentally ill inmate, whom the same court had earlier adjudged competent to be executed, pursuant to Justice Powell's formulation of insanity in his concurrence in Ford v. Wainwright, 477 U.S. 399, 422 (1986) (Powell, J., concurring). Timberlake v. State [of Indiana], 859 N.E.2d 1209 (Ind. 2007). When the United States Supreme Court granted certiorari in Panetti v. Quarterman, 127 S.Ct. 852 (Jan. 5, 2007), a case posing a question similar to that in Timberlake—the constitutionality of executing a mentally ill inmate who, nonetheless, does understand why he is being executed—the Indiana Supreme Court, compelled by no currently effective law or constitutional provision, stayed the execution. They did so because they recognized an obligation, as the state supreme court, to exercise caution in approving the execution of a citizen of their state. See id. at 1213 ("As a state court we are free to revisit our own decisions . . . If there is doubt as to the applicable legal precedent, we should be cautious in carrying out the death penalty"). This Court is bound by the same obligation.

19. In almost every state where the process of lethal injection has been examined, that process has been found

constitutionally deficient.    That examination has not yet occurred in Alabama.    Until it does, this Court should exercise due caution and refrain from setting dates for execution.

20.    The State argues both that this Court need not be concerned about Mr. Siebert's arguments in support of postponing setting a date, because the federal court is the appropriate venue for a balancing of the equities respecting whether a stay of execution is appropriate, and that the federal court is obligated "to respect any decision of this Court setting an execution date and to protect such an Order against abusive, dilatory suits, such as the one filed by Siebert."    State's Motion at 16-17.    In other words, the State would persuade this Court to ignore any questions concerning the appropriateness of putting off Mr. Siebert's execution date, because the federal court will decide such questions, while also arguing that the federal court will be bound to weigh heavily this Court's setting of a date in answering those very questions.    This is begging the question with a vengeance.

21.    Furthermore, the State's suggestion that "[t]he question of whether any further delay is warranted in this

18

case is not a State law question . . . but, instead, is best decided by the federal court in which Siebert currently is litigating his civil lawsuit," State's Motion at 15, distorts well-settled norms of federalism.  Whether this Court should routinely grant every motion to set a date of execution submitted to it by the State is a question very appropriately addressed to this Court.  This Court has the authority to take notice of the prevalence and gravity of lethal injection litigation in other venues throughout the nation and conclude that the question of lethal injection's constitutionality is a matter of such importance that postponement of execution of death sentences by that method is warranted.  Such analysis is not the sole province of the federal courts.  Without such analysis, this Court effectively abdicates its responsibility to set dates of execution to the Attorney General's office, which, as counsel for the defendants in the lethal injection litigation, has a vested interest in its outcome.

22.  Finally, the State's suggestion that Mr. Siebert's lethal injection suit comes on "the eve of his execution," State's Motion at 17, comparing Mr. Siebert's situation to Clarence Hill's in <u>Hill v. McDonough</u>, 464 F.3d 1256 (11th Cir. 2006), mischaracterizes the sequence of events in this case.

19

The State did not apply for an execution date for Mr. Siebert until after Mr. Siebert had filed his lethal injection challenge. See the discussion above in ¶ 7. The petitioner in Hill filed his § 1983 complaint challenging the method to be employed in his execution a mere _four_ _days_ before his execution was scheduled to take place. Hill, 464 F.3d at 1257. Should this Court set an execution date for Mr. Siebert at the State's request, it is the State, not Mr. Siebert, who will have been "the architect of the . . . trap from which he now seeks relief." Id. at 1259.

23. Mr. Siebert's § 1983 suit challenging the method proposed for his execution is neither speculative, dilatory, nor abusive. This Court should decline to set an execution date for Mr. Siebert until he has been able to litigate the issue fairly.

WHEREFORE, for the reasons stated above, or any other reason discernible by this Court, this Court should deny the State's Motion to Set an Execution Date for Daniel Lee Siebert.

Dated: April 27, 2007.

