IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **DANIEL LEE SIEBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD ALLEN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **GRANTT CULLIVER, Warden,** | ) | |
| **Holman Correctional Facility, and** | ) | **Case No.: 2:07-cv-295-MEF-WC** |
| | ) | |
| **OTHER UNKNOWN EMPLOYEES** | ) | |
| **AND AGENTS,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Individually, and in their** | ) | |
| **official capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' ANSWER
### AND SECOND MOTION TO DISMISS

Plaintiff, Daniel Lee Siebert, by and through undersigned counsel, pursuant to this

Court's Order of August 9, 2007 (Doc. # 25), hereby makes the following response to the

Defendants' Answer (Doc. # 23) and Motion to Dismiss the Amended Complaint (Doc. #

24):

1.      Mr. Siebert's amendment of his complaint is proper under Rule 15(a), Federal

Rules of Civil Procedure: "A party may amend the party's pleading once as a matter of

1

course at any time before a responsive pleading is served." *Cf.* Defendants' Answer to

Plaintiff's Amended Complaint (Doc. # 23), at ¶ 2.  At the time Mr. Siebert filed his

Amended Complaint (Doc. # 21), the Defendants had not yet filed an answer to his original

complaint.  Pleadings in civil cases in federal court include the complaint, the answer, and

any reply ordered by the court.  Fed. R. Civ. P. 7(a).  A motion to dismiss is not a pleading

and, therefore, not a responsive pleading that would cut off the plaintiff's right to amend:

> It is well established in this circuit that a motion to dismiss is not considered
> a responsive pleading for purposes of rule 15(a).  *Driscoll v. Smith Barney,
> Harris, Upham & Co.*, 815 F.2d 655, 659 (11th Cir. 1987), *vacated in part on
> other grounds* 484 U.S. 909, 108 S.Ct. 253, 98 L.Ed.2d 211 (1987), *cert.
> denied in part* 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987); *Chilivis
> v. Securities & Exchange Comm'n*, 673 F.2d 1205, 1209 (11th Cir. 1982);
> *McGruder v. Phelps*, 608 F.2d 1023, 1025 (5th Cir. 1979).  Because the
> appellees had only filed a motion to dismiss, not a responsive pleading, the
> appellants were entitled to amend their complaint at least once as a matter of
> course at any time before a responsive pleading was served.  Fed. R. Civ. P.
> 15(a); *McGruder*, 608 F.2d at 1025.

*Fortner v. Thomas*, 983 F.2d 1024, 1032 (11th Cir. 1993) (§ 1983 action by inmates).

Because the Defendants never answered Mr. Siebert's original Complaint, his right to amend

remained in force at the time he filed his amendment.

2.    Alternatively, even if Mr. Siebert were not entitled to amend as of right, the

interests of justice would require that amendment be permitted.  *See* Fed. R. Civ. P. 15(a)

("leave shall be freely given when justice so requires").  Mr. Siebert's claim under *Nelson

v. Campbell*, 541 U.S. 637 (2004), did not arise until late May 2007, after he had already

filed his original Complaint (Doc. # 1, filed April 9, 2007).  The symptoms of his illness did

not manifest themselves until this time, as the exhibits submitted with his Amended Complaint demonstrate. Mr. Siebert also added the facts concerning his Talladega conviction to his claim under *Hill v. McDonough*, 126 S. Ct. 2096 (2006), in order to facilitate adjudication of all of his claims against the Defendants respecting the lethal injection process in one proceeding.

3.    Mr. Siebert waited until July 19, 2007, to file his Amended Complaint because the diagnosis of his disease was not certain at the time he first became ill. Even as late as the date of filing the Amended Complaint, a second biopsy had been ordered but not performed. Given that the Defendants had filed a Motion to Dismiss (Doc. # 13) and a Reply to Mr. Siebert's Response (Doc. # 20, filed July 17, 2007), Mr. Siebert felt compelled to place his *Nelson* claim before the Court before a ruling was made on that motion. As of the date of this filing, August 22, 2007, Mr. Siebert does not have official documentation of the diagnosis. On information and belief, Mr. Siebert has been informed by Dr. Delano Benjamin, the physician employed at Holman Correctional Facility, and by other medical personnel that he does have pancreatic cancer. Review of available documents by Mr. Siebert's consulting expert also indicates that Mr. Siebert has hepatitis C. Both of these conditions and their treatment are likely to create complications for administration of lethal injection. (*See* Doc. # 21, Amended Complaint, at ¶¶ 20-23.)

