## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DANIEL LEE SIEBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD ALLEN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **GRANTT CULLIVER, Warden,** | ) | |
| **Holman Correctional Facility, and** | ) | **Case No.: 2:07-cv-295-MEF-WC** |
| | ) | |
| **OTHER UNKNOWN EMPLOYEES** | ) | |
| **AND AGENTS,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Individually, and in their** | ) | |
| **official capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S EMERGENCY MOTION
### FOR PRELIMINARY INJUNCTION TO STAY EXECUTION

COMES NOW the Plaintiff, Daniel Lee Siebert, by and through undersigned counsel,

and moves this Honorable Court to grant a preliminary injunction staying the execution date

of October 25, 2007, set for Mr. Siebert by the Alabama Supreme Court.  In support of this

Motion, Mr. Siebert would show the following:

**I.     THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION IN
THIS CASE BECAUSE THE UNITED STATES SUPREME COURT'S
DECISION IN *BAZE V. REES* WILL SET THE STANDARD FOR
DETERMINING WHAT IS CRUEL AND UNUSUAL PUNISHMENT**

1

**UNDER THE EIGHTH AMENDMENT.**

1.      On September 25, 2007, the United States Supreme Court granted a petition for certiorari to the Kentucky Supreme Court raising four questions related to lethal injection procedures.  *See* Exhibit A (Order, *Baze v. Rees*, No. 07-5439).  Those questions include the standard for determining what is cruel and unusual punishment under the Eighth Amendment to the United States Constitution and whether the three-drug sequence employed by Kentucky–and by Alabama–meets constitutional requirements.  The answers to these questions will be controlling for any decision to be reached by this Court.  Therefore, this Court should grant a stay of Mr. Siebert's execution until the *Baze* case is resolved.

2.      Further, on September 27, 2007, the United States Supreme Court granted a stay of execution in the Texas case of Carlton Turner, setting 90 days for the petitioner to file a petition for certiorari respecting lethal injection procedures in that state.  *See Turner v. Texas*, --- U.S. ---, 2007 WL 2803693 (Sept. 27, 2007).  On information and belief, Mr. Turner filed a successor post-conviction petition within days of his scheduled execution date. The state courts denied the petition, but the United States Supreme Court granted a stay.  *See* Exhibit B.  The Supreme Court's action in Mr. Turner's case supports the conclusion stated in paragraph 1.

3.      Subsequently, the Texas Court of Criminal Appeals on October 2, 2007, stayed the execution of Heliberto Chi, ordering the State to respond to Mr. Chi's allegations that Texas' lethal injection protocols do not comply with constitutional requirements.  *In re*

*Heliberto Chi*, Case No.WR-61,600-03, Order (Tex. Ct. Crim. App. Oct. 2, 2007) (granting stay of execution to allow state to "address the question of whether the current method of administering lethal injection in Texas constitutes cruel and unusual punishment such that the respondent would violate the Eighth Amendment if he complied with the Warrant of Execution"). *See also* Exhibit C. The effect of the Texas court's action is likely to be postponement of Mr. Chi's execution until the resolution of *Baze*.

4.     On October 3, 2007, the Attorney General of Oklahoma requested that state's Court of Criminal Appeals to postpone setting any execution dates until a decision is rendered in *Baze*. *Short v. State*, Case No. D-97-540, State's Notice of Exhaustion of State and Federal Appeals (Okla. Crim. App. Oct. 3, 2007) (asking the court not to set execution date for Terry Lyn Short "[o]ut of an abundance of caution" pending Supreme Court's decision in *Baze*). *See* Exhibit D.

5.     In California, United States District Judge Jeremy Fogel has ordered changes to that state's lethal injection protocol to comply with constitutional requirements. *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Calif. 2006). Executions appear to be on hold since that decision was issued. In a recent order addressing the impact of the certiorari grant in *Baze*, Judge Fogel stated, "While the issues presented in *Morales v. Tilton* are not identical in all respects to those before the Supreme Court in *Baze*, it would appear that at the very least the Supreme Court's decision in *Baze* is likely to affect this Court's legal analysis and conclusions." *Morales v. Tilton*, No. 5:06-cv-219-JF (Doc. # 335 at *2) (N.D. Calif. Sept.

26, 2007).  *See* Exhibit E.

6.     In Delaware, United States District Judge Sue L. Robinson issued an order on September 26, 2007, staying proceedings in the lethal injection challenge pending in her court explicitly as a result of the grant of certiorari in *Baze*.  *Jackson v. Danberg*, Civ. No. 06-300-SLR (Doc. # 80) (D. Del. Sept. 26, 2007).  *See* Exhibit F.

7.     The Supreme Court's action in granting a petition for certiorari on these Eighth Amendment matters to one petitioner and in granting a stay to another means that a national standard will be set in the not-too-distant future.  The Texas courts have read the Supreme Court's actions as mandating that they, too, hold executions in abeyance while the issue is pending before that higher court.  Similarly, the *Morales* court has indicated that, while discovery and an evidentiary hearing may continue before an opinion is issued in *Baze*, the Supreme Court's decision will have a significant impact on the determination of the case before it.  The *Jackson* court went further and suspended all proceedings pending a decision in *Baze*.  Given these developments, for the State of Alabama to proceed in its intent to execute Mr. Siebert prior to the Supreme Court's decision would be arbitrary, improper and unjust.  *See*, *e.g.*, *Timberlake v. State*, 859 N.E.2d 1209, 1212 (Ind. 2007) (granting stay of execution where a challenge was made under *Ford v. Wainwright*, 477 U.S. 399 (1986), because the Supreme Court had granted certiorari in *Panetti v. Quarterman*, 127 S. Ct. 2842 (2007)) ("If the Supreme Court interprets the Eighth Amendment in a manner significantly different from Justice Powell's concurrence in *Ford*, Timberlake's execution may prove to

be prohibited by the Eighth Amendment.  We grant a stay to prevent learning the answer to that question after it is too late").

8.    Actual or virtual stays are in place in a number of other states as well.  A recent decision of the United States District Court for the Middle District of Tennessee has halted executions in that state on the basis that a lethal injection protocol virtually identical to Alabama's violates the constitutional prohibition against cruel and unusual punishment. *Harbison v. Little*, --- F. Supp. 2d ---, 2007 WL 2821230 (M.D. Tenn. Sept. 19, 2007).  The State of Tennessee subsequently moved to vacate the execution order in light of this decision. *In re Harbison*, Case No. M1986-00093-SC-OT-DD, Motion to Vacate Order Setting Execution Date (Tenn. S.Ct. Sept. 24, 2007).

9.    Executions are also on hold for various reasons related to lethal injection challenges in at least the following additional states: Florida, Maryland, New Jersey, North Carolina, and Ohio.[1]    *See* "Lethal Injections: Other Official Actions" at http://www.deathpenaltyinfo.org/article.php?did=1686&scid=64.

10.    The State of Alabama has represented to the United States Supreme Court that its reasons for undertaking changes to its protocol are an "apparent" response to *Baze*.  *See* Exhibit G.  It is only proper that a consideration of whether Alabama's response to *Baze* is adequate be postponed until the Supreme Court's decision in that case is issued.

---

[1]Litigants in the class action challenge to Ohio's protocol have been granted preliminary injunctions staying execution while the petition for certiorari to the Sixth Circuit for its decision in *Cooey v. Strickland*, 479 F.3d 412 (6th Cir. 2007), is pending before the Supreme Court.  *See, e.g.*, *Cooey v. Taft*, 2007 WL 2607583 (S.D. Ohio Sept. 05, 2007) (granting stay to plaintiff-intervenor).

11.    Given that the Supreme Court's decision in *Baze*, when rendered, will decide the fundamental issue of what constitutes cruel and unusual punishment under the Eighth Amendment, it would be a waste of judicial resources for the parties in this case to make any argument beforehand and for this Court to reach any decision which will be necessarily premised on the very same question.

II.    **EVEN ABSENT THE GRANT OF CERTIORARI IN *BAZE V. REES*, MR. SIEBERT MEETS THE REQUIREMENTS TO OBTAIN A PRELIMINARY INJUNCTION STAYING HIS EXECUTION UNDER THE PRISON REFORM LITIGATION ACT, 18 U.S.C. § 3626(a)(1), AND RULE 65(a), FEDERAL RULES OF CIVIL PROCEDURE.**

   A.    **Mr. Siebert Meets the Requirements for a Preliminary Injunction under the Prison Reform Litigation Act.**

12.    In *Nelson v. Campbell*, 541 U.S. 637, 650 (2004), the Supreme Court indicated that prisoners bringing claims under 42 U.S.C. § 1983 must comply with the requirements of the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626(a)(1) (the Act), to obtain preliminary or permanent injunctive relief.   "[B]efore granting a stay, a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Id.* at 649-50.  There is "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring a stay." *Id.* at 650.  *Accord Hill v. McDonough*, 126 S. Ct. 2096, 2104 (2006).

13.    The Act requires that a district court

shall not grant or approve any prospective relief unless the court finds that

such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1). *See also* 18 U.S.C. § 3626(a)(2). A grant of preliminary injunctive relief automatically expires in 90 days after entry, "unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.*

### 1. Mr. Siebert can show a likelihood of success on the merits.

14.     In support of this requirement, Mr. Siebert incorporates by reference all of the discussion of recent developments in lethal injection challenges set forth above in Section I. These developments show that courts across the country are finding that lethal injection protocols similar to Alabama's likely create an unacceptable risk of causing excruciating and unnecessary pain.

15.     Mr. Siebert would note also that the ruling by the United States District Court for the Middle District of Tennessee in *Harbison v. Little* finds the Tennessee protocol constitutionally deficient for reasons that apply equally to Alabama's protocol. As an example, Judge Trauger found that Tennessee's protocol did not provide adequate monitoring of anaesthetic depth, because none of the execution team members, even though in the execution chamber during administration of the drugs, stood near enough to the inmate to make an adequate determination of unconsciousness. 2007 WL 2821230 at *19-20.

Alabama's protocol does not provide for any of the execution team members even to remain in the chamber as the drugs are administered. *See* Exhibit H. This indicates that Alabama is not prepared to deal with either "normal" failures in the execution procedures or emergencies specific to Mr. Siebert's medical condition.

16.    Although Alabama's execution protocol has been shrouded in secrecy, the Defendants have claimed that Section 1983 litigants knew or had reason to know the facts supporting their claims by comparison with other states' protocols. *See* Defendants' Reply to Siebert's Response to Defendants' Motion to Dismiss (Doc. # 20, at 23). Numerous executions in these other states, following allegedly similar protocols, have resulted in prolonged and demonstrably excruciating deaths. *See* Exhibit I, (Julie Carr Smyth and Andrew Welsh-Huggins, "Chemicals Took More than Twice Usual Time to Kill Ohio Inmate," *Associated Press*, May 26, 2007 (ten needle sticks and additional 16 minutes required for chemicals to take effect); Julie Carr Smyth, "Ohio Executes Inmate for Killing Cellmate in 2001" *Associated Press*, May 24, 2007, (nearly two hours spent locating usable veins); Nathan Crabbe, "Botched Diaz Execution Prompts Further Study by Commission," *Gainesville Sun*, January 27, 2007 (attached as Exhibit E to Exhibit 1 to Doc. # 19); Alan Johnson, "'It Don't Work,' Inmate Says during Botched Execution," *Columbus Dispatch*, May 3, 2006 (90 minutes required for execution behind closed curtain); Rhonda Cook, "Gang Leader Executed by Injection," *Atlanta Journal-Constitution*, November 7, 2001 (second intravenous line inserted in neck after 20 minute search for vein); Associated Press, "Killer

8

Helps Officials Find a Vein," *Chattanooga News-Free Press*, June 13, 1997 (body swollen from liver problems makes finding vein difficult). *See also Taylor v. Crawford*, No. 05-4173-CV-C-FJG, 2006 WL 1779035, at *8 (W.D. Mo. June 26, 2006) ("All of these concerns lead the Court to conclude that Missouri's lethal injection procedure [before revision] subjects condemned inmates to an unnecessary risk that they will be subject to unconstitutional pain and suffering when the lethal injection drugs are administered").

