IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **DANIEL LEE SIEBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD ALLEN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **GRANTT CULLIVER, Warden,** | ) | |
| **Holman Correctional Facility, and** | ) | **Case No.: 2:07-cv-295-MEF-WC** |
| | ) | |
| **OTHER UNKNOWN EMPLOYEES** | ) | |
| **AND AGENTS,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Individually, and in their** | ) | |
| **official capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT

1.      This is a civil rights action brought under 42 U.S.C. § 1983 and the United

States Constitution for violations and threatened violations of Plaintiff Daniel Lee Siebert's

rights to be free from cruel and unusual punishment under the Eighth and Fourteenth

Amendments. Mr. Siebert is a death-sentenced Alabama prisoner who seeks declaratory and

injunctive relief to prevent the Defendants from using Alabama's current lethal injection

procedures to execute him. The Defendants' improper use of anesthesia as a precursor to

execution unnecessarily risks infliction of severe pain and suffering. In addition, because the

chemicals used for execution require the proper induction and maintenance of anesthesia, the Defendants' failure to use medically approved procedures and equipment and properly trained personnel creates an unacceptable risk that Mr. Siebert will suffer excruciating pain during the course of his execution.

2.    Additionally, pursuant to Rule 15(a), Federal Rules of Civil Procedure, Plaintiff Daniel Lee Siebert amends his complaint on the basis of his recent preliminary diagnosis of hepatitis C and pancreatic cancer. Complications in the lethal injection process are likely to arise from the treatment or nontreatment of Mr. Siebert's illness or illnesses, as set forth more fully below. *See* ¶¶ 22 through 25. Such complications are likely to result in an unacceptable risk of unnecessary pain, in violation of the protections against cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

3.    Pursuant to this Court's scheduling order issued on December 7, 2007 (Doc. # 89), Plaintiff Daniel Lee Siebert further amends his complaint to allege (1) that revision of Alabama's lethal injection execution protocol has occurred as recently as October 18, 2007, (2) that the revisions made in October are significant, but (3) that they do not make the protocol constitutionally acceptable. *See* ¶ 21 below.

## JURISDICTION

4.    Jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

5.      Venue is appropriate in the Middle District of Alabama under 28 U.S.C. § 1391(b).

## THE PARTIES

6.      Plaintiff Daniel Lee Siebert is a United States citizen and a resident of the State of Alabama.  Mr. Siebert is a death-sentenced prisoner currently being held in the custody of the Alabama Department of Corrections ("ADOC") at Holman Correctional Facility in Atmore, Alabama.

7.      Defendant Richard Allen is the Commissioner of the ADOC. Defendant Grantt Culliver is the Warden of the Holman Correctional Facility in Atmore, Alabama.  Other Unknown Employees and Agents of the ADOC are involved in the development and execution of lethal injections.  Plaintiff does not yet know the identity of these persons.  All of the Defendants are being sued in their individual and official capacities.  The named Defendants are citizens and residents of the State of Alabama.

## JUSTICIABLE CASE OR CONTROVERSY

8.      There is a real and justiciable case or controversy between the parties.

9.      Plaintiff Daniel Lee Siebert is a death-sentenced prisoner who has been convicted of capital murder in the state courts of Alabama.  Mr. Siebert's petition for certiorari review in the United States Supreme Court of the dismissal of his petition for writ of habeas corpus respecting his Lee County conviction and sentence was denied on March 19, 2007.  Mr. Siebert is under a second sentence of death from his Talladega conviction and

filed a separate petition for writ of habeas corpus in that case. The case is currently pending in the Eleventh Circuit, awaiting issuance of an order and opinion on remand, following summary reversal by the United States Supreme Court in *Allen v. Siebert*, 552 U.S. —, 128 S. Ct. 2 (Nov. 5, 2007).

10.    On information and belief, the ADOC has adopted a written and confidential execution protocol for administering capital punishment by lethal injection.

11.    Plaintiff challenges the constitutionality of Alabama's lethal injection procedures under 42 U.S.C. § 1983.

12.    Upon information and belief, there is no administrative grievance process available at Holman Correctional Facility by which death-sentenced prisoners can challenge the procedures to be employed in their execution.