Respectfully submitted,

*Anne E. Borelli*

ANNE E. BORELLI
Federal Defenders
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
TEL: (334) 834-2099
FAX: (334) 834-0353
E-mail: anne_borelli@fd.org
Ala. SJIS: BOR-016

LESLIE S. SMITH
Assistant Federal Defender
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
TEL: (334) 834-2099
FAX: (334) 834-0353
E-mail: leslie_smith@fd.org
Ala. SJIS: SMI-162

LAJUANA DAVIS
122 Commerce Street
Montgomery, Alabama 36104
TEL: (334) 269-1803
FAX: (334) 269-1806
E-mail: ldavis@eji.org
Ala. SJIS: DAV-088

*Counsel for Daniel Lee Siebert*

21

## CERTIFICATE OF SERVICE

I hereby certify that on the twenty-seventh day of April, 2007, a copy of the foregoing was served by first-class mail on:

Mr. Henry M. Johnson, Esq.
Assistant Attorney General
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130-0152

*Anne E. Borelli*
Anne E. Borelli

22

# EXHIBIT A

. **1830756**    ## Alabama Supreme Court Docket Sheet    **1830756**

**CRC : Petition for Writ of Certiorari to the Court of Criminal Appeals**

Ex parte Darrell Grayson. PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS (In re: Darrell Grayson v. State of Alabama).

(Shelby Circuit Court: CC-81-043; Criminal Appeals : 7 DIV. 3).

## DEATH PENALTY, Indigent, EXPEDITED

**Classification**
Criminal - Capital Offense - Death Penalty

**Petition Filed : 04/24/1984**

Docketed 08/14/2001  VM
Last Updated   / /          AG

**Judges**
Criminal Appeals Judge Bowen

**Case Actions / Postings**

| | |
|---|---|
| 04/02/1984 | Extension of Time for Petitioner To File  Brief granted by Supreme Court; Due on 04/24/1984. |
| 04/02/1984 | Petitioner's request for extension of time. rrb |
| 04/02/1984 | Petitioner granted to and including April 24, 1984, to file petition for writ of certiorari and brief in support thereof.bsa/rrb |
| 04/24/1984 | Cert petition filed (10cc) (notified L.App.Ct. petition filed w/Sup.Ct.) |
| 04/24/1984 | Petitioner's Brief Filed 10 copies. |
| 04/24/1984 | Oral Argument Requested by Petitioner. |
| 05/09/1984 | Respondent's Brief Filed 9 copies. |
| 05/28/1984 | Submitted for Preliminary Examination |
| 06/19/1984 | Writ Granted. PER CURIAM - Maddox, Jones, Shores, Embry, and Beatty, JJ., concur. |
| 06/25/1984 | Supp. Respondent's Brief Filed 10 copies. |
| 07/12/1984 | Record rec'd from L.App.Ct. - 7 vols. |
| 07/12/1984 | Case delivered to JTWA |
| 07/12/1984 | Submitted On Briefs (set aside 7/17/84) |
| 07/17/1984 | NOTE TO ATTORNEYS: THE COURT HAS ORDERED THE SUBMISSION ON BRIEFS OF THIS CAUSE BE SET ASIDE AND THAT THIS CAUSE BE SET FOR ORAL ARGUMENT AT THE NEXT TERM OF COURT.  THIS CASE WILL BE SCHEDULED FOR ORAL ARGUMENT DURING THE MONTH OF OCTOBER, 1984, AND YOU WILL BE NOTIFIED LATER  AS TO THE EXACT DATE AND TIME OF THE ARGUMENT. DN/hh |
| 09/17/1984 | Oral Argument to be held on Otober 8, 1984, 1:30 pm. |
| 10/08/1984 | Argued and submitted.  Torbert, C.J., and Faulkner, Jones, Almon, Shores, Beatty, and Adams, JJ. |
| 02/15/1985 | Record returned to L.App.Ct. |