4.    Any delay in making his *Nelson* claim and supporting it with documentation, or potential prejudice to the Defendants resulting therefrom, is not fairly attributable to Mr.

3

Siebert.  The Defendants have custody of Mr. Siebert and control over his medical records and over decisions respecting his medical treatment.  Counsel for Mr. Siebert has obtained his medical records through mid-July upon request to Prison Health Services and the Alabama Department of Corrections.  Counsel has requested weekly updates on these records, *see* Exhibit A, but has not yet received records of the biopsy performed on Mr. Siebert on or about July 30, 2007.  Counsel obtained records directly from Atmore Community Hospital, where the biopsy was performed; however, those records are incomplete.  The surgeon who performed the biopsy, Dr. Robert Patascil, has not submitted the discharge summary.  Counsel has attempted to contact Dr. Patascil twice in the past week, but has yet to receive a return call.

5.    Once Mr. Siebert has received the above-requested documents, he will need time to submit them to his own experts.  Mr. Siebert has retained a physician to conduct a complete examination of him; arrangements for that examination are not yet complete.  Mr. Siebert expects this examination to occur within the next two weeks, assuming cooperation from Holman Correctional Facility, where he is incarcerated.  Mr. Siebert has also been informed that a consultation regarding treatment between Department of Corrections' medical personnel and counsel and Mr. Siebert and his own counsel is planned, but that meeting has not yet been scheduled.

6.    Mr. Siebert has not heretofore requested that this Court expedite these proceedings, including discovery, because of the developing nature of his *Nelson* claim, as

4

described above.  At the time of his initial filing and the filing of his Amended Complaint,

no execution date had been set, although the State of Alabama filed its request for a date on

April 17, 2007.  (*See* Doc. # 13, Exhibit A).  Additionally, the Defendants have argued in

other cases that expediting the litigation is a cause of prejudice to them.  *See Grayson v.*

*Allen*, Case No. 2:06-cv-1032-WKW-CSC, Doc.# 37.

   7. Mr. Siebert has not yet moved for a stay of execution in this Court for the same

reasons he delayed filing his Amended Complaint.  However, Mr. Siebert relies both on the

impossibility of litigating his *Nelson* claim at any earlier date and the argument he made

before the Supreme Court of Alabama respecting setting an execution date on the basis of

his sentence in the Lee County/Middle District case: that an execution date is premature

where litigation of a first federal habeas petition is still ongoing in his Talladega/Northern

District case, which served as an aggravating circumstance to obtain the death sentence in

the Lee County/Middle District case.  *See*, *e.g.*, *Lonchar v. Thomas*, 517 U.S. 314 (1996)

(stay of execution appropriate to permit litigation of first federal habeas petition); *Barefoot*

*v. Estelle*, 463 U.S. 880 (1983) (stay appropriate to permit completion of appeal of dismissal

of first federal habeas petition).  Mr. Siebert's § 1983 action is not the kind of "last-minute"

filing meant to delay his execution, as described in *Gomez v. United States Dist. Court for*

*Northern Dist. of Cal.*, 503 U.S. 653 (1992).  Mr. Siebert is still engaged in litigation of a

first federal habeas petition and has never received merits review of any of his habeas claims

in that case.

8.     At the penalty phase of his trial in the Lee County case, the State argued that Mr. Siebert's conviction in the Talladega County case constituted an aggravating circumstance under Alabama Code 1975 § 13A-5-49(2).[1]  (R. 659-60, 662.)  The trial court instructed the jury that it had this aggravating circumstance to consider in arriving at a verdict regarding Mr. Siebert's punishment.  (R. 680.)  In its sentencing order, the trial court made a finding that an aggravating circumstance under Alabama Code 1975 § 13A-5-49(2) existed, in part, on the basis of the Talladega County conviction.  (C.R. 38.)  Thus, Mr. Siebert's Talladega conviction was weighed by the sentencing court in making its determination that death was the appropriate sentence in the Lee County case.