17.    Additionally, recent research indicates that no "reliable medical research ever supported the formation of the three-drug protocol first devised by Oklahoma and then essentially copied by every other state seeking to use lethal injection as a method of execution." *Cooey v. Taft*, 2007 WL 2607583, at *3 (*referencing* T. A. Zimmers, J. Sheldon, D.A. Lubarsky, et al., *Lethal Injection for Execution: Chemical Asphyxiation?*, PLoS Med, Vol. 4, Issue 4, 156 (April 2007) (*available at* http://medicine.plosjournals.org)).

18.    The weight of evidence available to Mr. Siebert, prior to discovery, indicates a strong likelihood of success on the merits.

   **2.    The relief Mr. Siebert seeks is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, is the least intrusive means necessary to correct the violation of the Federal right, and has no adverse impact on public safety or the operation of Alabama's criminal justice system.**

19.    In requesting an injunction staying his October 25, 2007, execution date, Mr. Siebert asks only that this Court grant him the time necessary to litigate his claims fully and

fairly. The very essence of Mr. Siebert's claims is that execution by lethal injection as currently practiced in Alabama would violate his federal right not to be subjected to cruel and unusual punishment. The only means by which this Court can protect Mr. Siebert's federal right is a stay of execution as requested. Mr. Siebert further requests that this Court make its order final, as specified under 18 U.S.C. § 3626(a)(2) in order to permit resolution of his claims to await a ruling from the United States Supreme Court in *Baze v. Rees*. The grant of such a request has no adverse impact on the public safety or the operation of Alabama's criminal justice system because it requires no change in Mr. Siebert's current conditions of incarceration.

### 3.    Mr. Siebert has not delayed unnecessarily in bringing his claims.

20. On October 3, 2007, this Court ruled that two of Mr. Siebert's claims survive the Defendants' Motion to Dismiss. *See* Memorandum Opinion and Order (Doc. # 39). In so ruling, this Court held that Mr. Siebert had stated claims upon which relief can be granted and that he had not been dilatory in bringing his two surviving claims. (*Id.* at 19-20.) At the time he filed his initial Complaint on April 9, 2007, Mr. Siebert did not yet have an execution date set, nor had any court in this district ruled on the timeliness of Section 1983 claims.[2] Mr. Siebert amended his complaint to include the surviving claims expeditiously. In particular, Mr. Siebert filed his claim under *Hill v. McDonough* with respect to his Northern

---

[2]The opinion in *Jones v. Allen*, 483 F. Supp. 2d 1142 (M.D. Ala. 2007), issued on April 17, 2007, was the first ruling in a *Hill* lethal injection challenge in Alabama.

District death sentence while that conviction was (and is) still on habeas review.  *See* Memorandum Opinion and Order (Doc. # 39, at 19-20).  His claim under *Nelson v. Campbell* could not have been brought before the symptoms of his cancer manifested themselves in late May 2007.  *See* Amended Complaint (Doc. # 21, at 6).  Even so, he amended his complaint to include this claim on July 19, 2007 (*id.*), even before the Alabama Supreme Court set an execution date on July 30, 2007.  It would have been simply factually impossible for Mr. Siebert to have brought this claim a year or more before his execution date was set.  *See Jones v. Allen*, 483 F. Supp. 2d 1142, 1152 (M.D. Ala. 2007) (litigation of lethal injection claim could not reasonably be completed in less than a year's time).  For these reasons, this Court should find that Mr. Siebert has not "delayed unnecessarily in bringing the claim." *Nelson*, 541 U.S. at 649-50.

**B.    Mr. Siebert Meets the Requirements for a Preliminary Injunction under Rule 65(a), Federal Rules of Civil Procedure.**

21.    The standard for determining whether a stay or injunction is appropriate in a Section 1983 action involves a weighing of four considerations: "(1) whether there is a substantial likelihood of success on the merits; (2) whether the requested action is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm the stay or injunction would inflict upon the nonmovant; and (4) whether the requested action would serve the public interest."  *Rutherford v. McDonough*, 466 F.3d 970, 979 (11th Cir. 2006) (Wilson, J., dissenting) (*citing Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

11

       **1.**     **Mr. Siebert can show a substantial likelihood of success on the merits.**

22.    See the discussion in Section I(A)(1) above.

       **2.**     **The requested action is necessary to prevent irreparable harm.**

23.    The harm Mr. Siebert will suffer, should this Court deny a stay, is execution by means of a procedure that runs an unnecessary risk of inflicting excruciating pain in violation of the Eighth Amendment prohibition against cruel and unusual punishment.  That this risk is real and substantial is supported by the evidence cited in support of factor 1.  This harm cannot be prevented or repaired absent a stay.

       **3.**     **The threatened injury outweighs any harm to the Defendants.**

24.    The only harm to the Defendants arising from issuance of a stay would be delay in enforcing a criminal judgment in a timely fashion.  That delay, however substantial, is minimal in comparison to the harm threatened to Mr. Siebert.  Those courts which have found lethal injection protocols defective have nonetheless also opined that the problems can be fixed.  *See, e.g., Morales*, 465 F. Supp. 2d at 974 ("Defendants' implementation of lethal injection is broken, but it can be fixed"); *Taylor v. Crawford*, 487 F.3d 1072 (8th Cir. 2007) (holding that *new* protocol passes constitutional muster).  Mr. Siebert requests only that he be accorded time to litigate his claim and ensure that his execution will not be unnecessarily torturous.

       **4.**     **The requested action will serve the public**

**interest.**

25.    The public interest is better served, not by continuing to employ a hastily-devised execution protocol with significant risks of error, but in examining that protocol to ensure that it meets constitutional requirements.  The citizens of Alabama, no less than Mr. Siebert, have a significant interest in assuring that executions carried out in their name comply with the requirements of the United States Constitution, the purpose of which is protection of the rights of all.  *See Cooey v. Taft*, 2007 WL 2607583, at *5.

26.    A balancing of the equities, i.e., the four factors enumerated above, weighs heavily in Mr. Siebert's favor and, therefore, supports the grant of a preliminary injunction staying his execution until this matter can be resolved.

WHEREFORE, for the reasons stated above, or any other reason discernible by this Court, this Court should issue a preliminary injunction enjoining the execution of Daniel Lee Siebert by the Defendants and the State of Alabama pending the decision of the United States Supreme Court in *Baze v. Rees*.

Dated: October 9, 2007.

Respectfully submitted,

/s/Anne E. Borelli
ANNE E. BORELLI
AL SJIS: BOR -016
E-mail:anne_borelli_@fd.org

Christine A. Freeman
TN BAR NO.: 11892
E-mail: Christine_Freeman@fd.org

Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353

Thomas M. Goggans
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery, AL 361056
Phone: 334-834-2511
Fax: (334) 834-2512
E-mail: tgoggans@tgoggans.com

*Counsel for Daniel Lee Siebert, Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **DANIEL LEE SIEBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD ALLEN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **GRANTT CULLIVER, Warden,** | ) | |
| **Holman Correctional Facility, and** | ) | **Case No.: 2:07-cv-295-MEF-WC** |
| | ) | |
| **OTHER UNKNOWN EMPLOYEES** | ) | |
| **AND AGENTS,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Individually, and in their** | ) | |
| **official capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2007, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will electronically send a copy of the same to each of the following:

James Clayton Crenshaw, Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 242-7300
Fax: (334) 353-8440
Email: ccrenshaw@ago.state.al.us

15

James William Davis, Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 242-7300
Fax: (334) 353-8440
Email: jimdavis@ago.state.al.us

Jasper Beroufon Roberts, Jr., Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4848
Fax: (334) 353-3637
Email: jroberts@ago.state.al.us

Corey Landon Maze
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4336
Fax: (334) 353-3637
Email: cmaze@ago.state.al.us

Respectfully submitted,

/s/ Anne E. Borelli
ANNE E. BORELLI

# EXHIBIT A

```
┌─────────────────────────────────────────────────────────┐
│                                                         │
│      SUPREME COURT OF THE UNITED STATES                 │
│      GRANTED & NOTED LIST - OCTOBER TERM 2007           │
│                                                         │
└─────────────────────────────────────────────────────────┘
```

### As of September 25, 2007

**06-43**        CFX    *STONERIDGE INVESTMENT V. SCIENTIFIC-ATLANTA, INC.*
                        Court: USCA-8                      Grant: 3/26/07 (CJ & SGB
– no part)
                        Argument Date: 10/9/07

**06-179**       CFX    *RIEGEL V. MEDTRONIC, INC.*
                        Court: USCA-2                      Grant: 6/25/07

**06-457**       CFX    *ROWE, ATT'Y GEN. OF ME V. NH MOTOR TRANSPORT ASSN.*
                        Court: USCA-1                      Grant: 6/25/07

**06-571**       CFY    *WATSON V. UNITED STATES*
                        Court: USCA-5                      Grant: 2/26/07
                        Argument Date: 10/9/07

**06-637**       CFX    *BD. OF EDUCATION OF CITY OF NEW YORK V. TOM F.*
                        Court: USCA-2                      Grant: 2/26/07
                        Argument Date: 10/1/07

**06-666**       CSX    *DEPT. OF REVENUE OF KY V. DAVIS*
                        Court: CA-KY                       Grant: 5/21/07
                        Argument Date: 11/5/07

**06-694**       CFY    *UNITED STATES V. WILLIAMS*
                        Court: USCA-11                     Grant: 3/26/07
                        Argument Date: 10/30/07

**06-713)**      CFX    *WASHINGTON STATE GRANGE V. WA REPUBLICAN PARTY*
**06-730)**      CFX    *WASHINGTON V. WA REPUBLICAN PARTY*
                        Court: USCA-9                      Grant: 2/26/07
                        Argument Date: 10/1/07

**06-766**       CFX    *NY BD. OF ELECTIONS V. TORRES*
                        Court: USCA-2                      Grant: 2/20/07
                        Argument Date: 10/3/07

**06-856**       CFX    *LARUE V. DEWOLFF, BOBERG & ASSOC., INC.*
                        Court: USCA-4                      Grant: 6/18/07

**06-937**       CFX    *QUANTA COMPUTER, INC. V. LG ELECTRONICS, INC.*
                        Court: USCA-Fed.                   Grant: 9/25/07

**06-984**       CSH    *MEDELLIN V. TEXAS*

Court:  Crim. App., TX
Argument Date:  10/10/07                              Grant:  4/30/07

06-989        CFX    HALL STREET ASSOC. V. MATTEL, INC.
                     Court:  USCA-9                           Grant:  5/29/07
                     Argument Date:  11/7/07

06-1005       CFH    UNITED STATES V. SANTOS
                     Court:  USCA-7                           Grant:  4/23/07
                     Argument Date:  10/3/07

06-1037       CFX    KENTUCKY RETIREMENT SYS. V. EEOC
                     Court:  USCA-6                           Grant:  9/25/07

06-1082       CSY    VIRGINIA V. MOORE
                     Court:  SC-VA                            Grant:  9/25/07

06-1164       CFX    JOHN R. SAND & GRAVEL CO. V. UNITED STATES
                     Court:  USCA-Fed.                        Grant:  5/29/07
                     Argument Date:  11/6/07

06-1181       CFX    DADA V. KEISLER, ACTING ATT'Y GEN.
                     Court:  USCA-5                           Grant:  9/25/07

06-1195)      CFH    BOUMEDIENE V. BUSH, PRESIDENT OF UNITED STATES
06-1196)      CFH    AL ODAH V. UNITED STATES
                     Court:  USCA-DC                          Grant:  6/29/07

06-1221       CFX    SPRINT/UNITED MANAGEMENT CO. V. MENDELSOHN
                     Court:  USCA-10                          Grant:  6/11/07

06-1265       CFX    KLEIN & CO. FUTURES, INC. V. BD. OF TRADE OF THE CITY OF NY
                     Court:  USCA-2                           Grant:  5/21/07
                     Argument Date:  10/29/07

06-1286       CFX    KNIGHT V. CIR
                     Court:  USCA-2                           Grant:  6/25/07

06-1287       CFX    CSX TRANSPORTATION, INC. V. GA BD. OF EQUALIZATION
                     Court:  USCA-11                          Grant:  5/29/07
                     Argument Date:  11/5/07