13.    Absent judicial intervention or executive clemency, Mr. Siebert will be executed pursuant to Alabama's lethal injection procedures. There is a justiciable case or controversy regarding the constitutionality of Alabama's lethal injection procedures.

## GENERAL ALLEGATIONS

14.    A jury in Talladega County, Alabama, found Mr. Siebert guilty of capital murder on March 19, 1987. Mr. Siebert was sentenced to death on April 17, 1987. A second jury, in Lee County, Alabama, found Mr. Siebert guilty of capital murder on June 17, 1987. Mr. Siebert was sentenced to death on the Lee County conviction on August 19, 1987.

15.    Mr. Siebert's Talladega and Lee County convictions and sentences were affirmed on direct appeal, and his state post-conviction petitions were dismissed as untimely.

16.     Mr. Siebert filed for a writ of habeas corpus in the Talladega case with the United States District Court for the Northern District of Alabama, which was dismissed on February 9, 2006. *Siebert v. Campbell*, No. 1:01-cv-2323-IPJ-TMP (N.D. Ala. Feb. 9, 2006). On March 7, 2007, the Eleventh Circuit reversed and remanded the case to the District Court for further proceedings.  *Siebert v. Allen*, 480 F.3d 1089 (11th Cir. 2007).  The State of Alabama's petition for rehearing and rehearing en banc was denied on April 30, 2007. *Siebert v. Allen*, No. 06-11841 (11th Cir. Apr 30, 2007) (table decision).  The State filed a petition for a writ of certiorari with the United States Supreme Court on June 15, 2007.  Sup. Ct. No. 06-1680.  The United States Supreme Court summarily reversed on November 5, 2007.  *Allen v. Siebert*, 552 U.S. —, 128 S. Ct. 2 (Nov. 5, 2007).  The case is currently pending in the Eleventh Circuit, awaiting issuance of an order and opinion on remand.

17.     Mr. Siebert filed for a writ of habeas corpus in the Lee County case with the United States District Court for the Middle District of Alabama, which was denied on October 4, 2005. *Siebert v. Campbell*, 2005 WL 2456032, No. 3:01CV1097-A (M.D. Ala. Oct. 4, 2005).  On July 13, 2006, the Eleventh Circuit affirmed the District Court's judgment denying Mr. Siebert habeas relief, *Siebert v. Allen*, 455 F.3d 1269 (11th Cir. 2006), and on October 4, 2006, the Eleventh Circuit denied Mr. Siebert's petition for rehearing and rehearing en banc, *Siebert v. Allen*, No. 05-16646 (11th Cir. Oct. 4, 2006) (table decision). Mr. Siebert filed a petition for a writ of certiorari with the United States Supreme Court, which was denied on March 19, 2007. *Siebert v. Allen*, —U.S.—, 2007 WL 98145 (2007).

18.     Under Alabama law, the ADOC is responsible for carrying out executions, all

of which take place at Holman Correctional Facility. Ala. Code 1975 §§ 15-18-82 to -82.1.

Alabama law does not prescribe specific drugs, dosages, drug combinations, sequences, or

manner of administering lethal chemicals to carry out executions, nor does it prescribe any

certification, training, or licensure required of those who participate in either the anesthesia

process or the execution.

19.    Upon information and belief, Alabama's execution procedures are deemed

confidential, and the Defendants will not publicly disclose any details about the procedures

involved in carrying out executions in Alabama. Defendants have obtained a protective order

in another case challenging Alabama's lethal injection protocols. *McNair v. Allen*, No.

2:06CV695-WKW (M.D. Ala.), (Doc. # 29).

20.    Plaintiff asserts upon information and belief that Alabama uses drugs to

achieve first anesthesia, then paralysis, and finally execution by cardiac arrest. The

chemicals used include Thiopental, Pavulon, and Potassium Chloride. The combination of

drugs utilized by the State of Alabama in its execution protocol will likely subject Mr. Siebert

to an excruciatingly painful and torturous death. This unconstitutional result is likely both

on the basis of complications arising from Mr. Siebert's current medical condition and from

the deficiencies in the protocol in and of itself.