<u>Case Actions / Postings</u>

| | |
|---|---|
| 02/15/1985 | Affirmed |
| | BEATTY, J. - ALL THE JUSTICES CONCUR. (No. of pages 11, see 051085 rehearing entry) |
| 03/01/1985 | Application for Rehearing Filed (see 030485 misc. entry) |
| 03/01/1985 | Motion to extend time for the filing of briefs in support of application for rehearing.rrb |
| 03/04/1985 | NOTE TO ATTORNEYS: Petitioner granted to and including March 8, 1985, to file briefs in spport of rehearing. Application for rehearing filed. rrb |
| 03/08/1985 | Brief in support of rehearing filed (10cc) (Bell) |
| 03/19/1985 | In filing brief in response to rehearing brief, AG's office is requested to brief aplicability of U.S.S.C. cases: Shea v. La. decided 2/20/85 (No. 82-5290) and Ake v. Oklahoma, decided 2/26/85 (No. 83-5424) (by JTWA) (Joe Marston cld 3/19/85) sjm |
| 03/22/1985 | Brief in Opposition to rehearing filed (9cc) |
| 04/02/1985 | Notified parties and request that they brief the retroactivity of AKE under SHEA. AG 7 days and Grayson 7 days to reply. JTWA/sm |
| 04/08/1985 | Supp. brief in opposition to rehearing filed (9cc) (+1c 041085) |
| 04/08/1985 | Supplemental brief and argument in response to rehearing (9cc)(+1c 041085). awk/JTWA |
| 04/12/1985 | cm Supp. brief in support of rehearing filed (10cc)(Bell) |
| 04/12/1985 | cm Supplemental brief in support of appellant-petitioner's application for rehearing. (10cc) rrb |
| 05/10/1985 | Application for rehearing granted; opinion extended; affirmed. |
| | BEATTY, J. - ALL THE JUSTICES CONCUR. |
| 05/15/1985 | Petitioner's application for stay of execution.awk/dn |
| 05/20/1985 | No action will be taken on the application for stay of execution. An execution date will not be set if you timely file a pet. for cert. in the USSC. Please notify us when the USSC rules on this acse.RGE/dn |
| 06/17/1985 | Attorney fee declaration approved in amount of $1,000 for Richard Bell./bsa |
| 07/08/1985 | Order of USSC extended to 8/8/85 to file petition for writ of certiorari.ajh/dn |
| 08/08/1985 | Cert. petition filed in USSC on 8/8/85 (No. 85-5212).; notice filed 8/19/85. |
| 08/16/1985 | Notice from USSC cert. petition docketed in their Court.nsh |
| 10/07/1985 | Cert. petition Denied In U.S. Supreme Court. notice filed 10/11/1985. |
| 01/03/1986 | Certificate Of Judgment Issued |
| 08/12/2002 | Motion to set execution date. (10cc) rrb/sg/jcd/WJ (RULING - DENIED 052203) |
| 03/17/2003 | Extension of Time for Petitioner To File response in opposition to motion to set execution date; Due on 03/28/2003. rrb/WJ |
| 03/28/2003 | Opposition to motion st set execution date. (10cc) rrb/sg/wj |
| 04/15/2003 | Motion to allow the State of Alabama to file a response to Grayson's Opposition to the Motion to Set An Execution Date filed. tr/wj (RULING UNKNOWN) |

## Case Actions / Postings

| Date | Action |
|---|---|
| 04/30/2003 | State's response to Grayson's Opposition to State's Motion to set an execution date. tr/wj |
| 05/07/2003 | Petitioner's reply in support of opposition to motion to set execution date. rrb/sg/wfj |
| 05/22/2003 | Motion to set execution date denied pending ruling on motion for DNA testing pending in U.S. District Court for the Northern District of Alabama, Southern Division.  Houston, Lyons, Johnstone, Harwood, and Woodall, JJ., concur.  Moore, C.J., Brown, and Stuart, JJ., dissent. dd |
| 10/22/2003 | Case placed on Administrative Docket in the Clerk's Office. (DEATH PENALTY) |
| 01/22/2007 | Respondent's motion to set execution date filed 10 copies. |
| 01/22/2007 | Notice of appearance of James Houts as counsel for the respondent |
| 03/19/2007 | Petitioner's opposition to State's motion to set execution date filed 13 copies. |