9.     Mr. Siebert is currently litigating the constitutionality of his conviction and sentence in the Talladega County case.  *See Allen v. Siebert*, Sup. Ct. No. 06-1680, *petition for cert. filed* June 15, 2007; *Siebert v. Allen*, 480 F.3d 1089 (11th Cir. 2007), *reh'g en banc denied Siebert v. Allen*, No. 06-11841 (11th Cir. Apr. 30, 2007) (table decision); *Siebert v. Allen*, No. 1:01-cv-02323-IPJ-TMP (N.D. Ala. 2006).  There has been no ruling on the merits in either of Mr. Siebert's federal habeas cases.  Should Mr. Siebert obtain relief in the Talladega County case, the validity of the Talladega conviction as an aggravating circumstance in the Lee County case would be undermined.  *Brown v. Sanders*, 546 U.S. 212, 891, 892 (2006) (death sentence must be set aside "if the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before

---

[1]The District Attorney argued to the jury not only Mr. Siebert's Talladega conviction but alaso his sentence and the jury vote on that sentence.  (R. 662.)

it"); *Stringer v. Black*, 503 U.S. 222, 232 (1992) ("when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale").

10.     The United States Supreme Court has held that "[i]f the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, *due process would mandate reversal*." *Brown v. Sanders*, 126 S. Ct. 884, 892 (2006) (emphasis added). *See also Johnson v. Mississippi*, 486 U.S. 578 (1988). In Mr. Siebert's Lee County case, the evidence concerning his Talladega conviction was not admissible for any purpose other than as support for an aggravating factor.

11.     The events underlying Mr. Siebert's two convictions occurred on the same evening in the same apartment complex. The State chose to prosecute Mr. Siebert under two separate indictments. However, the State also elected to create a dependency between the two cases by asking that the jury consider the Talladega conviction as an aggravating circumstance in the Lee County case; therefore, the Alabama Supreme Court should not have set an execution date in the Lee County case until all matters respecting Mr. Siebert's Talladega conviction and sentence are resolved.

12.     Setting an execution date in Mr. Siebert's Lee County case before complete adjudication of his Talladega County conviction violates his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. This Court owes no deference to an unconstitutionally obtained execution date.

13.     Turning to the Defendants' Answer and Second Motion to Dismiss, Mr. Siebert notes first that neither document contains any argument addressed to his *Nelson* claim, with the exception of blanket denials of the allegations contained in paragraphs 2 and 22 of Mr. Siebert's Amended Complaint.  (*See* Doc. # 23, Defendants' Answer at ¶¶ 2 and 22.)  No argument on this issue appears in the Defendants' Motion to Dismiss Plaintiff's Amended Complaint.  (*See* Doc. # 24.)  Nor do the Defendants indicate how any argument raised in their original Motion to Dismiss applies to this claim.  Because the Defendants raise no arguments in support of dismissal of this claim, there is no basis upon which this Court can dismiss it.

14.     Additionally, Defendants do not address Mr. Siebert's *Hill* claim as it pertains to his Talladega/Northern District sentence.  In their Answer to Mr. Siebert's Amended Complaint, Defendants admit the facts of the case, but make no further comment.  (*See* Doc. # 23, ¶¶ 13-15.)  Defendants also do not indicate how any argument raised in their second Motion to Dismiss applies to this claim.  While the argument respecting a statute of limitations defense to the Lee County claim in their original Motion to Dismiss may apply similarly with respect to the Talladega County case, the laches argument does not.  Mr. Siebert's Talladega County case is still actively proceeding through federal habeas review and, therefore, is not subject to the same attack as that raised against the Lee County case.

15.     Although Mr. Siebert's arguments raised in his own response to the Defendants' original Motion to Dismiss were submitted before an execution date had been

set by the Alabama Supreme Court, the analysis of the issue of the ripeness of his claim(s) is not altered by the subsequent setting of a date, and Mr. Siebert here incorporates that analysis by reference. (*See* Doc. # 19, at 10-40.)  Mr. Siebert continues to assert that his *Hill* claim in the Lee County/Middle District case was not ripe until execution of sentence became imminent, i.e., at the conclusion of federal habeas review.[2]  Mr. Siebert also continues to assert that the matter at issue is not simply the drugs employed by the Defendants to effect his death, but also all of the procedures and personnel involved in the execution process. Additionally, Mr. Siebert relies on the fact that the State of Alabama has altered its protocol and procedures more than once and those alterations are of significance to any decision respecting the timeliness of Mr. Siebert's complaint.