06-1321       CFX    GOMEZ-PEREZ V. POTTER, POSTMASTER GEN.
                     Court:  USCA-1                           Grant:  9/25/07

06-1322       CFX    FEDERAL EXPRESS CORP. V. HOLOWECKI
                     Court:  USCA-2                           Grant:  6/4/07
                     Argument Date:  11/6/07

06-1346       CFH    ALI V. ACHIM
                     Court:  USCA-7                           Grant:  9/25/07

06-1413      CSX   MEADWESTVACO CORP. V. IL DEPT. OF REVENUE
                   Court: App. Crt., IL-1st Dist.        Grant: 9/25/07

06-1431      CFX   CBOCS WEST, INC. V. HUMPHRIES
                   Court: USCA-7                         Grant: 9/25/07

06-1457)     CFX   MORGAN STANLEY CAPITAL GROUP V. PUBLIC UTILITY DIST. 1
06-1462)     CFX   CALPINE ENERGY SVCS. V. PUBLIC UTILITY DIST. 1
                   Court: USCA-9                         Grant: 9/25/07

06-1463      CSX   PRESTON V. FERRER
                   Court: CA-CA, 2nd App. Dist.          Grant: 9/25/07

06-1498      CFX   WARNER-LAMBERT CO. V. KENT
                   Court: USCA-2                         Grant: 9/25/07

06-1509      CFY   BOULWARE V. UNITED STATES
                   Court: USCA-9                         Grant: 9/25/07

06-1646      CFY   UNITED STATES V. RODRIQUEZ
                   Court: USCA-9                         Grant: 9/25/07

06-6330      CFY   KIMBROUGH V. UNITED STATES
                   Court: USCA-4                         Grant: 6/11/07
                   Argument Date: 10/2/07

06-6911      CFY   LOGAN V. UNITED STATES
                   Court: USCA-7                         Grant: 2/20/07
                   Argument Date: 10/30/07

06-7949      CFY   GALL V. UNITED STATES
                   Court: USCA-8                         Grant: 6/11/07
                   Argument Date: 10/2/07

06-8273      CSH   DANFORTH V. MINNESOTA
                   Court: SC-MN                          Grant: 5/21/07
                   Argument Date: 10/31/07

06-9130      CFX   ALI V. FED. BUREAU OF PRISONS
                   Court: USCA-11                        Grant: 5/29/07
                   Argument Date: 10/29/07
06-10119     CSY   SNYDER V. LOUISIANA
                   Court: SC-LA                          Grant: 6/25/07

06-11543     CFY   BEGAY V. UNITED STATES
                   Court: USCA-10                        Grant: 9/25/07

06-11612     CFY   GONZALEZ V. UNITED STATES
                   Court: USCA-5                         Grant: 9/25/07

| 07-21) | CFX | CRAWFORD V. MARION CTY. ELECTION BD. | |
|--------|-----|-------------------------------------|---|
| 07-25) | CFX | IN DEMOCRATIC PARTY V. ROKITA, IN SEC. OF STATE | |
| | | Court: USCA-7 | Grant: 9/25/07 |

| 07-5439 | CSX | BAZE V. REES, COMM'R, KY DOC | |
|---------|-----|------------------------------|---|
| | | Court: SC-KY | Grant: 9/25/07 |

## NOTE:

No. of Cases made available for Argument (Hours): **47 (43)**

No. of Cases Argued (Hours):

Total Disposed of:

\* Unanimous Court
\*\* Unanimous Court in Part
# Unanimous in Judgment

Breakdown (no. in parentheses = no. of cases)

Signed Opinion/Judgment -     Per Curiam -          Dismissed -                Other -

---

| CASE CODE KEY |
|---------------|

❑   First Letter = Jurisdictional Grounds  (ex. 99-804 CFY)

C  - Certiorari
A  - Appeal
Q  - Certified Question

❑   Second Letter = Court Below  (ex. 99-804 CFY)

S  - State
F  - U.S. Court of Appeals
T  - Three-Judge District Court
M  - U.S. Court of Appeals for the Armed Forces
O  - Other Court

❑   Third Letter = Nature of Case  (ex. 99-804 CFY)

X  - Civil
Y  - Criminal
H  - Habeas Corpus or other collateral attack

**07-5439 BAZE V. REES**

DECISION BELOW:217 SW3d 207

LOWER COURT CASE NUMBER: 2005-SC-0543

QUESTIONS PRESENTED:

Although the Court has authorized civil actions challenging portions of a method of execution, it has not addressed the constitutionality of a method of execution or the legal standard for determining whether a method of execution violates the Eighth Amendment in over 100 years-- leaving lower courts with no guidance on the law to apply to the many lethal injection challenges filed since the Court's rulings allowing the claim in a civil action. Lower courts have been left to look to cursory language in the Court's opinions dealing with the the death penalty on its face and prison conditions. As a result, the law applied by lower courts is a haphazard flux ranging from requiring "wanton infliction of pain," "excessive pain," "unnecessary pain," "substantial risk", "unnecessary risk," "substantial risk of wanton and unnecessary pain," and numerous other ways of describing when a method of execution is cruel and unusual.

Considering that at least half the death row inmates facing an imminent execution in the last two years have filed suit challenging the chemicals used in lethal injections, certiorari petitions and stay motions on the issue are arriving before the Court so often that this issue is one of the most common issues. Thus, it is important for the Court to determine the appropriate legal standard, particularly because the difference between the standards being used is the difference between prevailing and not.

This case presents the Court with the clearest opportunity to provide guidance to the lower courts on the applicable legal standard for method of execution cases. This case arrives at the Court without the constraints of an impending execution and with a fully developed record stemming from a 20-witness trial. The record contains undisputed evidence that any and all of the current lethal injection chemicals could be replaced with other chemicals that would pose less risk of pain while causing death than the tri-chemical cocktail currently used. Although this automatically makes the risk of pain associated with the use of sodium thiopental, pancuronium bromide, and potassium chloride unnecessary, relief was denied on the basis that a "substantial risk of wanton and unnecessary pain" had not been established. This squarely places the issue of whether "unnecessary risk" is part of the cruel and unusual punishment equation and whether an "unnecessary risk" exists upon a showing that readily available alternatives are known.

The Kentucky Supreme Court's decision gives rise to the following important questions:

I. Does the Eighth Amendment to the United States Constitution prohibit means for carrying out a method of execution that create an unnecessary risk of pain and suffering as opposed to only a substantial risk of the wanton infliction of pain?

II. Do the means for carrying out an execution cause an unnecessary risk of pain and suffering in violation of the Eighth Amendment upon a showing that readily available alternatives that pose less risk of pain and suffering could be used?
III. Does the continued use of sodium thiopental, pancuronium bromide, and potassium chloride, individually or together, violate the cruel and unusual punishment clause of the Eighth Amendment because lethal injections can be carried out by using other chemicals that pose less risk of pain and suffering?
IV. When it is known that the effects of the chemicals could be reversed if the proper actions are taken, does substantive due process require a state to be prepared to maintain life in case a stay of execution is granted after the lethal injection chemicals are injected?

CERT. GRANTED 9/25/2007

EXPEDITED BRIEFING SCHEDULE

# EXHIBIT B

» Cars  » Event tickets  » Jobs  » Real estate  » Shop  » Online degrees

Search _____  How do I find it?                                    Subscribe to paper

**USA TODAY**    Home    News    Travel    Money    Sports    Life    Tech    Weather    Become a member of the USA TODAY community now!
Log in | Become a member What's this?

News » Nation    Troops at Risk    States    Lotteries

# Supreme Court halts Texas execution

Updated 11d ago | Comments | 244 | Recommend | 7          E-mail | Save | Print | RSS



◄ Enlarge                                By Tim Dillon, USA TODAY

Supreme Court Justices, (back row from left) Stephen Breyer, Clarence Thomas, Ruth Bader Ginsburg, Samuel Alito, (front row from left) Anthony Kennedy, John Paul Stevens, Chief Justice John Roberts, Antonin Scalia and David Souter.

HUNTSVILLE, Texas (AP) — A man condemned for killing his parents avoided the nation's busiest death chamber Thursday night when he won a reprieve from the U.S. Supreme Court, which had already agreed to review another state's lethal injection procedures.

Attorneys for Carlton Turner Jr., 28, had appealed to the high court hoping that its planned review of lethal injection procedures in Kentucky, the same process used in Texas, could keep him alive.

His case is being watched as an indicator of whether executions in Texas could be halted until the court rules on the Kentucky case next year.

In a brief order, the court said it had granted its stay of execution but made no mention of its reasons for stopping the punishment. The order came less than two hours before the death warrant would have expired at midnight CT.

"All I can say is all glory to God," Turner told prison officials as he was being returned to death row, in another prison about 45 miles east of Huntsville.

FIND MORE STORIES IN: Supreme Court | Kentucky | Gov | Attorneys | Huntsville | Bob Riley | Carlton Turner | Alabama Supreme Court | Tommy Arthur

The order followed a decision earlier in the day by Alabama Gov. Bob Riley to stay the execution of a contract killer hours before it was to have been carried out, so the inmate could be put to death using a new lethal injection formula the governor had ordered just a day before.

Turner would have been the 27th Texas inmate to be executed this year and the second this week.

After state courts earlier Thursday refused to halt the punishment, Turner's lawyers went to the Supreme Court, which on Tuesday agreed to review an appeal from two condemned inmates in Kentucky who argued that the three-drug process used in lethal injection is unconstitutionally cruel. The same procedure is used in Texas.

"The inmate will be forced into a chemical straitjacket, unable to express the fact of his suffocation," the appeal in Turner's case asserted.

Turner's lawyers went early Thursday to his trial court judge with a request to withdraw the execution order. When that failed, they went to the Texas Court of Criminal Appeals, which voted 5-4 to refuse to stop the punishment. The case then went to the Supreme Court.

Turner was 19 when authorities said he shot Carlton Turner Sr., 43, and Tonya Turner, 40, several times in the head. He then bought new clothes and jewelry and continued living in the family's Irving home.

From death row last week, Turner told The Associated Press he didn't find the prospect of death frightening but was concerned about possible pain from the lethal injection.

"The only thing I worry about is when the process is starting, the suffocation and pain if the anesthesia doesn't work," he said.

In Alabama, Riley said he issued the 45-day stay of Tommy Arthur's execution only to allow time for the new lethal-injection procedures to be put in place. The changes are designed to make sure the inmate is unconscious when given drugs to stop the heart and lungs.

Riley said evidence is "overwhelming" that Arthur is guilty "and he will be executed for his crime." The governor encouraged the attorney general's office to ask the Alabama Supreme Court to set another execution date "as soon as possible."

Assistant Attorney General Clay Crenshaw said the request would be filed with the court Friday.

Before Riley issued his stay, state officials had said they intended to execute Arthur at 6 p.m. Thursday, even though the changes Riley ordered could not be implemented by then.

They said the procedures already in place were constitutional, though Arthur's attorney, Suhana Han, contended that Riley's order to change the protocol amounted to the state conceding that its execution procedure was deficient. Han did not immediately return a phone message seeking comment Thursday.

Arthur, 65, was sentenced to death for the Feb. 1, 1982, killing of Troy Wicker, 35, of Muscle Shoals. The victim's wife, Judy Wicker, testified she had sex with Arthur and paid him $10,000 to kill her husband, who was shot in the face as he lay in bed.

Arthur was visiting with his daughter when he learned of the stay in a call from his attorney, prison system spokesman Brian Corbett said.

Like Turner, Arthur had asked the U.S. Supreme Court for a stay pending its ruling on the Kentucky case. The Alabama Supreme Court had declined to grant a stay Wednesday.

The wife of Arthur's victim was given a life sentence for her part in the murder and paroled after 10 years behind bars.

In a statement, Peter Neufeld, co-director of the Innocence Project, urged Riley to use the next 45 days to allow DNA testing on evidence from Arthur's trial.

E-mail features

E-mail newsletters
Sign up to receive our free Daily Briefing e-newsletter and get the top news of the day in your inbox.