21.    On information and belief, the Defendants have revised the lethal injection

execution protocol on more than one occasion. *See Jones v. Allen*, 483 F. Supp. 1142, 1146

n. 2 (M.D. Ala. 2007). The Defendants most recently revised the protocol on October 18,

2007. *See* (Doc. # 56). The most recent revision includes procedures intended to assess the

consciousness of the condemned inmate after the administration of the anesthetic and before the second and third drugs are administered. This revision to the protocol is substantial, though inadequate to meet constitutional standards. Furthermore, these procedures are to be conducted by inadequately trained Department of Corrections personnel with no medical background.

22.    On information and belief, Mr. Siebert suffers from pancreatic cancer and hepatitis C. *See* Exhibit 1 (Prison Health Services Authorization Letter, dated July 12, 2007, and Atmore Community Hospital X-ray Reports, dated June 7 and 8, 2007). These illnesses had not manifested any discernible symptoms before late May 2007, when Mr. Siebert was stricken with severe jaundice. *See* Exhibit 2 (Prison Health Services, Inc., Sick Call Request, dated May 26, 2007, and Nursing Evaluation Tool, dated May 27, 2007). A biopsy was performed on July 12, 2007, to determine the malignancy and stage of the cancer. Dr. George Lyrene, Consulting Medical Director for the Defendants, has stated in a letter dated August 28, 2007, addressed to Defendant Allen and filed as an exhibit in this case by the Defendants, *see* (Doc. # 28-2, Attachment A), that Mr. Siebert has been diagnosed with pancreatic cancer.

23.    Information available to undersigned counsel indicates that Mr. Siebert has been prescribed morphine patches to control pain, *see id.*, but that the morphine does not treat Mr. Siebert's disease. Mr. Siebert suffers recurrent and unpredictable bouts of vomiting. Mr. Siebert has also suffered significant weight loss and wasting due to his disease.

24.    Mr. Siebert's symptoms, if left untreated, will interfere with the Defendants'

proposed execution procedures because of the potential for interruption, inability to keep Mr. Siebert restrained, and interference with assessment of unconsciousness, all of which increase the likelihood of ineffective delivery of the lethal chemicals.

25.    Mr. Siebert has been advised by a consulting expert that other potential areas of difficulty in carrying out an underdeveloped protocol, with no emergency provisions, arise from, *inter alia*, drug interactions and difficulty of intravenous access. Drug interactions are most likely with the Thiopental and could significantly affect Mr. Siebert's sensitivity to the anesthetic, increasing the likelihood of consciousness during delivery of the two remaining drugs during the lethal injection process. Scarring of the veins may occur from some treatments and would increase the difficulty of obtaining intravenous access, especially by nonmedical personnel with limited training. Weight loss and wasting may also increase the difficulty of gaining intravenous access.

26.    Furthermore, the combination of drugs utilized by the State of Alabama in its execution protocol will likely subject Mr. Siebert to an excruciatingly painful and torturous death. On information and belief, the first drug, Thiopental (also known as sodium pentothal), is an ultra-short-acting barbiturate that depresses the central nervous system to produce unconsciousness and anesthesia. Thiopental derives its utility from its rapid onset and rapid redistribution through the body at surgical doses. Typically, Thiopental is used in the induction phase of anesthesia to temporarily anesthetize patients for sufficient time to, for example, intubate the trachea.

27.    If it is necessary to maintain a patient in a surgical plane of anesthesia for

longer than just a few minutes, physicians typically use drugs that are longer lasting than Thiopental. If Thiopental is used not only to induce, but also to maintain, a surgical plane of anesthesia, a qualified person must be present to continually monitor the patient to ensure that the Thiopental has been correctly administered (repeated intravenous doses are usually required) and is maintaining the patient in a state of unconsciousness.