### Attorneys & Officials

| Role | Name | Location |
|---|---|---|
| Circuit Clerk | Shelby County Circuit Clerk's Office | Columbiana, AL  (205) 669-3760 |
| Atty. | Harold E. Walden | Alabaster, AL  (205) 663-0915 |
| Atty. for Pet. | Richard W. Bell, | Birmingham, AL  (205) 980-4322 |
| | Stephen B. Bright | Atlanta, GA  (404) 688-1202 |
| A.G. for Resp. | Charles (out of office) Graddick, INACTIVE | Montgomery, AL  (  ) - |
| | Troy King | Montgomery, AL  (334) 242-7300 |
| Asst. A. G. for Resp. | James R. Houts | Montgomery, AL  (334) 242-7401 |
| | J. Clayton Crenshaw | Montgomery, AL  (334) 242-7408 |
| Asst. Atty. General for Resp. | Joseph G. L. Marston, III | Montgomery, AL  (334) 365-3409 |

*END OF DOCKETING INFORMATION*

# EXHIBIT B



STATE OF TENNESSEE
# E X E C U T I V E   O R D E R
BY THE GOVERNOR

### Number 43

## AN ORDER DIRECTING THE DEPARTMENT OF CORRECTION TO COMPLETE A COMPREHENSIVE REVIEW OF THE MANNER IN WHICH THE DEATH PENALTY IS ADMINISTERED IN TENNESSEE

**WHEREAS,** this Administration has been and continues to be firmly committed to carrying out death sentences properly imposed under the laws of this state in a timely and judicious manner; and

**WHEREAS,** this Administration also recognizes its unique responsibility to ensure that death sentences are administered in a constitutional and appropriate manner; and

**WHEREAS,** since 2000, two inmates sentenced to death have been executed in Tennessee by lethal injection, and both executions were completed professionally in a constitutional and appropriate manner; and

**WHEREAS,** while these executions have been carried out appropriately, a recent review has highlighted deficiencies in the written procedures intended to ensure that all legal executions will continue to be carried out appropriately; and

**WHEREAS,** the administration of the death penalty in a constitutional and appropriate manner is a responsibility of the highest importance.

**NOW THEREFORE,** I, Phil Bredesen, Governor of the State of Tennessee, by virtue of the power and authority vested in me by the Tennessee Constitution and law, do hereby order and direct the following:

1. I hereby direct the Commissioner of Correction ("Commissioner") to initiate immediately a comprehensive review of the manner in which death sentences are administered in Tennessee. This review shall specifically include the state's protocols and any related procedures, whether written or otherwise, related to the administration of death sentences, both by lethal injection and by electrocution. In completing this review, the Commissioner is directed to utilize all relevant and appropriate resources, including but not limited to scientific and medical experts, legal experts, and Correction professionals, both from within and outside of Tennessee. As a component of this review, the Commissioner is further directed to research and perform an analysis of best practices used by other states in administering the death penalty.

2. As soon as practical, but no later than May 2, 2007, the Commissioner of Correction is directed to establish and provide to me new protocols and related written procedures for administering death sentences in Tennessee, both by lethal injection and electrocution. In addition, the Commissioner is directed to provide me with a report outlining the results of the review completed pursuant to paragraph one (1) above.

3. The current protocols and any related procedures, whether written or otherwise, used by the Department of Correction and related to the administration of death sentences in Tennessee, both by lethal injection and by electrocution, are hereby revoked.

By separate orders of reprieve, I have this day granted reprieves to the following individuals, all of whom had sentences of death scheduled to be carried out within the next ninety (90) days: Michael Joe Boyd a/k/a/ Mika'eel Abdullah Abdus-Samad, Edward Jerome Harbison, Daryl Keith Holton and Pervis T. Payne. These four (4) reprieves will remain in place until May 2, 2007.