16.    Courts in this circuit, dismissing § 1983 lethal injection challenges, cite to considerations of equity and the "strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Diaz v. McDonough*, 472 F.3d 849, 850 (11th Cir. 2006) (*quoting Hill*, 126 S.Ct. at 2014).  *See also Williams v. Allen*, 2007 WL 2368028 (11th Cir. Aug. 21, 2007) (unpaginated); *Grayson v. Allen*, 2007 WL 2027903, at *3 (11th Cir. July 18, 2007); *Jones v. Allen*, 485 F.3d 635, 638 (11th Cir. 2007).  However, in the litigation of claims challenging Alabama's lethal injection protocol and procedures, no court has required

---

[2]Mr. Siebert notes that at least one judge on the Eleventh Circuit subscribes to the opinion that ripeness arises at the conclusion of federal habeas.  *See Williams v. Allen*, 2007 WL 2368028 (11th Cir. Aug. 21, 2007) (Barkett, J., dissenting) (unpaginated).

the Defendants to *prove* that the challenged protocol has remained unchanged since lethal injection was adopted as the default method of execution by the State of Alabama.  Mr. Siebert alleges that the State of Alabama has changed its protocol.  (*See* Doc. # 19, Response to Motion to Dismiss at pp. 18-21 (*citing Jones v. Allen*, 483 F. Supp. 1142, 1146 n. 2 (M.D. Ala. 2007)).)  The Defendants have not denied this allegation.  The Defendants bear the burden of proof as to any defense raised at the motion to dismiss stage.  *See In re Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003) (on motion to dismiss, movant bears burden of proof); *see also Misener Marine Const., Inc., v. Georgia Ports Authority*, 199 Fed.Appx. 899, 900 (11th Cir. 2006) (unpublished op.) (defendants bore burden of proof through evidentiary submissions in support of defense of Eleventh Amendment immunity at motion to dismiss stage).  Mr. Siebert relies on this factual admission in support of the claims raised in his Amended Complaint.  In its most recent decision affirming an order dismissing a § 1983 lethal injection challenge from this state, the Eleventh Circuit denied relief to Luther Williams, in part, on the basis that "no claim [had been made] that Alabama's lethal injection protocol has been modified since its inception."  *Williams*, 2007 WL 2368028 (unpaginated). This is not the case in this suit.

17.    Proof of these changes is in the custody and control of the Defendants and is not available to Mr. Siebert without disclosure ordered by this Court.  Principles of fairness, which are certainly implicated in any decision based on equitable considerations, require that the Defendants be compelled to produce this evidence.  With or without such evidence, this

Court can come to only one conclusion respecting Mr. Siebert's knowledge of such changes (either when they occurred or what modifications they entailed)–that is, that he had no means of knowing.  The Defendants, in their Answer, have refused to disclose any information respecting the specifics of the protocol or procedure without a protective order.  (*See* Doc. # 23 at ¶¶ 19, 24, 26, and 27.)  As Mr. Siebert has argued in his Response to the Defendants' original Motion to Dismiss, the possibility of change in Alabama's protocol and procedures, without public notification, makes early litigation of a *Hill* claim impracticable.  (*See* Doc. # 19 at pp. 15-21, 27-29.)

18.    Mr. Siebert further alleges that the State of Alabama has inadequate emergency procedures in place to respond to potential difficulties in effecting his execution.  The State of Alabama does not provide that any medical personnel remain in the execution chamber during the procedure to monitor delivery of the anesthetic through the tubing (i.e., leaks in the tubing, dislocation of the intravenous line, etc.) or indications from the prisoner that the anesthesia has not taken effect (reflexive responses to stimuli, grimacing, twitches, etc.).  The only individual remaining in the execution chamber throughout the execution, besides the condemned, is the prison chaplain, who, according to eyewitness observation, stands well away from the inmate.  *See* Exhibit B.[3]

19.    Mr. Siebert additionally relies on all other arguments raised in his Response

---

[3]Mr. Staunton's article was not available to Mr. Siebert before the filing of any of his previous submissions. An affidavit of Mr. Staunton's observations can be obtained, should the Court require sworn testimony.

to Defendants' Motion to Dismiss (Doc. # 19) and here incorporates them by reference.

20.    Defendants' defenses raised in paragraphs 1 through 20 under "Additional Defenses" in their Answer (Doc. # 23) give no detail as to how they apply in this case and are, in some instances, contradictory.[4] Therefore, Mr. Siebert cannot respond to them at this time.