E-mail _____ (GO)

Select one:  ● HTML  ○ Text

Breaking news E-mail alerts
Get breaking news in your inbox as it happens

"Gov. Riley said last week that DNA testing was only a tactic to delay this execution. It's not. Now that the execution is delayed for other reasons, DNA testing should be started immediately," Neufeld said.

Another lethal-injection lawsuit, filed by a convicted ax murderer on death row on Delaware's death row, had been scheduled for trial Oct. 9. A federal judge postponed the trial Wednesday, citing the pending Supreme Court case.

Copyright 2007 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

Posted 11d ago

Updated 11d ago                                                                     E-mail | Save | Print | RSS

To report corrections and clarifications, contact Reader Editor Brent Jones. For publication consideration in the newspaper, send comments to letters@usatoday.com. Include name, phone number, city and state for verification.

Conversation guidelines: USA TODAY welcomes your thoughts, stories and information related to this article. Please stay on topic and be respectful of others. Keep the conversation appropriate for interested readers across the map.

You must be logged in to leave a comment. Log in | Register



[ Submit ]

Comments: (244)                                                      Showing:  Newest first



Schirl wrote:  9d ago
When they were learning, Jesus told his followers to walk the land without a sword. But, before he went to Gethsemane, he told them to acquire swords

Luke 22:35-36
Then Jesus asked them, "When I sent you without purse, bag or sandals, did you lack anything?"
"Nothing," they answered.
He said to them, "But now if you have a purse, take it, and also a bag; and if you don't have a sword, sell your cloak and buy one."
--
The idea that Christians must be TOTAL pacifists isn't supported by history, nor is it supported by the New or Old Testament. That same Old Testament that some say prohibits killing proscribes the death penalty for many crimes. Why? Because the Old Testament doesn't prohibit killing, it prohibits unlawful killing.

"Kill" in English is an all-encompassing verb that covers the taking of life in all forms and for all classes of victims. This concept is expressed in Hebrew by the verb "harag." The verb that appears in the 10 Commandments is "ratsah", not "harag". "Ratsah" refers only to murder (criminal acts of killing). The word never had the same meaning as the word "kill" does in English; the meaning was always "murder".
--
Do not suppose that I have come to bring peace to the earth, but a sword.
--
Capital Punishment fairly conducted by the state isn't totally against the Christian faith. In fact, it could be (and has been) argued that it's required.

                                                        Recommend    1 |  Report Abuse



Mad Swede wrote:  9d ago
How about this. Execute murderers in the exact same way they executed their victims. What could be fairer? I wonder how many murder victims were given a choice of how they would die? My bet would be NONE ! And what was done to them BEFORE they were murdered?

                                                        Recommend    |  Report Abuse



flagwaverlizzy wrote:  10d ago
Political correct-ism is complacency and apathy, disguised as empathy towards others.

Liberal PC-ism has become the #1 covert back door method of suppressing freedom of speech.

Allow it - and lose your freedoms.

                                                        Recommend    1 |  Report Abuse



PD102 wrote:  10d ago
The Mick wrote:  14h 53m ago
I don't understand the major problem. I've been anesthetized without pain, and then had my skin cut open and bones carved on (Achilles Tendon and Cervical Vertibra operations) without waking up until the doctors wanted me awake. Why is it such a problem to terminate a life in a peaceful painless way?

The alternative is the Guillotine, named after the doctor who invented it as an almost painless method of execution!
============================================
He didn't invent it to prevent pain for the person being executed but because they couldn't find enough executioners to meet demand and those they had were so over worked they couldn't physically keep up with the demand.

                                                        Recommend    |  Report Abuse

# EXHIBIT C

**The New York Times**
nytimes.com

October 3, 2007

# Texas Ruling Signals Halt to Executions Indefinitely

By RALPH BLUMENTHAL

HOUSTON, Oct. 2 — Signaling an indefinite halt to executions in Texas, the state's highest criminal appeals court late Tuesday stayed the lethal injection of a 28-year-old Honduran man who was scheduled to be put to death Wednesday.

The reprieve by the Texas Court of Criminal Appeals was granted a week after the United States Supreme Court agreed to consider whether a form of lethal injection constituted cruel and unusual punishment barred under the Eighth Amendment. On Thursday, the Supreme Court stepped in to halt a planned execution in Texas at the last minute, and though many legal experts interpreted that as a signal for all states to wait for a final ruling on lethal injection before any further executions, Texas officials said they planned to move ahead with more.

As a result, Tuesday's ruling by the Texas court was seen as a sign that judges in the nation's leading death penalty state were taking guidance from the Supreme Court and putting off imminent executions.

The Texas court order gave state authorities up to 30 days to explain in legal papers why the execution of the inmate, Heliberto Chi, should proceed. With responses then certain from defense lawyers, the effect of the order was to put off the execution for months, lawyers said.

Mr. Chi was convicted of killing the manager of a men's store in Arlington in 2001.

Other executions, including four more scheduled in the next five months, were also likely to be stayed, said David R. Dow of the Texas Defender Service, a nonprofit law clinic that worked on Mr. Chi's appeal.

"Until the Court of Criminal Appeals addresses the questions raised in this case there will be no more executions in Texas," predicted Mr. Dow, a law professor at the University of Houston.

Acting less than a week after it rejected another inmate's appeal 5 to 4, the appeals court justices provided no breakdown of the vote and did not give any reasoning for their decision. But they directed the state's director of criminal justice, Nathaniel Quarterman, not to execute Mr. Chi and gave Mr. Quarterman and Tim Curry, the district attorney of Tarrant County, where the crime had been committed, up to 30 days to respond to claims by Mr. Chi's lawyers that the formulation and administration of chemicals used for lethal injections did not quickly and painlessly kill but paralyzed the condemned inmates while they painfully

suffocated.

Earlier Tuesday, the Texas Board of Pardons and Paroles voted 4 to 3 against recommending a stay for Mr. Chi. A request for a 30-day reprieve was also pending with Gov. Rick Perry.

Had the appeals court not halted the execution, Mr. Chi's lawyers would have taken the case to the United States Supreme Court, which last Thursday stayed the execution for another Texas inmate, Carlton Turner Jr.

Bryan Stevenson, director of the Equal Justice Initiative in Montgomery, Ala., and a law professor at New York University, said the Supreme Court's ruling was a sign that while it was reviewing the legality of lethal injection in a Kentucky case, "it was at least unseemly for states to be carrying out executions."

Deborah Denno, a professor at Fordham Law School, called the latest stay in Texas significant. "I do think Texas is reaching a turning point," Ms. Denno said. "It's not unusual throughout the country, but it is unusual in Texas. And not uncommonly when people are talking about the death penalty, there's Texas and everywhere else, because Texas seems to be in its own death penalty world."

But Diane Clements, president of Justice For All, a victims' advocacy group in Texas, said the Supreme Court and the Texas appeals court gave no reasons for their rulings, "so we're left here with no direction."

The delays spelled more suffering for victims' families, Ms. Clements said. "I'm sure family of that stayed-execution victim is on a roller coaster ride," she said. "If there's anything certain about the death penalty for families, it's that it is very uncertain."

Copyright 2007 The New York Times Company

# EXHIBIT D

# Oklahoma
## Office of the Attorney General
### W.A. Drew Edmondson

## News Release

## 10/03/2007

*W.A. Drew Edmondson, Attorney General*

### AG Asks Court to Delay Issuing Execution Da

Citing judicial prudence, Attorney General Drew Edmondson today asked the Oklahoma Court of Criminal Appeals (OCCA) to delay scheduling executions in Oklahoma until the U.S. Supreme Court defines what constitutes cruel and unusual punishment in execution procedures.

The Supreme Court (USSC) has agreed to hear the appeal of a Kentucky death row inmate who claims that state's execution process violates the Eighth Amendment ban on cruel and unusual punishment. The case, Baze v. Rees, is expected to establish a national standard for executions.

"The Eighth Amendment prohibits cruel and unusual punishment," Edmondson said. "The issue before the Supreme Court is what standard defines cruel and unusual. In Oklahoma, our standard prohibits the wanton infliction of pain. In the Kentucky case, the defendant is asking the court to set the standard at unnecessary risk of pain."

Edmondson filed his OCCA motion because the USSC earlier this week refused to hear the final appeal of Oklahoma death row inmate Terry Lyn Short. Short was sentenced to death for the January 1995 murder of 22-year-old Ken Yamamoto in Oklahoma City. Typically, when the USSC denies an inmate's final appeal, the attorney general asks the OCCA to schedule the execution for 60 days from the date of the denial.

"The constitutionality of our lethal injection

protocol has withstood prior challenges in federal and state courts, but the Baze case poses a unique question," Edmondson said. "We have reviewed the issues in the Baze case and relevant Oklahoma law and believe our procedure will be upheld. However, we think it prudent and in the state's best interests to ask our court to delay the setting of an execution date until the Supreme Court issues its ruling."

In the last two weeks, Edmondson said, two Texas executions have been stayed because of the Kentucky case. The attorney general said it is likely any execution scheduled in Oklahoma would be stayed as well.

execution - short occa.pdl

| 313 NE 21st Street,
Oklahoma City, OK
73105 | 405.521.3921 |
918.581.2885 |

IN THE COURT OF CRIMINAL APPEALS
OF THE STATE OF OKLAHOMA

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

OCT − 3 2007

MICHAEL S. RICHIE
CLERK

TERRY LYN SHORT,    )
    )
            Appellant,    )
    )
vs.    )    Case No. D-97-540
    )
THE STATE OF OKLAHOMA,    )
    )
            Appellee.    )

## NOTICE OF EXHAUSTION OF STATE AND FEDERAL APPEALS

COMES NOW W.A. Drew Edmondson, Attorney General of the State of Oklahoma, and hereby provides notice to this Court that Defendant Terry Lyn Short has exhausted all his regular appeals in State and Federal Court:

1.    Defendant, Terry Lyn Short, was charged and convicted by a jury of his peers of the crimes of one (1) count of Murder in the First Degree (While in the Commission of Arson in the First Degree) (Count I) in violation of 21 O.S.1991, § 701.7(B); five (5) counts of Attempting to Kill after Former Convictions of Two or More Felonies (Counts II through VI) in violation of 21 O.S.1991, § 652; and one (1) count of Possession of Explosives by a Convicted Felon after Former Convictions of Two or More Felonies (Count VII) in violation of 21 O.S.1991, § 1368, in Case No. CF-95-216, in the Oklahoma County District Court. Count VII was dismissed on motion of the State. The jury returned a verdict of guilty as to all remaining counts.

2.     During the second stage of trial, the jury found the existence of three aggravating circumstances: (1) that the defendant knowingly created a great risk of death to more than one person; (2) that the murder was especially heinous, atrocious, or cruel; and (3) that there was an existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

3.     The jury then set punishment at death in Count I, imprisonment of one-hundred (100) years for each of Counts II through IV, and imprisonment of two-hundred (200) years for each of Counts V and VI. The trial court sentenced Defendant in accordance with the jury's verdicts and ordered Counts II through VI to be served consecutively with each other and with Count I.

4.     Defendant's convictions and sentences were affirmed and his request for an evidentiary hearing was denied by this Court in Case No. F-1997-540, on April 14, 1999. *Short v. State*, 1999 OK CR 15, 980 P.2d 1081. This Court denied a petition for rehearing on May 21, 1999.

5.     The United States Supreme Court denied a petition for writ of certiorari to the OCCA on January 10, 2000. *Short v. Oklahoma*, 528 U.S. 1085 (2000).

6.     This Court denied Defendant's applications for an evidentiary hearing, for discovery, and for post-conviction relief in Case No. PCD-1998-1274 on May

2

21, 1999, in an unpublished opinion. Defendant did not seek certiorari review of the denial of these applications by the Supreme Court of the United States.

7.    Defendant filed a Petition for Writ of Habeas Corpus in the District Court for the Western District of Oklahoma on October 31, 2000, which was denied on August 17, 2004.

8.    The denial of habeas relief was affirmed by the Tenth Circuit Court of Appeals on December 26, 2006. *Short v. Sirmons*, 472 F.3d 1177 (10th Cir. 2006).