28.     Next, on information and belief, Defendants administer pancuronium bromide, also referred to as Pavulon, which paralyzes voluntary muscles, including the diaphragm. Pavulon does not affect consciousness or the perception of pain. To the extent that the first chemical, Thiopental, is improperly administered and fails to establish and maintain a sufficient plane of anesthesia, the Pavulon serves only to mask from observers (but not the prisoner) the pain and suffering that would attend a paralyzed diaphragm. In addition, the paralysis that Pavulon induces ultimately causes an intense, painful death by asphyxiation. Pavulon masks the telltale physical signs that would signal a properly trained observer whether or not a prisoner had been sufficiently anesthetized.

29.     Finally, the drug that is used to fatally poison the prisoner is potassium chloride. Potassium chloride disrupts the normal electrical activity of the heart and stops it from pumping blood, thereby causing cardiac arrest. As it travels in the bloodstream from the site of injection towards the heart, potassium chloride activates all the nerve fibers inside the vein, causing a burning sensation as it courses through the body and ravages the internal organs.

30.     This causes excruciating pain that is agonizing for a recipient who has not been

properly anesthetized. Because of this risk of excruciating pain, the use of potassium chloride requires an appropriate anesthesia protocol prior to its administration to ensure an adequate depth of anesthetic plane. However, anesthetic depth cannot be reliably determined during Alabama executions because Pavulon blocks an accurate assessment by observers by paralyzing all of the muscles which would otherwise move when a prisoner is in excruciating pain. Because no one can reliably assess anesthetic depth using this process (and make appropriate adjustments), the procedures the Defendants use can result in the extreme terror and suffering of conscious suffocation.

31.     The American Veterinary Medical Association (AVMA) states that the use of neuromuscular paralyzing drugs, including pancuronium bromide (Pavulon), solely or in conjunction with other drugs, is unacceptable as a method of euthanasia. The AVMA further states that the use of potassium chloride in a euthanasia protocol requires a surgical plane of anesthesia, which is characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli. The AVMA recommends the use of a longer lasting barbiturate for animal euthanasia than the Thiopental that is used in Alabama executions of death-sentenced prisoners. Alabama law also does not authorize the use of neuromuscular blocking agents in animal euthanasia. *See* Ala. Code 1975 § 34-29-131(a)).

32.     Defendants do not conduct lethal injections that comport with the appropriate standards of practice for inducing and monitoring anesthesia as a precursor to execution. Nor do Defendants take effective measures to ensure that a prisoner will not suffer a conscious and painful death, constituting cruel and unusual punishment under the current anesthesia

procedures.

33.    Defendants' anesthesia procedures lack medically necessary safeguards and, therefore, substantially increase the risk that an inmate such as Mr. Siebert will suffer unnecessarily severe pain during the course of his execution.  For example, on information and belief, there is no standardized time to administer each of the three chemicals.  There are no procedures for ensuring that the anesthetic agent is properly flowing into the prisoner, and no procedures for ensuring that the prisoner is properly sedated prior to the administration of other chemicals, as would be required in any medical or veterinary procedure before the administration of a neuromuscular blocking agent (such as pancuronium bromide) or the administration of a painful potassium chloride overdose.

34.    Defendants' existing procedures do not require the personnel who perform the tasks in the anesthesia and execution processes to have any minimum qualifications or expertise.  Defendants do not adequately ensure that the individuals responsible for inducing and maintaining unconsciousness are credentialed, licensed, and proficient in the knowledge, skills, and procedures necessary to establish an appropriate plane of anesthesia throughout the lethal injection process, notwithstanding the fact that it is a complex medical procedure requiring expertise to be performed correctly.