IN WITNESS WHEREOF, I have subscribed my signature and caused the Great Seal of the State of Tennessee to be affixed this 1st day of February, 2007.

GOVERNOR

ATTEST:

SECRETARY OF STATE

2

# EXHIBIT C

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 06-260

WHEREAS, the laws of Florida provide that, under certain circumstances, murder in the first degree is punishable by death; and

WHEREAS, in 2000, the Florida Legislature determined that death by lethal injection is the preferred method for carrying out a sentence of death, leaving to persons under sentence of death the option of choosing to have the death sentence administered by electrocution; and

WHEREAS, in implementing the death penalty, Florida has adopted procedures and protocols for lethal injection intended to ensure that the lethal injection is administered appropriately and in a manner that does not cause unnecessary pain and suffering; and

WHEREAS, courts, including the Florida Supreme Court in the case of *Sims v. State*, 754 So.2d 657 (Fla. 2000), and subsequent cases citing *Sims*, have upheld Florida's method of lethal injection as consistent with the Eighth Amendment of the United States Constitution and its prohibition against cruel and unusual punishment; and

WHEREAS, the cases that have upheld Florida's lethal injection protocols have done so based on evidence that the Department of Corrections was adequately implementing and following such protocols; and

WHEREAS, the findings in the autopsy report prepared by William F. Hamilton, M.D., Medical Examiner for the 8th Circuit, regarding Angel Diaz, who was executed on December 13, 2006, indicate that the lethal injection protocols may need to be reviewed to determine if any

additional protocols should be added or whether any existing protocols should be modified in any way; and

WHEREAS, the significantly lengthier death process for Mr. Diaz compared to that of other inmates who previously have been executed by lethal injection in Florida, including, according to witness accounts, a longer period of time during which Mr. Diaz lay conscious, should be considered; and

WHEREAS, as a matter of humanity, constitutional imperative, and common sense, if the State is going to execute persons convicted of capital crimes, it must do so in a manner that comports to its own protocols and the United States and Florida Constitutions;

NOW, THEREFORE, I, JEB BUSH, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, and all other applicable laws, do hereby promulgate the following Executive Order, to take immediate effect:

Section 1.  I hereby create the Governor's Commission on Administration of Lethal Injection (the "Commission").

Section 2.  The purpose of the Commission shall be to review the method in which the lethal injection protocols are administered by the Department of Corrections and to make findings and recommendations as to how administration of the procedures and protocols can be revised so that Floridians, including those persons who are sentenced to death, can be assured that the State continues to take reasonable and appropriate measures to ensure that its administration of death by lethal injection comports to the United States and Florida Constitutions, as interpreted by current case law.

Section 3.  The Commission shall be composed of 11 members, five of whom shall be appointed by the Governor, three of whom shall be appointed by the Attorney General, one of

2

whom shall be appointed by the Senate President, one of whom shall be appointed by the Speaker, and one of whom shall be appointed by the Chief Justice of the Florida Supreme Court. To the extent possible, the members of the Commission shall reflect a cross-section of the scientific, medical, law enforcement and legal communities. At least one such member of the Commission shall be an attorney with extensive capital collateral experience or a present or former capital collateral regional counsel or registry attorney. In order to provide the broadest experience available to the Commission, at least three members shall be persons who are not currently involved in the criminal justice system in Florida. The Chairman shall be appointed by the Governor from among the members of the Commission.

Section 4. Members of the Commission shall serve at the pleasure of the appointing authority and shall serve without compensation, except that they may be reimbursed for travel to Commission meetings at the rates permitted under Section 112.061, Florida Statutes (2006).

Section 5. The Commission shall meet as often as necessary, and in no event fewer than three times, and shall submit its preliminary report of findings and recommendations to the Governor no later than February 1, 2007, and its final report of findings and recommendations by March 1, 2007. Upon issuance of its final report, the Commission shall be dissolved. Moreover, all meetings of the Commission shall be open to the public as set forth in Article I, Section 24(b) of the Florida Constitution and Chapter 286, Florida Statutes (2006).