21.    In conclusion, Mr. Siebert reiterates that the Defendants have not raised any arguments in either of their motions to dismiss directed at his *Nelson* claim or his *Hill* claim related to his Talladega/Northern District sentence.  Mr. Siebert asks that this Court not permit the Defendants to effectively amend their second Motion to Dismiss by submitting new arguments in the reply to this response previously ordered by the Court.  Alternatively, should the Defendants raise arguments in support of dismissing his *Nelson* claim or the *Hill* claim in their reply, and should this Court permit such additional argument, Mr. Siebert requests the opportunity to answer.

WHEREFORE, for all of the foregoing reasons, Mr. Siebert again respectfully requests that this Court deny the Defendants' Motion to Dismiss the Plaintiff's Amended Complaint and proceed to trial of this matter.

---

[4]For example, Defendants argue both that Mr. Siebert has unduly delayed, ¶ 7, and that his claims are not ripe, ¶ 14.  (Doc. # 23, Defendants' Answer to Plaintiff's Amended Complaint.)

Dated: August 22, 2007.

Respectfully submitted,

/s/Anne E. Borelli
ANNE E. BORELLI
AL SJIS: BOR -016
Federal Defenders
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail:anne_borelli @fd.org

Thomas M. Goggans
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery, AL 361056
Phone: 334-834-2511
Fax: (334) 834-2512
E-mail: tgoggans@tgoggans.com

Counsel for Daniel Lee Siebert, Plaintiff

13

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **DANIEL LEE SIEBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD ALLEN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **GRANTT CULLIVER, Warden,** | ) | |
| **Holman Correctional Facility, and** | ) | **Case No.: 2:07-cv-295-MEF-WC** |
| | ) | |
| **OTHER UNKNOWN EMPLOYEES** | ) | |
| **AND AGENTS,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Individually, and in their** | ) | |
| **official capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2007, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will electronically send a copy of the same to each of the following:

> James Clayton Crenshaw, Esq.
> Office of the Attorney General
> 11 South Union Street
> Montgomery, AL 36130
> Tel.: (334) 242-7300
> Fax: (334) 353-8440
> Email: ccrenshaw@ago.state.al.us

James William Davis, Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 242-7300
Fax: (334) 353-8440
Email: jimdavis@ago.state.al.us

Jasper Beroufon Roberts, Jr., Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4848
Fax: (334) 353-3637
Email: jroberts@ago.state.al.us

Corey Landon Maze
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4336
Fax: (334) 353-3637
Email: cmaze@ago.state.al.us


Respectfully submitted,

/s/ Anne E. Borelli
ANNE E. BORELLI

15

# EXHIBIT A

# FEDERAL DEFENDERS

## MIDDLE DISTRICT OF ALABAMA
### FEDERAL DEFENDER PROGRAM, INC.
### 201 MONROE STREET, SUITE 1960
### MONTGOMERY, AL 36104
TELEPHONE (334) 834-2099
FACSIMILE (334) 834-0353
Website: www.almfd.org

CHRISTINE A. FREEMAN
Executive Director

August 15, 2007

**VIA HAND DELIVERY**

Mr. Richard Allen, Commissioner
Alabama Department of Corrections
301 S. Ripley Street
P.O. Box 301501
Montgomery, AL. 36130-1501

**Re: Medical Records for Daniel Siebert, Z-475**

Dear Commissioner Allen:

Given our ongoing concern with Mr. Siebert's medical condition, I am writing to request that you provide us with weekly updates of Mr. Siebert's medical records. On August 6, we received records through July 17, so would you please first supply an update for the time intervening between that date and this and then supplement with new documentation as it becomes available. We have an immediate need of a copy of Mr. Siebert's chart showing the diagnosis of cancer. We have previously submitted a HIPAA compliant release signed by Mr. Siebert.

We still do not have the results of the second biopsy conducted at Atmore Community Hospital on or about July 30, 2007, and would appreciate copies of these records, also, as soon as they are available.

Thank you for your assistance in this matter.