9.    Finally, Defendant sought certiorari review in the United States Supreme Court and was denied such on October 1, 2007. *Short v. Sirmons*, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___ (U.S., October 1, 2007). At this time, all appeals in state and federal courts have been exhausted.

10.    The manner in which the State carries out the sentence of death is wholly constitutional. Its lethal injection protocol is the most humane method of carrying out its responsibilities to execute the judgment of juries and courts that lawfully impose the ultimate sanction for the most heinous murderers. Both this Court and the federal courts have found that Oklahoma's lethal injection protocol is neither cruel nor unusual. *See, e.g., Malicoat v. State*, 2006 OK CR 25, ¶¶ 6, 11, 137 P.3d 1234; *Bland v. State*, 2007 OK CR 25, ¶ 10, 164 P.3d 1076; *Hamilton v. Jones*, 472 F.3d 814, 815 (10th Cir. 2007); *see also Bland v. Jones*, Western District of Oklahoma, Case No. CIV-07-695-F (Transcript of order denying

3

preliminary relief attacking lethal injection, June 25, 2007). Under the current protocol, there is no likelihood of conscious suffering during a lethal injection.

However, the State is aware that the United States Supreme Court has granted a writ of certiorari challenging Kentucky's lethal injection protocol in *Baze v. Rees*, U.S. Case No. 07-5439, ___ U.S. ___, 2007 WL 2075334 (Mem.) (September 25, 2007).

11.    Out of an abundance of caution and notwithstanding the constitutionality of Oklahoma's lethal injection process, the State suggests that an execution date not be set pending resolution of *Baze* and that the appropriateness of setting an execution date be revisited when *Baze* has been decided by the United States Supreme Court.

Respectfully submitted,

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

**ROBERT L. WHITTAKER, OBA #9570**
**ASSISTANT ATTORNEY GENERAL**

313 NE 21st Street
Oklahoma City, OK 73105-4894
(405) 521-3921
(405) 522-4534 Fax

**ATTORNEYS FOR APPELLEE**

4

## **CERTIFICATE OF MAILING**

On this 3rd day of October, 2007, a true and correct copy of the foregoing was mailed to:

John Dexter Marble
Susan F. Kane
Smith Rhodes Stewart & Elder, P.L.L.C.
119 N. Robinson, Suite 820
Oklahoma City, Oklahoma   73102

ROBERT WHITTAKER

5

# EXHIBIT E

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                       **SAN JOSE DIVISION**

11

| | |
|---|---|
| 12 Michael Angelo MORALES, | Case Number 5-6-cv-219-JF-RS |
| | Case Number 5-6-cv-926-JF-RS |
| 13            Plaintiff, | |
| | DEATH-PENALTY CASE |
| 14      v. | |
| | ORDER FOLLOWING GRANT OF |
| 15 James E. TILTON, Secretary of the California | CERTIORARI IN *BAZE V. REES* |
| Department of Corrections and Rehabilitation, et | |
| 16 al., | |
| 17            Defendants. | |
| 18 PACIFIC NEWS SERVICE, | Case Number 5-6-cv-1793-JF-RS |
| 19            Plaintiff, | DEATH-PENALTY CASE |
| 20      v. | ORDER FOLLOWING GRANT OF |
| | CERTIORARI IN *BAZE V. REES* |
| 21 James E. TILTON, Secretary of the California | |
| Department of Corrections and Rehabilitation, et | |
| 22 al., | |
| 23            Defendants. | |

24

25        Yesterday, the Supreme Court of the United States granted certiorari in *Baze v. Rees*, No.

26  07-5439, 2007 WL 2075334 (U.S. Sept. 25, 2007) (mem.).  The questions presented by the

27  petition for certiorari in *Baze* are:

28              I.      Does the Eighth Amendment to the United States
                        Constitution prohibit means for carrying out a method of

1                execution that create an unnecessary risk of pain and
2                suffering as opposed to only a substantial risk of the wanton
infliction of pain?

    II.    Do the means for carrying out an execution cause an
3                unnecessary risk of pain and suffering in violation of the
Eighth Amendment upon a showing that readily available
4                alternatives that pose less risk of pain and suffering could
be used?

5    III.   Does the continued use of sodium thiopental, pancuronium
bromide, and potassium chloride, individually or together,
6                violate the cruel and unusual punishment clause of the
Eighth Amendment because lethal injections can be carried
7                out by using other chemicals that pose less risk of pain and
suffering?

8    IV.   When it is known that the effects of the chemicals could be
reversed if the proper actions are taken, does substantive
9                due process require a state to be prepared to maintain life in
case a stay of execution is granted after the lethal injection
10               chemicals are injected?

11  Br. for Pet'r at ii–iii, *Baze* (filed July 11, 2007).  While the issues presented in *Morales v. Tilton*

12  are not identical in all respects to those before the Supreme Court in *Baze*, it would appear that at

13  the very least the Supreme Court's decision in *Baze* is likely to affect this Court's legal analysis

14  and conclusions.  The order granting certiorari indicates that the Supreme Court will not hear

15  argument in *Baze* until early in 2008.

16       The Court held a joint status conference in the above-captioned related actions on

17  September 14, 2007.  At that conference, the Court set a fact-discovery cutoff date of November

18  16, 2007, scheduled proceedings at San Quentin State Prison on November 19, 2007, and set a

19  further evidentiary hearing in *Morales* for December 10 and 11, 2007.  The Court is interested in

20  the parties' views as to what impact, if any, the Supreme Court's grant of certiorari in *Baze*

21  should have on this schedule.  Accordingly, and good cause therefor appearing, the parties to

22  both actions shall file, on or before October 1, 2007,  letter briefs not to exceed five (5) pages in

23  length addressing this question. Counsel should not assume from this request for briefing that the

24  Court is inclined to make further changes to the case schedule in *Morales* absent a compelling

25  reason for doing so.

26       In addition, counsel advised the Court at the September 14 conference that the Marin

27  Superior Court has scheduled argument in Plaintiff Morales's related state-law action for October

28

Case Nos. 5-6-cv-219-JF-RS, 5-6-cv-926-JF-RS, & 5-6-cv-1793-JF-RS
ORDER FOLLOWING GRANT OF CERTIORARI IN *BAZE V. REES*
(DPSAGOK)

1    24, 2007. By this order, the Court directs the parties to file a joint statement immediately

2    following that hearing indicating the status of the action. In addition, Defendants shall advise the

3    Court immediately if it appears that construction of the new execution chamber will not be

4    completed prior to November 19, 2007.

5        Defendants' motion to dismiss the first amended complaint in *Pacific News Service v.*

6    *Tilton* currently is set for argument on October 26, 2007. In light of the current status of

7    *Morales*, and for the reasons stated by the Court at the September 14 conference, the October 26

8    hearing will be vacated; all pending motions in *Pacific News Service* are terminated without

9    prejudice to being restored to the Court's calendar at a later date.

10        IT IS SO ORDERED.

11

12    DATED: September 26, 2007                           _____

13                                      JEREMY FOGEL
                                            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT W. JACKSON, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-300-SLR |
| | ) | |
| CARL C. DANBERG, | ) | |
| THOMAS L. CARROLL, PAUL | ) | |
| HOWARD, OTHER UNKNOWN STATE | ) | |
| ACTORS RESPONSIBLE FOR AND | ) | |
| PARTICIPATING IN THE CARRYING | ) | |
| OUT OF PLAINTIFF'S EXECUTION, | ) | |
| all in their individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**O R D E R**

At Wilmington this 26th day of September, 2007, having conferred with counsel;

IT IS ORDERED that the trial scheduled to commence on October 9, 2007 is

postponed based on the United States Supreme Court having granted the petition for a

writ of certiorari in Blaze v. Rees, ___ S.Ct. ___, 2007 WL 2075334 (Sept. 25, 2007).

IT IS FURTHER ORDERED that the pretrial conference scheduled for October 1,

2007 is cancelled.

United States District Judge

# EXHIBIT G



**Bradley Arant**
BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2119
205.521.8000   FAX 205.521.8800
WWW.BRADLEYARANT.COM

Kevin C. Newsom

Direct Dial: (205) 521-8803
Direct Fax: (205) 488-6803
knewsom@bradleyarant.com

September 28, 2007

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Mr. Chris Vasil
Chief Deputy Clerk
United States Supreme Court
One First Street, N.E.
Washington, D.C. 20543

RE:   *Richard Allen, Commissioner, Alabama Department of Corrections v. Daniel Siebert*
Supreme Court Case No. 06-1680

Dear Mr. Vasil:

The State of Alabama has filed today (under separate cover) its reply brief in support of the petition for a writ of certiorari in *Allen v. Siebert*, No. 06-1680. I write this letter to apprise the Court of the unique procedural circumstances surrounding Mr. Siebert's case. The uniqueness of those circumstances may (or may not) be compounded by the Court's September 25, 2007, order granting certiorari in *Baze v. Rees*, No. 07-543.

By way of background, Mr. Siebert was charged with murdering four people in two separate, but related, incidents. He was tried and convicted in two different state courts (specifically, in Lee and Talladega Counties) and sentenced to death – separately – in both. After his state post-conviction challenges were rejected as time-barred, *see Siebert v. State*, 778 So. 2d 842 (Ala. Crim. App. 1999), *cert. denied, Ex parte Siebert*, 778 So. 2d 857 (Ala. 2000), Mr. Siebert filed two separate federal habeas corpus petitions. He challenged his Lee County convictions and death sentence in the U.S. District Court for the Middle District of Alabama and his Talladega County conviction and death sentence in the U.S. District Court for the Northern District of Alabama.

The present petition for certiorari arises out of Mr. Siebert's "Northern District" habeas litigation. As the Court knows from the certiorari papers, the district court dismissed Mr. Siebert's petition as untimely pursuant to *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), *see* App. 49a *et seq.*, but the Eleventh Circuit reversed, *see* App. 1a. The State seeks review of the Eleventh Circuit's decision. By my calculation, the State's petition for certiorari will be discussed at this Court's October 26, 2007, Conference.

Unlike Mr. Siebert's Northern District habeas litigation, which is ongoing, Mr. Siebert's "Middle District" habeas litigation has concluded. The Eleventh Circuit affirmed the denial of

Mr. Chris Vasil
September 28, 2007
Page 2

Mr. Siebert's Middle District habeas petition on July 13, 2006, *see Siebert v. Allen*, 455 F.3d 1269 (11th Cir. 2006), and this Court denied certiorari on March 19, 2007, *see Siebert v. Allen*, 127 S. Ct. 1823 (2007).

Mr. Siebert is currently scheduled to be executed on the Lee County (*i.e.*, Middle District) death sentence on October 25, 2007 – the day before this Court considers the State's petition for certiorari pertaining to the Northern District litigation. It should be noted, however, that Mr. Siebert has filed in the Middle District a complaint under 42 U.S.C. § 1983 challenging the State of Alabama's lethal-injection protocol. *See Siebert v. Allen*, No. 2:07-CV-295-MEF. That complaint was filed April 9, 2007, and, as of today, remains pending in the district court.

The Governor of Alabama granted a 45-day reprieve to Thomas D. Arthur, an inmate who was scheduled for execution yesterday, apparently in response to this Court's grant of certiorari in *Baze v. Rees*. The Governor explained that "[t]he sole purpose of this reprieve is to allow the Alabama Department of Corrections sufficient time to make modifications to its lethal injection protocol." This statement implies that he intends to postpone all executions until mid-November.

The State, of course, has no way of knowing whether, either in the light of *Baze v. Rees*, the Governor's reprieve, or otherwise, Mr. Siebert will seek or be granted a stay of his scheduled October 25 execution. But given the unique circumstances of the case – with the State's cert petition on the Northern District case set for conference the day after Mr. Siebert's scheduled execution for the Middle District crime – the State thought it prudent to apprise the Court of the procedural posture in some detail.