35.    The importance of employing qualified medical personnel, and the lack of assurance that the Defendants do so, is illustrated by the Defendants' representations to the court in *Nelson v. Campbell*, No. 2:03-cv-1008-MHT-WC (M.D. Ala. filed October 6, 2003). In that case, the Defendants' medical expert, Dr. Mark Sonnier, a gynecologist in the employ

of Naphcare, advised that intravenous access to Mr. Nelson could be accomplished through the "external carotid vein." *Id.* (Doc. # 4 at 14, Affidavit of Dr. Marc Sonnier). Alternatively, a "cut-down" could be achieved by "isolat[ing] and dissect[ing] the saphenous vein" in the arm. *Id.* at 15 (Affidavit of Dr. Marc Sonnier). There is no "external carotid vein" anywhere in the human body.[1] *See id.* (Doc. # 11 at 6-7, Affidavit of Mark Heath, M.D.). The saphenous vein is in the leg, not the arm. After remand from the United States Supreme Court, the Defendants, instead of consulting an anesthesiologist on an appropriate means of obtaining intravenous access, referred their questions to a physician specializing in aerospace medicine. *Nelson v. Campbell*, No. 2:03-cv-1008-MHT-WC (Doc. # 65 at 10-11).

36. Furthermore, medical personnel involved in assessing vein accessibility, and possibly training execution team members, have demonstrated inexpertise in starting an intravenous line and have abdicated that responsibility to the patient. *See Nelson v. Campbell*, No. 2:03-cv-1008-MHT-WC, Doc. # 60-1 at 3, 8. *See also id.*, (Doc. # 4 at 17, Affidavit of Warden Grantt Culliver, acknowledging difficulty in accessing Mr. Nelson's veins for medical treatment).

37. The absence of medical personnel who are credentialed, licensed, and proficient in the field of anesthesiology and the lack of adequate procedures greatly increases the risk that a prisoner will not receive the necessary amount of anesthetic prior to being paralyzed by the pancuronium bromide and then experiencing the extremely painful internal

---

[1] There is an external carotid *artery*.

"burn" of the potassium chloride, and greatly increases the risk that a conscious prisoner will experience excruciating pain and suffering.

38.    On information and belief, the Defendants do not have appropriate emergency procedures established, nor do they provide equipment appropriate to deal with emergencies, such as inability to access a peripheral vein.  *See Nelson v. Campbell*, No. 2:03-cv-1008-MHT-WC (Doc. # 122-3 at 15, 17, Affidavit of Mark Heath, M.D.).

39.    The lack of adequate standards for administration of chemicals, the lack of qualifications of the personnel involved in the process, the lack of emergency protocols and equipment, and the combination of the drugs the Defendants use as a precursor to an execution, as well as for the execution, create a grave and substantial risk that Mr. Siebert will be conscious throughout the execution process and, as a result, will experience an excruciatingly painful and protracted death.

## CAUSE OF ACTION

**VIOLATION OF THE RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

40.    Commissioner Allen, Warden Culliver, and Other Unknown Employees and Agents of the Alabama Department of Corrections are acting under color of Alabama law in undertaking to execute Plaintiff Daniel Lee Siebert by lethal injection using an insufficient, improperly designed and improperly administered procedure for inducing and maintaining anesthesia prior to execution; by using chemicals that cause severe pain in the process of causing death; by employing inadequately trained personnel; and by failing to provide

emergency plans and equipment, such that Plaintiff will unnecessarily suffer an excruciating death in violation of his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

41.    Although it is possible to conduct executions in a constitutionally compliant manner, Defendants have chosen not to do so.  While Defendants could select additional or alternative chemicals and retain qualified medical personnel to administer its chosen chemicals to ensure the constitutionality of its lethal injection procedure, Defendants have failed to do so and have acted with deliberate indifference.  Defendants' current lethal injection procedures violate evolving standards of decency.  *See Estelle v. Gamble*, 429 U.S. 87, 102 (1976) (noting that the Eighth Amendment requires courts to assess "evolving standards of decency that mark the progress of a maturing society") (*quoting Trop v. Dulles*, 356 U.S. 86, 101 (1958); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (stating that the Eighth Amendment prohibits infliction of unnecessary and wanton pain).

## PRAYER FOR RELIEF

For these reasons, Plaintiff Daniel Lee Siebert respectfully requests this Court to:

A.    Enter a declaratory judgment that Defendants' inadequate anesthesia and execution procedures violate Plaintiff's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution;

B.    Grant injunctive relief to enjoin the Defendants from executing Plaintiff with inadequate anesthesia and execution procedures which violate Plaintiff's right

to be free from cruel and unusual punishment under the Eighth and Fourteenth

Amendments to the United States Constitution;

C.    Grant reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the laws of

the United States, as well as costs of suit; and

D.    Grant any further relief as it deems just and proper.

Dated:    February 22, 2008.