Section 6. The Commission's purpose and mission shall be limited to evaluating Florida's lethal injection procedures and protocols, including enforcement of those procedures and protocols, and shall not extend to re-evaluating the policy decisions of the Legislature in enacting a death penalty or the means chosen by the Legislature for implementing the state's death penalty.

3

Section 7.  The Executive Office of the Governor shall provide administrative support to the Commission.

Section 8.  Until the Commission has issued its findings and recommendations and the appropriate revisions to the Department of Corrections' procedures and protocols have been adopted, or until further executive order, no further death warrants shall be signed.

Section 9.  All state agencies under the direction of the Governor are hereby ordered, and all other state agencies are hereby requested, to provide such assistance to the Commission as may be requested by the Commission in furtherance of this Executive Order.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, the Capitol, this 15th day of December, 2006.

_____
GOVERNOR

ATTEST:


_____
SECRETARY OF STATE

4

# The Governor's Commission on Administration of Lethal Injection

John W. "Bill" Jennings
Senator Victor Crist
Rodney Doss
Harley Lappin
Honorable Stan Morris
Dr. Steve Morris



Representative Dennis Ross
Harry K. Singletary
Dr. Peter Springer
Carolyn Snurkowski
Dr. David Varlotta

March 1, 2007

The Honorable Charlie Crist
Office of the Governor
The Capitol
Tallahassee, FL  32999-0001

Dear Governor Crist:

Please find enclosed the final report of the Governor's Commission on Administration of Lethal Injection.  A copy of this report was electronically mailed to you on March 1, 2007.  I want to thank you for the opportunity to be of service to you and the citizens of the State of Florida.  Every member of your staff that I interacted with on this project has demonstrated a positive attitude and a dedication to helping the Commission.

I will personally deliver a copy of the transcripts and all the other documents received or generated by the Commission to your legal office early next week.  If I can be of further assistance to you on this or any other matter, please do not hesitate to contact me.

Respectfully,

Bill Jennings
Chairman

# EXHIBIT D

limitations expired on Jones's § 1983 claim in 2004, two years before he brought the instant suit.

Jones argues that the court should deny the defendants' motion, both because Cooey is wrong as a matter of law and because this case is distinguishable on the facts. As to Cooey's legal conclusion, Jones argues that the view expressed in the dissent and by the district court, that the claim accrues when habeas proceedings come to an end and execution is imminent, is the correct one. As to the facts, Jones argues that, because Alabama does not publicly disclose its execution protocol, Jones did not have reason to know of his claim at the time Alabama began using lethal injection. Jones also argues that the defendants may have made material changes to the execution protocol since its inception in 2002, which would cause the claim to re-accrue and the statute-of-limitations clock to reset.[2]

---

2.    The defendants have disclosed the most recent revision to the execution protocol, which does not contain any changes that materially affect Jones's claim.
(continued...)

15

The court must now decide whether to dismiss Jones's claim as barred by the statute of limitations.   Having reviewed the Cooey decision along with the briefs in this case, the court concludes that the statute of limitations does not operate to bar Jones's claim and that the defendants' motion is therefore due to be denied.   The court reaches this conclusion not on the basis of factual distinctions between this case and Cooey; instead, the court respectfully disagrees with the Cooey majority that the statute of limitations applies to a case such as this one.

As the court explains in more detail below, the Cooey majority (and the defendants in this case) made two

_____

2.   (...continued)

However, the defendants have also admitted that earlier revisions to the protocol were made as well but that after diligent search they are unable to locate the version of the protocol that existed before such changes were made.   Theoretically, if a material component of Jones's claim arises from a part of the execution procedure that was not part of the protocol from its inception but was initiated within two years of Jones filing his complaint, then even under the Cooey framework Jones's claim would not be barred on statute-of-limitations grounds.

16

# EXHIBIT E

ERROR: Macro headerinfo is missing! **Gainesville.com**

This is a printer friendly version of an article from **www.gainesville.com**
To print this article open the file menu and choose Print.