Sincerely,

*Anne Borelli*

Anne Borelli
Assistant Federal Defender
Counsel for Daniel Siebert

AEB/

cc:    Vernon Barnett, Chief Deputy Commissioner, Alabama Department of Corrections
Grantt Culliver, Warden, Holman Correctional Facility

*In Memory: John William Focke, II 1949 - 2001*

# EXHIBIT B

Source: News & Business > Individual Publications > I > **The Irish Times** ⓘ
Terms: **"darrell grayson"** (Edit Search | Suggest Terms for My Search)

⚐Select for FOCUS™ or Delivery
☐

*'As he lay still on the gurney, I tried to imagine his last moments of consciousness. . .' The Irish Times August 4, 2007 Saturday*

Copyright 2007 The Irish Times
All Rights Reserved
The Irish Times

August 4, 2007 Saturday

**SECTION:** NEWS FEATURES; Pg. 1

**LENGTH:** 2478 words

**HEADLINE:** 'As he lay still on the gurney, I tried to imagine his last moments of consciousness. . .'

**BODY:**

It was three hours before the state of Alabama was due to execute **Darrell Grayson** after 25 years on death row at Holman Correctional Facility, a maximum-security prison about two hours south of the state capital, Montgomery, writes Denis Staunton.

"It seems a little quieter on the exercise yard," the guard said. "This guy is more popular than most." I was sipping coffee and nibbling a cookie from the prison bakery with two local reporters and a couple of prison guards as we waited in a low, brick building across the road.

The guards expressed no pity for the condemned man but they showed no disrespect either as they spoke about him and the punishment he was about to receive.

Grayson was 19 years old when he confessed to one of the most brutal crimes committed in his home town of Montevallo, a few miles south of Birmingham. In the early morning hours of Christmas Eve 1980, two men broke into the home of Annie Laura Orr, an 86-year-old widow who stood just five feet and three inches. "They entered Mrs Orr's bedroom, where she was apparently sleeping. They subdued and beat her, striking her in the head with a blunt instrument and breaking several of her ribs," the court record said. "Grayson then placed a pillowcase over her head and wrapped two relatively long lengths of masking tape very tightly around her head so that when they were finished her head appeared to be that of a mummy. They then proceeded to look for money and other valuables.

"During their assault, they raped Mrs Orr repeatedly. She lived through the assault of being raped, beaten, threatened, unable to see or adequately breathe, and begging her assailants not to hurt her but to take her money, for a considerable period of time. She then died."

Police found a trail of playing cards leading from the crime scene to the home of 18-year-old Victor Kennedy, a petty criminal who had been drinking and playing cards with Grayson and two other men the previous evening. Grayson remembered nothing at first, because he had been so drunk after a drinking session that started at 5pm. He waived his right to have a lawyer present and, under questioning, admitted that he and Kennedy had decided to burgle Orr's house, where he had done odd jobs in the past. He said he put the pillowcase over Orr's

face to prevent her from recognising him and admitted that he and Kennedy had raped her repeatedly. Kennedy tried to blame Grayson for both the rape and the murder, but both men were found guilty of murder during a burglary and sentenced to death at Holman Prison.

Grayson, an African-American, was tried before an all-white jury. His court-appointed attorney, who was given $500 to investigate the case, was a divorce lawyer who had never tried a capital case before. In the witness stand, Grayson again confessed to the crime but repeatedly said he was drunk at the time and couldn't independently recall the events. He also testified that he gave officers details of the crime that he didn't actually remember, based on what they said Kennedy had told them.

Passing sentence, the judge acknowledged mitigating circumstances, including the fact that Grayson had no prior history of violence or criminal activity, that he came from a poor, single-parent family with 11 siblings, left school in the 10th grade, "and had given his mother little trouble in growing up". These factors were outweighed, however, by the aggravating factors of the rape and the brutality of the crime, which the court described as "more characteristic of the actions of wild ravaging dogs of hell rather than even the lowest and most depraved level of humanity".

ALMOST HALF OF Alabama's 200 death row inmates are black, even though African-Americans make up only a quarter of the state's population. Although two out of three murder victims in the state are black, 80 per cent of the inmates on death row are there for killing whites. Death row inmates are overwhelmingly poor - 95 per cent of those at Holman are officially described as indigent. Alabama is almost alone among US states in having no state-wide public-defender system and does not guarantee appointed counsel for post-conviction appeals.

At Holman, death row inmates usually spend 23 hours a day in their cells, with an hour's exercise each day and a shower every other day. They can also leave their cells to attend church services and, on certain days, to visit the law library, which has mostly out-of-date books but functions as a day room where inmates play chess or draughts. Death row prisoners don't work, but friends and relatives outside can lodge money to PMOD (Prisoner Money on Deposit) accounts to pay for commissary items such as food and toiletries. They are allowed to own a TV if they can afford one.