Sincerely,

*Kevin C. Newsom /cja*

Kevin C. Newsom
Counsel for the State of Alabama

KCN/cja

# EXHIBIT H

Source: News & Business > Individual Publications > I > The Irish Times [i]
Terms: "darrell grayson" (Edit Search | Suggest Terms for My Search)

↙Select for FOCUS™ or Delivery

*'As he lay still on the gurney, I tried to imagine his last moments of consciousness. . .' The Irish Times August 4, 2007 Saturday*

Copyright 2007 The Irish Times
All Rights Reserved
The Irish Times

August 4, 2007 Saturday

**SECTION:** NEWS FEATURES; Pg. 1

**LENGTH:** 2478 words

**HEADLINE:** 'As he lay still on the gurney, I tried to imagine his last moments of consciousness. . .'

**BODY:**

It was three hours before the state of Alabama was due to execute **Darrell Grayson** after 25 years on death row at Holman Correctional Facility, a maximum-security prison about two hours south of the state capital, Montgomery, writes Denis Staunton.

"It seems a little quieter on the exercise yard," the guard said. "This guy is more popular than most." I was sipping coffee and nibbling a cookie from the prison bakery with two local reporters and a couple of prison guards as we waited in a low, brick building across the road.

The guards expressed no pity for the condemned man but they showed no disrespect either as they spoke about him and the punishment he was about to receive.

Grayson was 19 years old when he confessed to one of the most brutal crimes committed in his home town of Montevallo, a few miles south of Birmingham. In the early morning hours of Christmas Eve 1980, two men broke into the home of Annie Laura Orr, an 86-year-old widow who stood just five feet and three inches. "They entered Mrs Orr's bedroom, where she was apparently sleeping. They subdued and beat her, striking her in the head with a blunt instrument and breaking several of her ribs," the court record said. "Grayson then placed a pillowcase over her head and wrapped two relatively long lengths of masking tape very tightly around her head so that when they were finished her head appeared to be that of a mummy. They then proceeded to look for money and other valuables.

"During their assault, they raped Mrs Orr repeatedly. She lived through the assault of being raped, beaten, threatened, unable to see or adequately breathe, and begging her assailants not to hurt her but to take her money, for a considerable period of time. She then died."

Police found a trail of playing cards leading from the crime scene to the home of 18-year-old Victor Kennedy, a petty criminal who had been drinking and playing cards with Grayson and two other men the previous evening. Grayson remembered nothing at first, because he had been so drunk after a drinking session that started at 5pm. He waived his right to have a lawyer present and, under questioning, admitted that he and Kennedy had decided to burgle Orr's house, where he had done odd jobs in the past. He said he put the pillowcase over Orr's

face to prevent her from recognising him and admitted that he and Kennedy had raped her repeatedly. Kennedy tried to blame Grayson for both the rape and the murder, but both men were found guilty of murder during a burglary and sentenced to death at Holman Prison.

Grayson, an African-American, was tried before an all-white jury. His court-appointed attorney, who was given $500 to investigate the case, was a divorce lawyer who had never tried a capital case before. In the witness stand, Grayson again confessed to the crime but repeatedly said he was drunk at the time and couldn't independently recall the events. He also testified that he gave officers details of the crime that he didn't actually remember, based on what they said Kennedy had told them.

Passing sentence, the judge acknowledged mitigating circumstances, including the fact that Grayson had no prior history of violence or criminal activity, that he came from a poor, single-parent family with 11 siblings, left school in the 10th grade, "and had given his mother little trouble in growing up". These factors were outweighed, however, by the aggravating factors of the rape and the brutality of the crime, which the court described as "more characteristic of the actions of wild ravaging dogs of hell rather than even the lowest and most depraved level of humanity".

ALMOST HALF OF Alabama's 200 death row inmates are black, even though African-Americans make up only a quarter of the state's population. Although two out of three murder victims in the state are black, 80 per cent of the inmates on death row are there for killing whites. Death row inmates are overwhelmingly poor - 95 per cent of those at Holman are officially described as indigent. Alabama is almost alone among US states in having no state-wide public-defender system and does not guarantee appointed counsel for post-conviction appeals.

At Holman, death row inmates usually spend 23 hours a day in their cells, with an hour's exercise each day and a shower every other day. They can also leave their cells to attend church services and, on certain days, to visit the law library, which has mostly out-of-date books but functions as a day room where inmates play chess or draughts. Death row prisoners don't work, but friends and relatives outside can lodge money to PMOD (Prisoner Money on Deposit) accounts to pay for commissary items such as food and toiletries. They are allowed to own a TV if they can afford one.

When he arrived at Holman in 1982, Grayson "wallowed for years in self-pity and ignorance until my mother's death became the catalyst for positive changes in my life", as he put it in an account of his case earlier this year in Wings of Hope, a journal written and edited by death row prisoners in Alabama.

He started to write poetry, which was published in magazines and chapbooks and took educational courses that were then still available to Alabama death row inmates, receiving a GED (the US school-leaving certificate) and an associate science degree.

In 1994, he joined Project Hope to Abolish the Death Penalty (PHADP), a group run by death row inmates with the help of a handful of outside volunteers, becoming its chairman in 2000.

"During one of my quiet, lucid moments, I was shocked to realise the depth of loss and deprivation that is endured here on death row," he wrote. "I understood that each of us in our own way chooses to open the doors our own way, that can limit or increase the possibilities in our lives. Some doors open only onto the miseries of the world, overwhelm us and make us lose our focus . . . But there are other doors which we can choose that lead to spiritual growth and positive action."

For 20 years, Grayson didn't question his own guilt, and Kennedy refused to talk to him about what happened the night of the murder. But on the night of Kennedy's execution in 1999, Grayson was taken from his cell to the captain's office. "Victor had asked his personal

preacher to tell me that he, Victor, asked for my forgiveness. I asked the preacher, 'for what does he want my forgiveness?' The preacher told me, 'that is not important'," Grayson said later.

In 2001, Esther Brown, a veteran Alabama activist against the death penalty, started to investigate the case and a witness came forward to say that Grayson could not have killed Orr because he was passed out elsewhere at the time of the crime.

Brown persuaded the Innocence Project, which has used DNA testing, to exonerate more than 200 people convicted of serious crimes, to take up the case, calling for sperm taken from Orr's clothing to be matched against Grayson's DNA.

If Grayson didn't rape Orr, the strongest plank in the prosecution's case linking him to the murder would collapse, leaving his own confession as the most compelling evidence against him.

False confessions are not uncommon, even without evidence of police brutality, and DNA testing has cleared a number of people who claimed responsibility for high-profile murders they didn't commit.

In the weeks before Grayson's execution date, numerous groups and individuals including former taoiseach John Bruton, now EU ambassador to Washington, appealed to Alabama governor Bob Riley to stay the execution and order DNA testing.

The Innocence Project offered to pay for a test at a nationally accredited DNA laboratory, which could be completed within 30 days, but, with two hours to go before the execution hour, Riley said no, declaring that DNA testing would make no difference. "DNA testing would neither prove nor disprove this killer's guilt. He was convicted of burglary and murder, not rape and murder, so legally DNA testing would not exonerate him even if there is no DNA evidence that he raped Mrs Orr," the governor said. A few minutes later, the US Supreme Court rejected Grayson's appeal for a stay of execution with a two-line statement, closing off his last chance of avoiding death.

A guard came in with news of how Grayson had spent the day meeting friends and relatives, including his sister Betty, two nephews and a niece, as well as Brown and his attorney, Charlotte Norton. For his last meal, Grayson asked for a cheese omelette with fresh sliced tomatoes, and during the afternoon he wrote his will: "Inmate Mark Jenkins W/Z 527: 1 Sony radio, $100 from PMOD account. Inmate Jeffery Rieber W/Z 540: Assorted store items, $133 remaining money from PMOD account. Inmate Corey Grayson W/Z 598: 1 head phone set, 1 pair of shoes. Inmate Ronald Smith W/Z 586: 1 TV Sanyo. Esther Brown: 1 ring, assorted letters and books."

At about 5.30pm, an officer patted me down, allowing me to keep a notebook and pen. Another told me that, if I changed my mind about witnessing the execution, I could back out. "If you want to leave when you get in there because it's too much, or if you decide you don't want to see it, there's a small bathroom off the witness room and you can sit in there until it's over," he said.

We piled into a white prison van and drove across the road to Holman, past the four-metre-high double-fencing topped with razor wire and through two gates to join a small procession of cars. In the exercise yard, a few prisoners stood in silence, watching us pass a row of individual exercise cages on our way to the death house.

A heavy-set man in a short-sleeved shirt with a mobile phone strapped to his belt was chatting and joking with guards outside. The ears of a stethoscope stuck out of his back pocket - this was the county medical examiner, a qualified doctor who would pronounce Grayson dead.

We moved down a narrow corridor into a tiny room lit by a pink fluorescent bulb, with white, brick walls on three sides and a rectangular window taking up almost all the fourth wall. Sitting in the front row, our knees touching the ledge, were the three reporters, and Esther Brown, Grayson's sole witness.

Through a curtain, the shape of a hospital gurney was visible, with a few figures moving around it.

Brown, a thin, grey-haired woman wearing a cotton print dress and a denim jacket, who had become Grayson's closest friend outside the prison, fidgeted and looked at her watch a couple of times.

A GUARD DREW back the curtain and Grayson was lying just a few feet away, a lean, handsome man, dressed in a white prison uniform, draped in a white sheet and strapped to the gurney, his arms stretched out on black arm rests, almost in cruciform. Two drips attached to his right arm disappeared into a small square opening in the wall behind, next to a microphone hanging on a hook.

Grayson saw Brown and smiled and winked at her, flashing the peace sign with his fingers; he smiled at the chaplain, a thin, stern-faced man who was standing in the corner of the death chamber.

Then Grayson looked through the glass on the other side of the chamber, where Lee Binion, Orr's granddaughter, was sitting. He smiled at her and she gave him a cold stare.

Holman's warden, Grantt Culliver, entered the chamber and approached the gurney. Culliver, an African-American, is obliged by Alabama law to carry out all executions at the prison himself. "I look at it as part of the job," he said in an interview two years ago. "The people of the state of Alabama, because of the ways the laws are written, are as responsible as I am. I am the pawn or tool. The responsibility lies with the people of Alabama."

As Culliver read the order of execution, Grayson's breathing quickened, his chest started to heave and, for the first time, a look of anguish crossed his face. When Culliver asked him if he wanted to make a statement, Grayson just said "peace", and again formed the peace sign with the fingers of each hand.

The warden left the chamber to start the process of execution in a small room next door, so Grayson was now alone except for the chaplain, who remained standing rigidly in his corner. Grayson was smiling again, looking over at Brown, who mouthed the words "I love you".

He exchanged a few words with the minister, lay back and waited.

It was 6.04pm and the deadly chemicals must now have been coursing through the cannula into Grayson's vein but nothing seemed to be happening.

"What the hell are they doing here?" Brown said.

A minute later, Grayson looked up, smiled one more time, turned to his right to look at Binion, and closed his eyes.

Alabama doesn't talk about the chemicals it uses in the lethal injection, but officials confirmed to me that the three drugs are similar to those used in other states. The first is sodium thiopental, a barbiturate to make the prisoner unconscious; the second is pancuronium bromide, which stops all muscle movement, except for the heart; the third, potassium chloride, stops the heart beating and causes death. A number of states have halted lethal

injection executions after medical studies showed that inadequate dosing meant some prisoners may have died painful deaths by asphyxiation. Sodium thiopental is an ultra-short-acting barbiturate, the anaesthetic effect of which can wear off within minutes, so a prisoner could be conscious as the pancuronium bromide paralyses his muscles and asphyxiates him to death.

As the minutes crawled past and Grayson lay still on the gurney, I hoped he was feeling nothing now and tried to imagine his last moments of consciousness, the terror and the loneliness of dying in this empty chamber, surrounded by hostile faces.

I remembered my father's death long ago, how I held his hand and spoke to him as he drew his last breaths among those he loved. I pictured my own death and wondered if I would face it with the same grace shown by this poor convict.

I looked across at Binion, who had taken out a handkerchief and was dabbing her eyes. Suddenly, she was shaking violently as the tears rolled down her face.

It was 6.13pm and the medical officer, who had been sitting behind Binion all this time, stood up and took out his stethoscope, confident by now that it would register nothing. The curtains around the death chamber were drawn as the doctor approached Grayson and, three minutes later, declared him dead.

"Bloody murderers," Brown said as she stood up.