Respectfully submitted,
 /s/ Anne E. Borelli
ANNE E. BORELLI
ASB-2419-A52B
E-mail:anne_borelli @fd.org

Christine A. Freeman
TN BAR NO.: 11892
E-mail: Christine_Freeman@fd.org

Federal Defenders for the
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353

Thomas M. Goggans
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery, AL 361056
Phone: 334-834-2511
Fax: (334) 834-2512
E-mail: tgoggans@tgoggans.com

*Counsel for Daniel Lee Siebert, Plaintiff*

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **DANIEL LEE SIEBERT,**      ) | |
|         ) | |
|     **Plaintiff,**     ) | |
|         ) | |
| **v.**         ) | |
|         ) | |
| **RICHARD ALLEN, Commissioner,**   ) | |
| **Alabama Department of Corrections,**   ) | |
|         ) | |
| **GRANTT CULLIVER, Warden,**   ) | |
| **Holman Correctional Facility, and**   ) | **Case No.: 2:07-cv-295-MEF-WC** |
|         ) | |
| **OTHER UNKNOWN EMPLOYEES**   ) | |
| **AND AGENTS,**   ) | |
| **Alabama Department of Corrections,**   ) | |
|         ) | |
| **Individually, and in their**   ) | |
| **official capacities,**   ) | |
|         ) | |
|     **Defendants.**   ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 22, 2008, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will electronically send a copy of the same to each of the following:

James Clayton Crenshaw, Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 242-7300
Fax: (334) 353-8440
Email: ccrenshaw@ago.state.al.us

James William Davis, Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 242-7300
Fax: (334) 353-8440
Email: jimdavis@ago.state.al.us

Jasper Beroufon Roberts, Jr., Esq.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4848
Fax: (334) 353-3637
Email: jroberts@ago.state.al.us

Corey Landon Maze
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
Tel.: (334) 353-4336
Fax: (334) 353-3637
Email: cmaze@ago.state.al.us

Respectfully submitted,

/s/ Anne E. Borelli
ANNE E. BORELLI

# EXHIBIT 1

| Patient Name: | Seibert, Daniel | Inmate Number: | 00Z475SE |
|---|---|---|---|
| Service Authorized: | Outpatient Surgery: Op One Day Surgery | Effective Dates: | 06/29/2007 |
| Effective: | Visits authorized for 60 days from effective date. | Visits Authorized: | 1 |
| Responsible Facility: | Holman Correctional Facility | Contact Name: | Michelle Pope |
| Authorization Number: | 17318826 | Telephone Number: | (334)395-5973 Ext 14 |

**Note to Provider of Services:**

- Medicare/Medicaid do not cover any health services provided to an inmate in custody, except in certain circumstances not applicable to this inmate.
- Authorization is diagnosis and procedure specific. Any additional tests, procedures, and inpatient or outpatient services must receive prior authorization to ensure benefit eligibility and payment. (Use above contact name and telephone number)
- Authorization for payment of service is guaranteed only if service is provided during the actual time of confinement to the referring correctional facility.
- HIPAA: Please be advised Prison Health Services, Inc. ("PHS") is not a covered entity under HIPAA's Rule on the Privacy of Individually Identifiable Health Information Standard ("Privacy Rule"). Because PHS does not engage in electronic transactions under HIPAA's Electronic Transactions and Code Set Standards ("Transaction Standards"), HIPAA's Privacy Rule does not apply to PHS.
- Payment will not be processed until we receive a clinical summary.