Back

## Article published Jan 28, 2007

Jan 27, 2007

**Botched Diaz execution prompts further study by commission**

### By NATHAN CRABBE

*Sun staff writer*

The Diaz executionAfter the botched execution of Angel Diaz, the Florida Department of Corrections formed a task force to investigate. The task force found deviations from standard procedure, which will be studied by a state commission:

- An independent observer from the Florida Department of Law Enforcement did not witness the mixing of lethal chemicals.
- Problems inserting catheters into Diaz's veins were not reported to the warden.
- When there were problems injecting the lethal chemicals into the left arm, no assessment was made of the IV line.
- After those problems, one executioner injected a chemical that stops the heart in Diaz's left arm while another executioner

injected a sedative in
Diaz's right arm.
Procedures required the
sedative first, then a drug
paralyzing the muscles and
finally the drug that stops
the heart.

*Source: Florida Department of
Corrections*

A state investigation found that the botched execution of Angel Diaz last month deviated from procedure in several significant ways.

Now a commission created by the governor will further study the execution, holding its first meeting Monday. But doctors involved in the group may face ethical issues about proposing changes to the lethal injection procedure.

Diaz appeared to shudder, grimace in pain and gasp for air during his Dec. 13 execution, before he stopped moving 24 minutes into the process and was declared dead 10 minutes later. The execution lasted nearly three times as long as normal.

The next morning, Department of Corrections Secretary James McDonough formed a task force to look into the execution. The task force issued a report Dec. 20 that found execution team members didn't report problems injecting an IV and defied procedure in changing the way the lethal drugs were dispensed.

The state has since stopped all executions and convened the commission to further investigate the lethal injection procedure. The group is scheduled to issue its report March 1.

The commission includes Gainesville Circuit Judge Stan Morris, who says the group will study problems and make recommendations on changes.

But making recommendations could create a dilemma for the three doctors on the commission. American Medical Association guidelines ban doctors from participating in executions in any way.

Dr. William G. Plested III, the AMA president, said he would advise doctors on the commission to recuse themselves from helping develop new lethal injections procedures.

Tampa anesthesiologist Dr. David Varlotta is one of the doctors on the commission. He said he's waiting to hear more about his role on the commission, but will be using medical ethics to guide his involvement.

"I think there's a fine line," he said. "I think there's places I can advise and places I can't."

The commission will be looking at an execution procedure similar to the one used in the 36 other states that use lethal injection. Florida and other states use a three-chemical cocktail to kill inmates.

The inmate is first injected with a sedative called sodium pentothal, followed by a paralytic called pancuronium bromide that freezes the muscles. A deadly drug called potassium chloride is then injected to stop the inmate's heart.

If problems occur in Florida, procedures require execution team members to check the IV line dispensing the drugs. If members determine the line isn't working, a switch is made to an IV line in another arm. If that doesn't work, team members are supposed to insert a line in another vein.

But the Diaz execution deviated from those procedures. According to the investigation, execution team members had problems inserting an IV line in Diaz's arm and failed to report those problems to the prison warden, as required.

Once the execution started, the executioner noted that the chemicals were taking two to three times longer than usual to push through the line into Diaz's left arm. In the middle of dispensing the paralytic, the executioner could no longer push the syringe.

A decision was made to dispense the rest of the paralytic and the final deadly drug into an IV in Diaz's right arm. But even after that, a heart monitor indicated he was still alive.

The executioner then started administering a second round of drugs. The sedative was dispensed into Diaz's right arm. But against procedure, the executioner decided to skip the paralytic and move immediately to dispensing the deadly drug into Diaz's left arm.

Alachua County Medical Examiner Dr. William Hamilton later said the errant IV caused the lethal cocktail of drugs to seep into Diaz's flesh rather than his veins. If the drugs had been been pumped into Diaz's bloodstream, they would have circulated throughout his body faster and worked more quickly. Instead, the drugs caused nearly footlong chemical burns on both of Diaz's arms, according to the examiner.