When he arrived at Holman in 1982, Grayson "wallowed for years in self-pity and ignorance until my mother's death became the catalyst for positive changes in my life", as he put it in an account of his case earlier this year in Wings of Hope, a journal written and edited by death row prisoners in Alabama.

He started to write poetry, which was published in magazines and chapbooks and took educational courses that were then still available to Alabama death row inmates, receiving a GED (the US school-leaving certificate) and an associate science degree.

In 1994, he joined Project Hope to Abolish the Death Penalty (PHADP), a group run by death row inmates with the help of a handful of outside volunteers, becoming its chairman in 2000.

"During one of my quiet, lucid moments, I was shocked to realise the depth of loss and deprivation that is endured here on death row," he wrote. "I understood that each of us in our own way chooses to open the doors our own way, that can limit or increase the possibilities in our lives. Some doors open only onto the miseries of the world, overwhelm us and make us lose our focus . . . But there are other doors which we can choose that lead to spiritual growth and positive action."

For 20 years, Grayson didn't question his own guilt, and Kennedy refused to talk to him about what happened the night of the murder. But on the night of Kennedy's execution in 1999, Grayson was taken from his cell to the captain's office. "Victor had asked his personal

preacher to tell me that he, Victor, asked for my forgiveness. I asked the preacher, 'for what does he want my forgiveness?' The preacher told me, 'that is not important'," Grayson said later.

In 2001, Esther Brown, a veteran Alabama activist against the death penalty, started to investigate the case and a witness came forward to say that Grayson could not have killed Orr because he was passed out elsewhere at the time of the crime.

Brown persuaded the Innocence Project, which has used DNA testing, to exonerate more than 200 people convicted of serious crimes, to take up the case, calling for sperm taken from Orr's clothing to be matched against Grayson's DNA.

If Grayson didn't rape Orr, the strongest plank in the prosecution's case linking him to the murder would collapse, leaving his own confession as the most compelling evidence against him.

False confessions are not uncommon, even without evidence of police brutality, and DNA testing has cleared a number of people who claimed responsibility for high-profile murders they didn't commit.

In the weeks before Grayson's execution date, numerous groups and individuals including former taoiseach John Bruton, now EU ambassador to Washington, appealed to Alabama governor Bob Riley to stay the execution and order DNA testing.

The Innocence Project offered to pay for a test at a nationally accredited DNA laboratory, which could be completed within 30 days, but, with two hours to go before the execution hour, Riley said no, declaring that DNA testing would make no difference. "DNA testing would neither prove nor disprove this killer's guilt. He was convicted of burglary and murder, not rape and murder, so legally DNA testing would not exonerate him even if there is no DNA evidence that he raped Mrs Orr," the governor said. A few minutes later, the US Supreme Court rejected Grayson's appeal for a stay of execution with a two-line statement, closing off his last chance of avoiding death.

A guard came in with news of how Grayson had spent the day meeting friends and relatives, including his sister Betty, two nephews and a niece, as well as Brown and his attorney, Charlotte Norton. For his last meal, Grayson asked for a cheese omelette with fresh sliced tomatoes, and during the afternoon he wrote his will: "Inmate Mark Jenkins W/Z 527: 1 Sony radio, $100 from PMOD account. Inmate Jeffery Rieber W/Z 540: Assorted store items, $133 remaining money from PMOD account. Inmate Corey Grayson W/Z 598: 1 head phone set, 1 pair of shoes. Inmate Ronald Smith W/Z 586: 1 TV Sanyo. Esther Brown: 1 ring, assorted letters and books."

At about 5.30pm, an officer patted me down, allowing me to keep a notebook and pen. Another told me that, if I changed my mind about witnessing the execution, I could back out. "If you want to leave when you get in there because it's too much, or if you decide you don't want to see it, there's a small bathroom off the witness room and you can sit in there until it's over," he said.

We piled into a white prison van and drove across the road to Holman, past the four-metre-high double-fencing topped with razor wire and through two gates to join a small procession of cars. In the exercise yard, a few prisoners stood in silence, watching us pass a row of individual exercise cages on our way to the death house.

A heavy-set man in a short-sleeved shirt with a mobile phone strapped to his belt was chatting and joking with guards outside. The ears of a stethoscope stuck out of his back pocket - this was the county medical examiner, a qualified doctor who would pronounce Grayson dead.