Outside, in the prison van, the other reporters were filing their stories over the phone. Binion had issued a statement on behalf of Orr's family welcoming the execution. "The family of Annie Laura Orr has seen the final chapter of this lengthy 27-year struggle come to an end. We are grateful that justice has finally been served," she said.

As we drove away from Holman, a guard told me that just one protester had kept vigil outside the prison during Grayson's execution.

"Hell, even that's a lot," he said.

**LOAD-DATE:** August 4, 2007

Source: News & Business > Individual Publications > I > The Irish Times 
Terms: **"darrell grayson"** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, August 20, 2007 - 12:05 PM EDT

LexisNexis®    About LexisNexis  |  Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT I

LexisNexis® *Total Research System*

Switch Client ⋮ Preferences ⋮ Live Support ⋮ Sign Off ⋮ ? Help

Search ⋮ Research Tasks ⋮ Get a Document ⋮ Shepard's® ⋮ Alerts

Dossier ⋮ History ⋮

Source:  News & Business > Individual Publications > A > The Associated Press ⓘ
Terms:  "christopher newton"  (Edit Search | Suggest Terms for My Search)

➜ Select for FOCUS™ or Delivery

*AP NewsBreak: Chemicals took more than twice usual time to kill Ohio inmate The Associated Press May 26, 2007 Saturday 12:42 AM GMT*

Copyright 2007 Associated Press
All Rights Reserved
The Associated Press

May 26, 2007 Saturday 12:42 AM GMT

**SECTION:** DOMESTIC NEWS

**LENGTH:** 647 words

**HEADLINE:** AP NewsBreak: Chemicals took more than twice usual time to kill Ohio inmate

**BYLINE:** By JULIE CARR SMYTH and ANDREW WELSH-HUGGINS, Associated Press Writers

**DATELINE:** COLUMBUS Ohio

**BODY:**

The 16 minutes it took **Christopher Newton** to die once chemicals began flowing into his veins was the longest stretch that any of the state's inmates executed since 1999 has endured, an Associated Press review shows.

During that span Thursday more than twice as long as usual, and 5 minutes longer than the state's previous longest on record Newton's stomach heaved, his chin quivered and twitched, and his 6-foot, 265-pound body twice mildly convulsed within the restraints.

State prison records show that other Ohio inmates died within an average of 7 minutes, 30 seconds, and that the entire process typically takes about 20 minutes. The state did not compile that information for two inmates.

The execution team at the Southern Ohio Correctional Facility in Lucasville stuck Newton at least 10 times with needles to find suitable veins for the shunts where the chemicals are injected. He died nearly two hours after the scheduled start of his execution.

Newton's unusual amount of movement and the time it took him to die raised new questions Friday among death penalty critics already alarmed by the problems that delayed his execution.

"It seems too long," Ohio State University surgeon Jonathan Groner said. "The whole thing seems agonizing."

Newton had insisted on the death penalty as punishment for choking and beating Jason

Brewer, 27, his cellmate at the Mansfield Correctional Center, over a chess game in 2001.

The American Civil Liberties Union of Ohio asked the state Thursday to halt executions, but prison officials said Friday that Newton's execution was properly handled and considered successful. They planned no investigation or autopsy.

The second of three drugs should have paralyzed Newton rather than allowing the five minutes of movement witnesses to his execution could observe, Groner said.

"That would suggest that the second drug of the three-drug protocol was not being effective," he said. "It's rapidly effective within 90 seconds. It paralyzes the muscles and stops the lungs."

Groner said the two minutes between the warden's signal to start the chemicals and Newton appearing to lose consciousness, and the total time that elapsed before his death, also suggest that the chemicals may not have been flowing properly, or in the proper doses.

State prisons officials blocked out the doses of sodium pentothal, pancuronium bromide and potassium chloride in records provided Friday to the AP. Andrea Dean, a spokeswoman for the Ohio Department of Rehabilitation and Correction, said that she did not know whether doses are modified based on an inmate's weight and that only the execution team knows dosage amounts.

Newton's obesity explains the difficulty in accessing his veins and the motion visible in the execution chamber, Dean said.

"When Newton got to Lucasville, he told us himself that his veins sat really deep. We did checks and we saw veins," said Dean, who was present during the execution. "He was thick, and his veins sat deep."

Dean said rules put in place after the botched execution of Joseph Clark last May, in which Clark sat up on the table to tell his executioners the process wasn't working, give prison employees the ability to slow down and do a professional job.

"The team took as much time as needed to find good veins," she said. "In our mind, the process worked. There was no artificial time line to hurry up and find veins."

Carrie Davis, staff attorney for the ACLU of Ohio, said her group is gathering information on the execution and considering legal action.

In Florida, after an unusually long delay in the Dec. 13 execution of Angel Diaz, 55, then-Gov. Jeb Bush created an 11-member panel to find out what had caused his death to take 34 minutes twice as long as usual and to recommend steps to prevent future delays that were similar. That panel has completed its work, and current Gov. Charlie Crist has allowed executions to resume.

**LOAD-DATE:** May 26, 2007

Source: News & Business > Individual Publications > A > **The Associated Press** ⓘ
Terms: **"christopher newton"** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Tuesday, October 9, 2007 - 7:27 PM EDT

LexisNexis® *Total Research System*

Switch Client ┊ Preferences ┊ Live Support ┊ Sign Off ┊ [?] Help

Search ┊ Research Tasks ┊ Get a Document ┊ *Shepard's*® ┊ Alerts

Dossier ┊ History ┊

Source: News & Business > Individual Publications > A > The Associated Press [i]
Terms: "christopher newton"  (Edit Search | Suggest Terms for My Search)

↰Select for FOCUS™ or Delivery
☐

*Ohio executes inmate for killing cellmate in 2001; problem finding veins delayed lethal dose*
*The Associated Press May 24, 2007 Thursday 11:49 PM GMT*

Copyright 2007 Associated Press
All Rights Reserved
The Associated Press

May 24, 2007 Thursday 11:49 PM GMT

**SECTION:** DOMESTIC NEWS

**LENGTH:** 686 words

**HEADLINE:** Ohio executes inmate for killing cellmate in 2001; problem finding veins delayed lethal dose

**BYLINE:** By JULIE CARR SMYTH, Associated Press Writer

**DATELINE:** LUCASVILLE Ohio

**BODY:**

An execution was delayed more than an hour Thursday while prison medical staff struggled to find suitable veins in the condemned man's arms the second time that has happened in Ohio in little more than a year.

The execution team stuck **Christopher Newton** at least 10 times with needles to get in place the shunts used to administer the lethal chemicals. Newton, who had insisted on the death penalty as punishment for killing a cellmate, continued to talk, smile and laugh with the prison staff, and at one point was even given a bathroom break.

When he eventually was moved from his holding cell and strapped to a table in the death chamber, he made this short statement: "Yes, boy, I could sure go for some beef stew and a chicken bone. That's it."

Newton, 37, was pronounced dead at 11:53 a.m. at the Southern Ohio Correctional Facility; his execution had been set to begin at 10.

He weighed 265 at his physical on Wednesday. The head of the Public Defender's death penalty division, Joe Wilhelm, said Newton told him it was hard for blood to be taken from his veins because of his weight.

The public defender's office said the decision was made not to intervene when the execution was delayed.

"You have to remember that Newton wanted to die. Our job isn't to oppose the death penalty, it's to represent our clients," said Greg Meyer, chief counsel for the Ohio Public Defender's Office.

In May 2006, the execution of another Ohio inmate, Joseph Lewis Clark, also was delayed more than an hour because the team could not find a suitable vein; a prison official said at the time that Clark's history of drug use may have been a factor. That case has been cited by death penalty opponents as an example of problems with lethal injection.

Executions typically last about 20 minutes. A group of Ohio inmates is suing over the state's injection method, saying it is unconstitutionally cruel, and the American Civil Liberties Union of Ohio called on the state to stop executions because of Thursday's problems.

The delay will be discussed as part of that suit and helps show the state is unable to complete executions smoothly, Meyer said.

"There will be a day in trial that they will have to answer up as to what caused this two-hour delay," Meyer said. "That's a lot of time messing around trying to get a needle in a vein."

Gov. Ted Strickland said every precaution was taken to make sure Newton was treated respectfully and was not in pain.

"The procedure worked as it was intended to work," Strickland said. "If someone is against the death penalty then I can understand why they would want me to have a moratorium on the death penalty, but I think what happened today is not any supporting justification for that."

"There was not a cause to intervene," Strickland spokesman Keith Dailey said. "Out of an abundance of caution, every precaution was taken before the procedure began to ensure that there would be no problems when the procedure began."

Newton beat and choked cellmate Jason Brewer, 27, to death in 2001 after they argued over a chess game.

In a statement read by public defender Robert Lowe after the execution, Newton apologized to his victim's family. "If I could take it back, I would," the statement said. "To my family, I love you and I'm sorry."

Although his attorneys argued Newton should be spared the death penalty because of mental disorders, a court last fall found him competent to forgo his appeals. The prosecution had argued that he had feigned mental illness.

Court documents say Newton, who spent much of his adult life in prison, knew Brewer's killing was a capital crime, and refused to cooperate with investigators unless they sought the death penalty.

In an interview with reporters last month, Newton said he killed Brewer because he repeatedly gave up while they were playing chess.

"Every time I put him in check, he'd give up and want to start a new game," Newton said. "And I tried to tell him you never give up ... I just got tired of it."

Newton also claimed that he had intentionally gotten himself put back in prison by leaving behind a handprint during a 1999 break-in at his father's house.

**LOAD-DATE:** May 25, 2007

Case 2:07-cv-00295-MEF-WC    Document 44-10    Filed 10/09/2007    Page 6 of 14
Page 1 of 3
Case 2:07-cv-00295-MEF-WC    Document 19-2    Filed 07/10/2007    Page 41 of 46

ERROR: Macro headerinfo is missing! **Gainesville.com**

This is a printer friendly version of an article from **www.gainesville.com**
To print this article open the file menu and choose Print.

Back

Article published Jan 28, 2007

Jan 27, 2007

**Botched Diaz execution prompts further study by commission**

**By NATHAN CRABBE**

*Sun staff writer*

The Diaz executionAfter the botched execution of Angel Diaz, the Florida Department of Corrections formed a task force to investigate. The task force found deviations from standard procedure, which will be studied by a state commission:

- An independent observer from the Florida Department of Law Enforcement did not witness the mixing of lethal chemicals.
- Problems inserting catheters into Diaz's veins were not reported to the warden.
- When there were problems injecting the lethal chemicals into the left arm, no assessment was made of the IV line.
- After those problems, one executioner injected a chemical that stops the heart in Diaz's left arm while another executioner

injected a sedative in
Diaz's right arm.
Procedures required the
sedative first, then a drug
paralyzing the muscles and
finally the drug that stops
the heart.

*Source: Florida Department of
Corrections*

A state investigation found that the botched execution of Angel Diaz last month deviated from procedure in several significant ways.

Now a commission created by the governor will further study the execution, holding its first meeting Monday. But doctors involved in the group may face ethical issues about proposing changes to the lethal injection procedure.

Diaz appeared to shudder, grimace in pain and gasp for air during his Dec. 13 execution, before he stopped moving 24 minutes into the process and was declared dead 10 minutes later. The execution lasted nearly three times as long as normal.

The next morning, Department of Corrections Secretary James McDonough formed a task force to look into the execution. The task force issued a report Dec. 20 that found execution team members didn't report problems injecting an IV and defied procedure in changing the way the lethal drugs were dispensed.

The state has since stopped all executions and convened the commission to further investigate the lethal injection procedure. The group is scheduled to issue its report March 1.

The commission includes Gainesville Circuit Judge Stan Morris, who says the group will study problems and make recommendations on changes.

But making recommendations could create a dilemma for the three doctors on the commission. American Medical Association guidelines ban doctors from participating in executions in any way.

Dr. William G. Plested III, the AMA president, said he would advise doctors on the commission to recuse themselves from helping develop new lethal injections procedures.

Tampa anesthesiologist Dr. David Varlotta is one of the doctors on the commission. He said he's waiting to hear more about his role on the commission, but will be using medical ethics to guide his involvement.