**For Payment Please Submit Claims To:**

Prison Health Services
Attn: Claims Department
105 West Park Drive, #200
Brentwood, TN 37027-5010

---

**The consulting physician should complete this section.**
**The completed form will be sealed in the attached envelope and**
**returned with an officer to the correctional facility.**

**Clinical Summary or Attached Report**

ENDOSCOPIC ULTRASOUND REVEALED MASS IN HOP
S/P BIOPSEY TIMES SIX. S AHOULD CALL FOR
PATH REPORT IN 1-2 WEEKS 251-625-8183.
F/U WITH DR RODRIGUEZ AS SCHEDULED.
IF THIS IS MALIGNANT, IT IS T3NOMX
STAGE II PANC MALIGNANCY

*** For security and safety, please do not inform patient of possible follow-up appointments. ***

| | | | |
|---|---|---|---|
| Signature of Consulting Physician: | _(signature)_ | 7/12/07 | 1245 |
| | | Date | Time |
| Reviewed and Signed By Medical Director: | _(signature)_ | 7/12/7 | |
| | | Date | Time |

MD Appt 7/19/7

Follow up biopsy results in 5-7 days

06/29/2007

## ATMORE COMMUNITY HOSPITAL
## X-RAY

| SIEBERT, DANIEL | | OP | | 480043 | | Dr. Benjamin |
|---|---|---|---|---|---|---|
| Patient | | Room Number | | Hospital Number | | Attending Physician |
| Patient Age: | 52 | | | | | |
| X-Ray#: | 30427 | | | | | |
| Date: | 06-07-07 | | | | | |

CT OF THE ABDOMEN WITHOUT AND WITH IV CONTRAST
   History: Pancreatic cancer. Jaundice.

The liver shows rather massive dilatation of the biliary system throughout the liver with grossly
enlarged common hepatic and bile ducts. The gallbladder is slightly dense compared to a normal
pattern, and would be consistent with a diffuse pattern of microstones throughout. There is
enlargement of the uncinate process of the pancreas measuring 5 cm in greatest dimension, and two
regions of the 2nd portion of the duodenum give the indication of a mass extending into the
duodenum. ERCP should be able to give the diagnosis, but this is most likely pancreatic
adenocarcinoma, producing a Courvoisier syndrome. There are several small lymph nodes seen in
the mesenteric or periaortic region, but none are pathologically enlarged, all measuring less than 1
cm, but they certainly need to be evaluated if a surgical cure is considered.

IMPRESSION:  Probable carcinoma in the uncinate process of the pancreas involving a portion
the head region with two areas seen bulging into the second portion of the duodenum. There is
massive dilatation of the biliary tree. There is also a prominent gallbladder with increased density
throughout, most likely secondary to numerous tiny stones.

LJA:jlw
D: 06-08-07 10:41
T: 06-08-07 11:38
Date sent to Physician: 06-08-07

LARRY J. ARCEMENT, M.D.

6/8/7
Scheduling ERCP

## ATMORE COMMUNITY HOSPITAL
## X-RAY REPORT

| SIEBERT, DANIEL | OP | 480043 | Dr. Benjamin |
|---|---|---|---|
| Name of Patient | Room Number | Hospital Number | Attending Physician |

**Patient Age:** 52
**X-Ray#:** 30427
**Date:** 06-06-07

ABDOMEN ULTRASOUND
  History: Acute Hepatitis C.

The liver shows evidence of intrahepatic biliary ductal dilatation, so-called "too many tubes" sign. The common bile duct is also grossly distended at 1-cm. The gallbladder shows numerous tiny stones and debris, and the gallbladder is also relatively enlarged. The head of the pancreas might be seen well enough to be able to adequately evaluate, but the possibility of a tumor at the head of the pancreas produces a "Courvoisier" syndrome has to be considered, and a CT scan is recommended.

Larry J. Arcement, M.D.