A full autopsy on Diaz is still pending release.

*Nathan Crabbe can be reached at 352-338-3176 or crabben@gvillesun.com.*

# EXHIBIT F

STATE OF FLORIDA
COUNTY OF LEON

COMES NOW THE AFFIANT, NEAL A. DUPREE, WHO, UNDER PENALTY
OF PERJURY, HEREBY SWEARS AND AFFIRMS AS FOLLOWS:

1.    My name is Neal A. Dupree, and I have been a licensed Florida attorney
since 1980.  I currently serve as the Capital Collateral Regional Counsel for South
Florida, and I have held that position since August, 1998.

2.    During my tenure as Capital Collateral Regional Counsel-South (CCRC-
South), my office has continually represented Angel Diaz during his post-
conviction appeals. It was in my capacity as CCRC-South that I witnessed the
execution of Mr. Diaz at Florida State Prison on December 13, 2006.

3.    The curtains to the execution chamber were opened at 6:00 p.m.   From my
seat in the front row of the observation room. I was located approximately six (6)
to seven (7) feet from Mr. Diaz. Initially, I observed Mr. Diaz laying on a gurney
covered by a white sheet. He was strapped to the gurney, and his right arm was
held in place by a leather strap. Additionally, Mr. Diaz had some type of tape or
gauze holding his right hand in place, and an intravenous needle had been placed in
his right arm where his elbow would bend. There appeared to be two separate lines
that ran beneath the gurney hooking into the intravenous line, and those two lines
traveled into a prepared space in the wall behind the gurney.

4.    Mr. Diaz was asked if he had any last words, and he was permitted to give a
brief speech in Spanish. Having met Mr. Diaz before, it appeared to me that he was
sedated in some manner, as his speech was slower and somewhat slurred.

5.    Within a few minutes, Mr. Diaz became agitated, and it appeared to me that
he was speaking to the members of the Department of Corrections staff. They did
not appear to respond to him and I was unable to hear his part of the conversation
because the intercom between the execution chamber and the observation room
had been turned off. During the time Mr. Diaz appeared to be speaking, it was my
observation that he was in pain. His face was contorted, and he grimaced on
several occasions.  His Adams Apple bobbed up and down continually, and his
jaw was clenched.

6.     I could observe some type of fluid flowing through the intravenous tube, and Mr. Diaz head rolled to the right. A strap had been placed across his forehead, and a member of the DOC staff held the strap. I observed Mr. Diaz' right eye to close, but his left eye remained open. His mouth opened, and Mr. Diaz appeared to be gasping for air for at least 10-12 minutes. It was apparent that the complete drug cycle had been given to Mr. Diaz, however, on several occasions over the next twenty minutes I observed movement from Mr. Diaz, and he continued to gasp heavily for air.

7.     Approximately twenty minutes into the procedure, I observed two members of the DOC staff, one large black male, and a slightly smaller white male have several conversations into two separate phones. The black male had been on one phone since the initiation of the procedure, and I observed him hand that phone to the white male two times. After speaking into the first phone, the white male picked up a second phone, and had another conversation. It was apparent that something was wrong, and it was my observation that the other DOC staff members in the room looked uncomfortable at that time.

8.     After a total of 25-30 minutes, Mr. Diaz' breathing appeared to get shallower. His face became slack, and his skin had a grayish pallor. During the last 5-6 minutes, both of his eyes opened and his Adam's apple slowly stopped bobbing.

9.     I next observed a person wearing a purple suit (somewhat like a beekeepers outfit) enter the room. He flashed a light into the opened eyes of Mr. Diaz, and then checked his heart rate. That person left the room, and another person similarly garbed entered the room. He also checked Mr. Diaz' eyes and his heart rate. Mr. Diaz was then pronounced deceased by DOC personnel at 6:36 p.m. The time from when Mr. Diaz finished speaking, until the time he was pronounced dead was a span of 34 minutes.

FURTHER AFFIANT SAYETH NAUGHT.