We moved down a narrow corridor into a tiny room lit by a pink fluorescent bulb, with white, brick walls on three sides and a rectangular window taking up almost all the fourth wall. Sitting in the front row, our knees touching the ledge, were the three reporters, and Esther Brown, Grayson's sole witness.

Through a curtain, the shape of a hospital gurney was visible, with a few figures moving around it.

Brown, a thin, grey-haired woman wearing a cotton print dress and a denim jacket, who had become Grayson's closest friend outside the prison, fidgeted and looked at her watch a couple of times.

A GUARD DREW back the curtain and Grayson was lying just a few feet away, a lean, handsome man, dressed in a white prison uniform, draped in a white sheet and strapped to the gurney, his arms stretched out on black arm rests, almost in cruciform. Two drips attached to his right arm disappeared into a small square opening in the wall behind, next to a microphone hanging on a hook.

Grayson saw Brown and smiled and winked at her, flashing the peace sign with his fingers; he smiled at the chaplain, a thin, stern-faced man who was standing in the corner of the death chamber.

Then Grayson looked through the glass on the other side of the chamber, where Lee Binion, Orr's granddaughter, was sitting. He smiled at her and she gave him a cold stare.

Holman's warden, Grantt Culliver, entered the chamber and approached the gurney. Culliver, an African-American, is obliged by Alabama law to carry out all executions at the prison himself. "I look at it as part of the job," he said in an interview two years ago. "The people of the state of Alabama, because of the ways the laws are written, are as responsible as I am. I am the pawn or tool. The responsibility lies with the people of Alabama."

As Culliver read the order of execution, Grayson's breathing quickened, his chest started to heave and, for the first time, a look of anguish crossed his face. When Culliver asked him if he wanted to make a statement, Grayson just said "peace", and again formed the peace sign with the fingers of each hand.

The warden left the chamber to start the process of execution in a small room next door, so Grayson was now alone except for the chaplain, who remained standing rigidly in his corner. Grayson was smiling again, looking over at Brown, who mouthed the words "I love you".

He exchanged a few words with the minister, lay back and waited.

It was 6.04pm and the deadly chemicals must now have been coursing through the cannula into Grayson's vein but nothing seemed to be happening.

"What the hell are they doing here?" Brown said.

A minute later, Grayson looked up, smiled one more time, turned to his right to look at Binion, and closed his eyes.

Alabama doesn't talk about the chemicals it uses in the lethal injection, but officials confirmed to me that the three drugs are similar to those used in other states. The first is sodium thiopental, a barbiturate to make the prisoner unconscious; the second is pancuronium bromide, which stops all muscle movement, except for the heart; the third, potassium chloride, stops the heart beating and causes death. A number of states have halted lethal

injection executions after medical studies showed that inadequate dosing meant some prisoners may have died painful deaths by asphyxiation. Sodium thiopental is an ultra-short-acting barbiturate, the anaesthetic effect of which can wear off within minutes, so a prisoner could be conscious as the pancuronium bromide paralyses his muscles and asphyxiates him to death.

As the minutes crawled past and Grayson lay still on the gurney, I hoped he was feeling nothing now and tried to imagine his last moments of consciousness, the terror and the loneliness of dying in this empty chamber, surrounded by hostile faces.

I remembered my father's death long ago, how I held his hand and spoke to him as he drew his last breaths among those he loved. I pictured my own death and wondered if I would face it with the same grace shown by this poor convict.

I looked across at Binion, who had taken out a handkerchief and was dabbing her eyes. Suddenly, she was shaking violently as the tears rolled down her face.

It was 6.13pm and the medical officer, who had been sitting behind Binion all this time, stood up and took out his stethoscope, confident by now that it would register nothing. The curtains around the death chamber were drawn as the doctor approached Grayson and, three minutes later, declared him dead.

"Bloody murderers," Brown said as she stood up.

Outside, in the prison van, the other reporters were filing their stories over the phone. Binion had issued a statement on behalf of Orr's family welcoming the execution. "The family of Annie Laura Orr has seen the final chapter of this lengthy 27-year struggle come to an end. We are grateful that justice has finally been served," she said.

As we drove away from Holman, a guard told me that just one protester had kept vigil outside the prison during Grayson's execution.

"Hell, even that's a lot," he said.

**LOAD-DATE:** August 4, 2007

Source: News & Business > Individual Publications > I > **The Irish Times** ⓘ
Terms: **"darrell grayson"** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, August 20, 2007 - 12:05 PM EDT

 LexisNexis®   About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.