"I think there's a fine line," he said. "I think there's places I can advise and places I can't."

The commission will be looking at an execution procedure similar to the one used in the 36 other states that use lethal injection. Florida and other states use a three-chemical cocktail to kill inmates.

The inmate is first injected with a sedative called sodium pentothal, followed by a paralytic called pancuronium bromide that freezes the muscles. A deadly drug called potassium chloride is then injected to stop the inmate's heart.

If problems occur in Florida, procedures require execution team members to check the IV line dispensing the drugs. If members determine the line isn't working, a switch is made to an IV line in another arm. If that doesn't work, team members are supposed to insert a line in another vein.

But the Diaz execution deviated from those procedures. According to the investigation, execution team members had problems inserting an IV line in Diaz's arm and failed to report those problems to the prison warden, as required.

Once the execution started, the executioner noted that the chemicals were taking two to three times longer than usual to push through the line into Diaz's left arm. In the middle of dispensing the paralytic, the executioner could no longer push the syringe.

A decision was made to dispense the rest of the paralytic and the final deadly drug into an IV in Diaz's right arm. But even after that, a heart monitor indicated he was still alive.

The executioner then started administering a second round of drugs. The sedative was dispensed into Diaz's right arm. But against procedure, the executioner decided to skip the paralytic and move immediately to dispensing the deadly drug into Diaz's left arm.

Alachua County Medical Examiner Dr. William Hamilton later said the errant IV caused the lethal cocktail of drugs to seep into Diaz's flesh rather than his veins. If the drugs had been been pumped into Diaz's bloodstream, they would have circulated throughout his body faster and worked more quickly. Instead, the drugs caused nearly footlong chemical burns on both of Diaz's arms, according to the examiner.

A full autopsy on Diaz is still pending release.

*Nathan Crabbe can be reached at 352-338-3176 or crabben@gvillesun.com.*

LexisNexis® *Total Research System*

Switch Client ⋮ Preferences ⋮ Live Support ⋮ Sign Off ⋮ ? Help

Dossier ⋮ History ⋮ 🖨

Search ⋮ Research Tasks ⋮ Get a Document ⋮ Shepard's® ⋮ Alerts ⋮

Source: News & Business > Individual Publications > C > The Columbus Dispatch ⓘ
Terms: "joseph clark"  (Edit Search | Suggest Terms for My Search)

➥ Select for FOCUS™ or Delivery
☐

*'It don't work,' inmate says during botched execution The Columbus Dispatch (Ohio) May 3, 2006 Wednesday*

Copyright 2006 The Columbus Dispatch
All Rights Reserved

## The Columbus Dispatch

The Columbus Dispatch (Ohio)

May 3, 2006 Wednesday
Home Final Edition

**SECTION:** NEWS; Pg. 01A

**LENGTH:** 833 words

**HEADLINE:** 'It don't work,' inmate says during botched execution

**BYLINE:** Alan Johnson, The Columbus Dispatch

**BODY:**

The needle was in his arm, he was strapped down and he had said his last, tearful words.

**Joseph Clark** was ready to die.

But Ohio's lethal-injection process, which had worked, if not flawlessly, at least without major problems on 20 previous occasions, went awry yesterday at the Southern Ohio Correctional Facility near Lucasville.

As the chemical began flowing, Clark, a longtime IV drug user before he went to prison, raised his head and upper body off the table several times.

"It don't work. It don't work," he said five times, according to media witnesses.

Medical technicians returned and the curtain was closed at 10:37 a.m., blocking the view of authorized witnesses, who later heard what they described as "moaning, crying out and guttural noises."

It took almost an hour and a half, but by 11:26 a.m., the 57-year-old killer from Toledo was dead as planned. It took two tries, and much of the work was conducted behind the curtain, preventing the official witnesses from viewing the process of inserting need-

les into Clark's veins after one vein collapsed, or "blew out."

The problems frayed the nerves of prison personnel and are certain to add fuel to a national controversy about lethal injection.

Terry Collins, who took over Monday as director of the Ohio Department of Rehabilitation and Correction, said he ordered the curtain closed to shield the victims' family members and keep his staff from being watched as they struggled to get the IV lines going.

"I absolutely believe I made the right call closing the curtain, and I would do it again," Collins said later. However, he said the entire process will be reviewed.

Clark was convicted and sentenced to death for killing David A. Manning on Jan. 13, 1984, during a robbery at a Toledo service station where Manning worked. Clark confessed to the crime after being arrested a few days later in connection with another robbery.

He also was convicted of murder, without a death-penalty specification, in the shooting death of Donald Harris, a convenience-store clerk.

Clark's execution, which started at 10 a.m., was troubled almost from the beginning. Prison medical technicians were able to attach the needle to a vein only in his left arm, not both arms as is the standard procedure.

Despite the lengthy execution process, prison officials said Clark did not appear to be in any pain. Eventually, he went to sleep as the curtain was opened at 11:17 a.m. He could be heard snoring as the second, successful attempt to end his life began.

"One hour, 26 minutes is unacceptable, inhumane, and another indication of a flawed, unnecessary death system that is irreparably broken," said Sister Alice Gerdeman, chairwoman of Ohioans to Stop Executions.

She renewed the call to Gov. Bob Taft to declare an "an immediate moratorium on executions and take an honest look at fair alternatives to the death penalty."

Dr. Jonathan I. Groner, trauma medical director at Children's Hospital and a longtime opponent of physician involvement in executions, said Clark's execution was "clearly botched."

"There was 90 minutes of torture and discomfort for this guy."

Before the problems began, Clark apologized to the families of both his victims and quoted Martin Luther King Jr. in a lengthy, rambling statement.

He added an anti-drug admonition, urging "young brothers and sisters all over the world. Do not let drugs ruin your life, ruin your body or destroy your mind. Today my life is being taken because of drugs."

The American Civil Liberties Union of Ohio quickly issued a statement by Carrie Davis, staff counsel. The ACLU has a suit pending in federal court in Columbus demanding that the public be allowed to watch the phase of executions when the IV tubes are inserted.

"By not allowing public viewing of the executions, the state is diminishing the power of people to understand the execution process and the possible problems that may arise," Davis said.

Legal concerns over the injection process had already prompted U.S. District Judge Gregory L. Frost on Monday to delay the next scheduled execution, that of Jeffrey Hill of Hamilton County on June 15. Frost cited "the growing body of evidence calling Ohio's lethal-injection protocol increasingly into question."

Opponents argue that a trio of drugs used in 36 states can leave a prisoner paralyzed but in great pain as they are executed. They say that violates the U.S. Constitution's ban on cruel and unusual punishment.

All states with capital punishment use lethal injection except Nebraska, which uses an electric chair. California's executions are on hold because of legal questions about the lethal-injection process.

The problems with Clark's execution were not a concern for family members of his two victims, who came to see justice done after a long wait.

"I didn't shed a tear," said Mary Ellen Manning Gordon, Manning's widow. "**Joseph Clark** lived 22 years too long."

"He really died quite peacefully," said Brenda Kuhl, Donald Harris' sister. "It was an easy way to go."

ajohnson@dispatch.com

**GRAPHIC:** Photo, **Joseph Clark,** 57, was executed yesterday for killing a man in Toledo in 1984.

**LOAD-DATE:** May 3, 2006

Source: News & Business > Individual Publications > C > **The Columbus Dispatch** 
Terms: **"joseph clark"** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Tuesday, October 9, 2007 - 7:20 PM EDT

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

● LexisNexis®   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

LexisNexis® *Total Research System*

Switch Client | Preferences | Live Support | Sign Off | [?] Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts

Dossier | History | ⬇

Source: News & Business > Individual Publications > A > The Atlanta Journal and Constitution [i]
Terms: **"jose high"** (Edit Search | Suggest Terms for My Search)

⬏Select for FOCUS™ or Delivery
☐

*Gang leader executed by injection;Death comes 25 years after boy, 11, slain The Atlanta Journal-Constitution November 7, 2001 Wednesday,*

Copyright 2001 The Atlanta Constitution
The Atlanta Journal-Constitution

November 7, 2001 Wednesday, Home Edition

**SECTION:** Metro News; Pg. 1B

**LENGTH:** 241 words

**HEADLINE:** Gang leader executed by injection;
Death comes 25 years after boy, 11, slain

**BYLINE:** RHONDA COOK

**SOURCE:** AJC

**BODY:**
**Jose High** fought his inevitable death Tuesday but finally surrendered to a combination of deadly drugs intended to kill him for the murder of an 11-year-old boy in 1976.

High's execution was scheduled for 7 p.m., but was delayed beyond what was to be expected because prison officials could not find a suitable vein to support the shunt that was used to deliver the drugs.

Department of Corrections spokesman Mike Light said contract emergency medical technicians had to abandon their attempts to insert needles into his arm after trying 15 to 20 minutes. Instead, they inserted one in his hand and, as a backup, a doctor inserted one between his shoulder and his neck.

Light insisted that High was cooperative and did not complain during this process. But under Department of Corrections guidelines, the procedure is not observed by witnesses.

Once witnesses were let into the death chamber, High was able to speak his final words, insisting he did not kill 11-year-old Bonnie Bulloch and decrying the death penalty as racist and designed to hurt only the poor.

"I did not kill that little boy," High said, adding that it was all part of a lie designed by investigators of the little boy's death. "I could not hurt a child. Never. That lie is going to follow me now. I'm ready to die."

The boy's mother and stepfather were in another part of the prison along with family members and relatives of another of High's victims.

**GRAPHIC:** Photo:

Attorneys for **Jose High** claimed he was mentally ill and mentally retarded.

**LOAD-DATE:** November 07, 2001

Source: News & Business > Individual Publications > A > **The Atlanta Journal and Constitution** 
Terms: **"jose high"** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Tuesday, October 9, 2007 - 7:13 PM EDT

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

LexisNexis® About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

LexisNexis® *Total Research System*

Switch Client ⫶ Preferences ⫶ Live Support ⫶ Sign Off ⫶ [?] Help

Search ⫶ Research Tasks ⫶ Get a Document ⫶ Shepard's® ⫶ Alerts

Dossier ⫶ History ⫶

Source: News & Business > Individual Publications > C > **Chattanooga Times Free Press** [i]
Terms: **"michael eugene elkins"** (Edit Search | Suggest Terms for My Search)

*Killer Helps Officials Find A Vein At His Execution Chattanooga Free Press (Tennessee) June 13, 1997, Friday*

Copyright 1997 Chattanooga News-Free Press Company
Chattanooga Free Press (Tennessee)

June 13, 1997, Friday

**SECTION:** NEWS; Pg. A7

**LENGTH:** 217 words

**HEADLINE:** Killer Helps Officials Find A Vein At His Execution

**BYLINE:** By The Associated Press

**BODY:**
COLUMBIA, S.C. -- Muffled comments were heard, then the condemned killer asked, "Should I lean my head down a little bit?" as prison officials searched for a vein to pump in the lethal chemicals.

They finally found one in **Michael Eugene Elkins'** neck, and the deadly mix of drugs began flowing. He was pronounced dead today at 12:58 a.m.

Elkins' body had become swollen from spleen and liver problems, which made finding a vein difficult, said his lawyer, Kevin Bell.

Elkins, 41, was convicted of robbing and stabbing 59-year-old Patricia Whitt eight times after she stopped to help him and another man who feigned car trouble along Interstate 95 near the Georgia state line.

"My life for hers is a poor trade, but it's all I could offer," Elkins said in a final statement read by Bell at 12:40 a.m.

Mrs. Whitt had met Elkins and Ralph Garner earlier on the night of July 9, 1990, when they helped fix her car, which had overheated on Interstate 95. She gave them $10 for their trouble.

Elkins was arrested days later after his girlfriend turned him in. He had given her three of Mrs. Whitt's rings. Garner, who was acquitted of murder, testified against Elkins.

He withdrew last-minute appeals "out of sorrow and respect for Ms. Whitt and her family," his final statement said.

**LOAD-DATE:** June 13, 1997

Source: News & Business > Individual Publications > C > **Chattanooga Times Free Press** [i]
Terms: **"michael eugene elkins"** (Edit Search | Suggest Terms for My Search)
View: Full