LJA: ab
D: 06-07-07    09:30
T: 06-07-07    10:11
Date mailed to physician: 06-07-07

# EXHIBIT 2



**PRISON HEALTH SERVICES, INC.**
**SICK CALL REQUEST**

Print Name: _Daniel Siebert_    Date of Request: _5/26/07_
ID # _Z-475_    Date of Birth: _6-17-54_  Location: _H1-27A_
Nature of problem or request: _Extremely sensitive, itchy rashy skin, dark_
_brown urine, fever, nausia – persisting over 6 days, stool_
_is a chalky white color._

_Daniel Siebert_
*Signature*

## DO NOT WRITE BELOW THIS LINE

Date: ___/___/___
Time: _____ AM  PM
Allergies: _____

┌─────────────────────────────┐
│        RECEIVED             │
│ Date: _5/26/7_              │
│ Time: _2130_               │
│ Receiving Nurse Intials _SL_ │
└─────────────────────────────┘

**(S)ubjective:**              X _Danu Subyt_

**(O)bjective**  (V/S):  T: _____   P: _____   R: _____   BP: _____   WT: _____

**(A)ssessment:**

**(P)lan:**

Refer to:   MD/PA   Mental Health   Dental   Daily Treatment       Return to Clinic PRN
CIRCLE ONE
Check One:   ROUTINE ( )     EMERGENCY ( )
If Emergency was PHS supervisor notified:   Yes ( )   No ( )
Was MD/PA on call notified:   Yes ( )   No ( )

_RN Nettles_
*SIGNATURE AND TITLE*

WHITE:    INMATES MEDICAL FILE
YELLOW:  INMATE RETAINS COPY AFTER NURSE INITIALS RECEIPT



**Nursing Evaluation Tool:**     General Sick Call

Facility: Alabama Department of Corrections

Patient Name: __Siebert__                    __Daniel__
                        Last                           First              MI

Inmate Number: __Z-475__         Date of Birth: __6__ , __17__ , __54__
                                                    MM      DD      YYYY

Date of Report: __5__ , __37__ , __07__    Time Seen: __1850__   AM / (PM) Circle One
                   MM     DD    YYYY

_Subjective:_ Chief Complaint(s): About a wk ago I had real bad indigestion & I took
             Onset: some antacid and I had a allergic reaction to it. I g
Brief History: nauseated and my urine is dark yellow and my stoc
(Continue on back if necessary) is chalky white c̄ a yellow tone to it. I've also been
aching all over my body. Everything taste & smell the
same.

                                              ☐ Check Here if additional notes on back

_Objective:_ Vital Signs: (As Indicated) T: 98.2 P: 109 RR: 20 B/P: 137 / 103 wt 30
Examination Findings: Noted red dot like to legs, back, chest. Skin w̄ d D dk u
(Continue on back if necessary) c̄ a slighty yellow tint to it. Eyes PERRL. Resp. even/unlabort
Abd (+) bowel sound in q 4 quads. Noted tenderness in
LLQ + LUQ and slight tenderness in RUQ + RLQ. Dark
amber urine collected @ this time.

                                              ☐ Check Here if additional notes on back

_Assessment:_ (Referral Status)    Preliminary Determination(s): Alt in Health
   ☐ Referral **NOT REQUIRED**

   ☐ Referral **REQUIRED** due to the following: (Check all that apply)
      ☐ Recurrent Complaint (More than 2 visits for the same complaint)
      ☒ Other: See below & see orders

Comment: You should contact a physician and/or a nursing supervisor if you have any concerns about the status of the patient or are unsure of
the appropriate care to be given.

_Plan:_  Check All That Apply:
      ☒ Instructions to return if condition worsens.
      ☒ Education: The patient demonstrates an understanding of the nature of their medical condition and instructions regarding what they
         should do as well as appropriate follow-up. ☒ YES  ☐ NO (If NO then schedule patient for appropriate follow-up visits)
      ☐ Other: Profile #2 & Hepatitis Profile A B C   ↑ fluids, Remain in sep. cell.
         (Describe)
      OTC Medications given ☐ NO  ☐ YES (If Yes List): Maalox 30cc PO BID x 6 wks, Tylenol 1000 mg

      Referral: ☐ NO  ☐ YES (If Yes, Whom/Where): _____  Date for referral: __ / __ / __
                                                                                MM   DD
      Referral Type: ☐ Routine ☐ Urgent ☒ Emergent (if emergent who was contacted?): Dr. Barnes   Time 1918

x _R Nettles_                    Name: R Nettles LPN
   Nurses Signature                        Printed